Filed 7/30/25

*See dissenting opinion*

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| DANIEL PATZ et al., | |
| Plaintiffs and Appellants, | E083543 |
| v. | (Super.Ct.No. 37-2015-23413-CU-MC-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of San Diego County. Eddie C. Sturgeon, Judge. Affirmed with directions.

Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney, Meghan Ashley Wharton, Tyler L. Krentz and Chance C. Hawkins, Deputy City Attorneys, for Defendant and Appellant.

Frank G. Wells Environmental Law Clinic, Heather Dadashi and Cara Horowitz for California Coastkeeper Alliance and Los Angeles Waterkeeper as Amici Curiae on behalf of Defendant and Appellant.

1

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Vernetra L. Gavin for Amici Association of California Water Agencies, California State Association of Counties, and League of California Cities as Amici Curiae on behalf of Defendant and Appellant.

Gibbs Law Group, Eric H. Gibbs, Andre M. Mura, Steven M. Tindall; Berding & Weil, Daniel L. Rottinghaus, Howard J. Silldorf, Ann L. Rauch and Theresa M. Filicia, Carlotta A. Kirby for Plaintiffs and Appellants.

Ross, Wolcott, Teinert & Prout, William C. O'Neill; Ciresi Conlin, Katie Crosby Lehmann, Kyle W. Wislocky and Patrick A. Cochran for Mesa Water District as Amicus Curiae on behalf of Plaintiffs and Appellants.

## I.  INTRODUCTION

In 1996, voters enacted Proposition 218, adding article XIII D to the California Constitution.  (Cal. Const., art. XIII D.)  Under section 6, subdivision (b)(3) (§ 6(b)(3)) of article XIII D,[1] a governmental fee or charge imposed on a parcel of property or as an incident of property ownership, "shall not exceed the proportional cost of the service attributable to the parcel."  In any legal action challenging the validity of the fee or charge, the government has the burden of showing it complies with the article. (§ 6(b)(5).)

---

[1] Undesignated article and section references are to article XIII D of the California Constitution.  We refer to subdivisions of section 6 in shorthand, e.g., § 6(b)(3).

Plaintiffs Daniel Patz and Joan Mann Chesner are the representative members of plaintiffs, a certified class of " '[a]ll single-family residential [(SFR)] customers of the City of San Diego [(herein, City)] who received water service after August 14, 2014.' " In their operative complaint, plaintiffs claim City's tiered water rates for SFR customers, which increase with higher levels of consumption, violate section 6(b)(3) because they exceed City's proportionate cost of delivering water to SFR customers at the usage levels in the higher tiers. City charges nonSFR customers uniform (nontiered) rates for their water usage.

Following a bifurcated trial on City's liability (Phase I), the trial court ruled City failed to show that its tiered rates for SFR customers complied with section 6(b)(3). In the later trial on damages (Phase II), the court awarded Class a refund of $79,541,880—the amount all Class members (SFR customers) overpaid for water services from August 14, 2014 through March 31, 2022, increasing by $643,750 each per month thereafter, "until the City imposes water rates consistent with" section 6(b)(3). Both City and Class appeal from the judgment.

City claims the trial court applied incorrect standards of proof and disregarded undisputed evidence that City's tiered SFR rates comply with section 6(b)(3). City also claims the trial court abused its discretion in certifying plaintiffs' action as a class action. In its appeal, Class claims the trial court erroneously awarded City an unpled and unproven offset of $27,583,091, against what should have been a refund award of $107,124,971, not $79,541,880. Class also claims it is entitled to attorney fees on appeal. We affirm the judgment with directions.

## II. FACTS AND PROCEDURE

A. *City's Water System, Customer Classes, and Water Rates*

City owns and operates a water utility system, which, as of 2015, provided potable water to a population of over 1.4 million, through approximately 280,000 residential, commercial, industrial, and wholesale customer accounts. The water system is self-supporting, and its revenues and expenditures are segregated from other City operations. City obtains water from two primary sources: (1) local groundwater and reservoir sources, and (2) the San Diego County Water Authority. These sources are comingled in City's reservoirs before being delivered to customers. In a normal year, City's local water supply meets 10 to 15 percent of City's aggregate customer demand.

City designs, builds, and maintains its water system at a size sufficient to meet "peak demand," the highest level of demand that could be placed on the system at a given time by all of City's customers. For billing purposes, City divides its customers into five "classes": (1) Single-Family Residential (SFR); (2) Other Domestics or Multi-Family Residential (MFR); (3) Commercial/Industrial; (4) Temporary Construction; and (5) Irrigation.

City's potable water charges have two parts: a fixed monthly charge and a commodity charge. As City explains, "The monthly service charge is an amount based on water meter size and is designed to recover fixed costs. Fixed costs do not vary with the volume of water used by a customer, and include meter reading, customer billing, and debt service. The commodity charge is an amount based on units of consumption measured by the number of hundred cubic feet (HCF) of water consumed during the

4

billing cycle. Included in the commodity charge are the costs associated with water purchases and system capacity, including components such as maintaining and operating the reservoirs, pump stations, and transmission and distribution lines. The commodity charge differs by customer class."

For SFR customers, the commodity charge "contains a tier structure that charges a different commodity charge for different tiers of water consumption." That is, SFR customers are charged higher rates for each HCF of water they consume, as their consumption increases above specified HCF levels or tier "breakpoints."

Effective January 1, 2014, SRF customers were charged the followed tiered rates: Tier 1, zero to four HCF ($3.64); Tier 2, five to 12 HCF ($4.08); Tier 3, 13 to 18 HCF ($5.82); Tier 4, 19 HCF and over ($8.19). The Tier 4 rate is exactly 2.25 times the Tier 1 rate ($3.64 x 2.25=$8.19). The other customers classes were charged a uniform rate for each HCF of water consumed: MFR ($4.34); Commercial & Industrial ($4.17); Temporary Construction ($4.62); and Irrigation ($4.62).

Thus, in 2014, an SFR customer who used 19 HCF during a month was charged $3.64 for the first 4 HCF, $4.08 for the next 8 HCF, $5.82 for the next 6 HCF, and $8.19 for the 19th HCF, for a total commodity charge of $90.31. In contrast, an irrigation customer who used 19 HCF was charged $4.62 for each HCF, for a total commodity charge of $87.78.[2]

---

[2] Before 2014, City had "a single commodity rate for all nonSFR customer classes" and a "three-block increasing rate structure" for SFR customers.

Effective January 1, 2016, City imposed new tiered rates for SFR customers:  Tier 1, $4.24; Tier 2, $4.75; Tier 3, $6.23; and Tier 4, $8.77.  City retained uniform rates for all other customer classes.

B.  *City's Ratemaking Processes*

1.  City's 2013 and 2015 Cost of Service Studies and Rate Designs

Every two to five years, City retains a consultant to prepare a COSS, including a financial plan, cost of service analysis, rate structure design, and rate recommendations for City's water system.  In setting the rates that went into effect in 2014 and 2016, City retained the consulting firm Black & Veatch (B&V).  B&V prepared a "2013 COSS" for the 2014 rates and an updated "2015 COSS" for the 2016 rates.  These cost-of-service studies show how City, in setting the rates, allocated the costs of providing water to the five customer classes.

City's expert, Ann Bui, led B&V's preparation of the 2013 COSS and 2015 COSS for City, as Managing Director of the Water Advisory and Planning Business in B&V's Management Consulting Division.  Bui also wrote opening and rebuttal expert reports for City for the Phase I trial.  Much of our discussion of City's 2013 and 2015 ratemaking processes is taken from the 2013 and 2015 COSSs, Bui's reports, and Bui's deposition testimony.

In her opening report, Bui explained that the American Water Works Association (AWWA), "the industry organization tasked with providing guidance on the operation and management of water utilities," publishes a manual on water rates called *Principles of Water Rates, Fees and Charges M1* (the M1 Manual).  In preparing the 2013 and 2015

6

COSSs, B&V used the "three-part rate setting framework" described in the M1 Manual. That is, B&V calculated City's total revenue requirement for a given year (part one), conducted a "cost of service analysis" (apportioned costs to the customer classes) (part two), and designed rate structures for each customer class (part three).

The total revenue requirement (part one) "is the total receipts" City "must recover from its rates to pay all operating and capital expenses during a given year." City's total revenue requirement was $407,452,200 for the 2014 fiscal year. In conducting the cost of service analysis for the 2013 COSS and 2015 COSS (part two), B&V allocated City's total revenue requirement (costs) to City's five customer classes using the "base-extra capacity method" outlined in the M1 Manual. In part three, rate design, City directed B&V to continue City's tiered rate structure for SFR customers, and uniform, flat rates for the other customer classes.

In the following subsections, we describe the data and methodology underlying B&V's use of the "base-extra capacity [allocation] method" and " 'peaking factors' " in calculating City's 2014 and 2016 rates, and City's decision to continue using tiered rates for SFR customers, and uniform rates for other customers. City claims its tiered rates do not violate section 6(b)(3) because the base-extra capacity method, with peaking factors, " 'calculate[d] the actual costs of service' " for the SFR tiers and other customer classes.

2. The Base-Extra Capacity Cost Allocation Method and Peaking Factors

The base-extra capacity method allocates the total revenue requirement (i.e., the total cost of service) to the customer classes based on the types and amounts of costs each customer class places on the water system. City explains: "The base-extra capacity

7

method focuses on average and above-average demand, as they relate to the size of the system's operations and facilities used to meet that demand. Average demand is the demand on the system when every customer uses water at the same rate every hour of every day of the year. Above-average demand is demand on the system when customers use above the amount established as average demand. A customer's water use may be below-average, average, or above-average when measured [in] each billing cycle. A customer with above-average demand uses water at an above-average rate during the billing cycle, which places above-average demand on the system. Further, each customer class demonstrates recognized patterns of average and above-average demand."

In applying the base-extra capacity method, B&V first allocated City's total revenue requirement to "functional costs components," that is, to costs associated with an identifiable activity. For example, the activity "source of supply" could include costs associated with reservoir management, water quality testing, water level maintenance, and handling water inflow and outflow. These functional cost categories were then divided into (1) operation and maintenance costs, and (2) capital asset costs, before they were allocated to four "basic functional cost components: base, extra-capacity, customer and fire protection."

Bui explained: "Base costs include the purchase of water, regulatory fees, debt service costs, water treatment, energy, administration, and operating and maintenance costs of the water system that are associated with the amount of water produced and a portion of capacity that meets average day demand." "Extra-capacity costs represent those operating costs incurred to meet demands that exceed average day demand and

8

capital related costs for additional . . . capacity beyond that required for the average rate of use.  These costs reflect the peak demands imposed on the system by the different customer classes.  They are identified as maximum day and maximum hour demands.

"Maximum Day Demand (Max Day) is the demand put on the water system to have the capacity [to] deliver the largest volume of water in a single day within a given year.  [¶]  Maximum hour demand (Max Hour) is the demand put on the water system to have the capacity to deliver the largest volume of water in a single hour within a given year."  Customer costs are costs associated with serving customers regardless of their water consumption, and include billing, customer service, accounting, collections, meter reading, and maintenance.  Fire protection costs are associated with public fire protection and include (1) hydrant testing and maintenance, and (2) designing and operating the system to meet fire flow demands.

After B&V allocated City's functional cost components to Base-Extra Capacity, Customer, and Fire Protection, B&V allocated the portion allocated to Base-Extra Capacity to Base, Max Day, and Max Hour, "based on the nature of the cost function." B&V also applied "demand factors" or "peaking factors" in allocating Extra Capacity costs to Base, Max Day, and Max Hour costs.[3]

---

[3]  City explains:  " 'Base,' 'Max Day,' and 'Max Hour' are terms of art in the water utility industry that refer to how large a water system must be designed, built, and operated to meet maximum possible demand and guarantee uninterrupted service. Importantly, Max Hour and Max Day **_do not_** refer to a specific day or hour in a billing cycle when total usage is above average."  "The base-extra capacity method recognizes that above-average demand on a system causes the system to incur significantly more costs, including capital and operating expenses, than would be incurred if the system

*[footnote continued on next page]*

As noted, the Base "cost bucket" includes, among other things, the operations and maintenance (O&M) and capital costs associated with the portion of the system's facilities used to meet average demand. City explains: the "Max Day cost bucket includes costs—*above Base Costs*—to build and operate the system sized at Max Day Size—1.5 times larger than the system would be to meet average demand. The Max Hour cost bucket includes costs—*above Base and Max Day costs*—to build and operate the system size at Max Hour Size—2.25 times larger than the system would be to meet average demand."

B&V used "1.5 Max Day" and "2.25 Max Hour" peaking factors to calculate the portion of each functional cost category allocated to City's Base, Max Day and Max Hour cost buckets. Bui explained that the 1.5 Max Day factor is the sizing factor set forth in City's Water Master Plan and is based on "historic operating data." The 2.25 Max Hour demand factor "is a multiplier of the Max Day factor that is used by [City] engineers for system sizing when planning to meet maximum possible demand." These ratios are within the ranges typically experienced by other water utilities nationwide. For 2014, B&V allocated the O&M and Capital cost categories (i.e., City's total revenue requirement of $407,452,200) to Base, Max Day, Max Hour Meters, Billing, and Fire

___

were built and operated at the size sufficient to only meet average demand. The base-extra capacity method separates the incremental extra costs to upsize the system from average use size (Base) to the maximum required size by allocating these incremental extra costs to the Max Day and Max Hour cost buckets. Where appropriate, this separation allows the system to recover a larger portion of the incremental costs to upsize the system to meet above-average demand from customers when they place above-average demand on the system."

Protection "cost buckets," as follows: Base $242,610,200; Max Day $38,680,800; Max Hour $32,978,500; Billing $31,678,300; and Fire Protection $5,072,600."

Next, B&V used the "units of service approach" to allocate a portion of each cost bucket to the five customer classes, "in proportion to each class's respective service requirements." For example, billing and accounting costs were allocated to the classes based on the number of bills in each class. B&V also used "annual usage data" for each customer class "to set the average daily usage" for each customer class as a whole.

B&V then calculated each class's units of service for the Max Day and Max Hour cost buckets, using "unique customer class peaking factors," rather than the 1.5 and 2.25 peaking factors used to "size the system." City calculated the class peaking factors based on its historic billing data. The irrigation and temporary construction classes have "the highest class peaking factors" because the billing data showed these classes have the "most peaking behavior."

City then calculated "the unit costs for each cost bucket" by dividing the total costs in each cost bucket by the corresponding units for that bucket, and apportioning each cost bucket's total revenue allocation to the customer classes. Last, B&V calculated the revenue requirement for each customer class, by cost bucket, by multiplying the units of service for each cost bucket for each customer class by the unit cost for each cost bucket. Under this calculation, the SFR total revenue requirement for 2014 was $169,157,700.

### 3.  The 2014 and 2016 Rate Designs

#### (a)  *City's Tiered and Uniform Rates*

For all customer classes, the commodity charge is based on the number of HCF the customer uses, and is designed "to recover costs associated with" the Base, Max Hour, and Max Day cost buckets (i.e., average and above-average use) for the entire customer class.  In designing City's 2014 and 2016 rates, City instructed B&V to continue using a tiered rate structure for the SFR customer class and uniform, flat rates for the other  customer classes.

City explains it chose uniform rates for the nonSFR customer classes because nonSFR customers "vary greatly in both size and the nature of their operations," while the SFR customer class is "relatively homogenous."  City posits that no SFR unit is "exponentially" larger or smaller than any other SFR unit; thus, usage among SFR units does not vary greatly, even though SFR units have varying numbers of residents, lot sizes, and landscaping (e.g. drought resistant plants, swimming pools).  Consumption data (billing records) for City's SFR customer class showed that an SFR unit used an average of 12 HCF per month.  Thus, City argues, "[u]sage above [12 HCF] in a billing cycle represented above-average usage for an SFR customer" and "contributed to the City's need to upsize the system to meet above-average demand."

In contrast, City claims "there was no reasonable way for B&V to document one single average monthly HCF usage amount" for the nonSFR customer classes due to the varying sizes and operations of nonSFR customers.  Bui explained:  "If an inclining block rate structure is used, small customers in these customer classes (corner store, 10-unit

12

apartment complex, one-acre irrigated lot) would likely remain in the bottom block paying at the lowest rate, while large customers that use more water simply because they are larger operations (Walmart, 200-unit apartment complex, an irrigated golf course) would pay for most of their water at the highest tiered rate. This would be inequitable because the larger sized customers would always pay rates in the highest tiers even when they use water efficiently for their size. Therefore, inclining block tiered rate structures are not used for nonSFR customer classes."

Regarding peak usages, the 2013 COSS postulated that "residential customers place a higher peak demand on the water system than nonresidential customers" because SFR customers "typically would have high water use in the morning due to shower and other morning chores," and "high usage in the evening when residents are usually back home . . . ." In contrast, "commercial customers have steady [usage] during business hours and very low demand during nonbusiness hours," while industrial customers usually have low peaking factors due to their "very stable pattern of water usage" throughout the day. As noted, City's data also showed that City's irrigation and temporary construction classes had the "highest class peaking factors" because the billing data showed they had the "most peaking behavior."

(b) *The Tier Breakpoints*

The 2013 COSS states that B&V's proposed tiered rates for City's SFR customers, "reflect general usage patterns of San Diego's single-family residential customers, as well as rate setting industry standards and AWWA household usage survey data." This "AWWA survey data indicate[d] that typical indoor residential water consumption is

roughly 50 to 60 gallons per person per day," and "[d]epending on typical residential family sizes of two to three persons per household, approximate monthly residential water use can range from 3,000 gallons per month to over 5,000 gallons per month (or 4 HCF to 7 HCF per month)." The 2013 COSS notes that the lower, Tier 1 "range would serve to recognize water efficiency within [the SFR] customer class."

The 2013 COSS set Tier 2 at seven to 12 HCF because 12 HCF was the average amount a typical SFR unit used in a month. In her opening report, Bui explained that 12 HCF "would provide a single-family residential household with average indoor usage with enough water for outdoor irrigation to maintain an average-sized green lawn." The 2013 COSS set Tier 3 at 12 to 18 HCF, explaining that this level of usage "represents an outdoor irrigation or landscape allowance," and usage beyond 18 HCF "would represent high use for this class." City set the Tier 4 breakpoint at 19 HCF effective January 1, 2014, rather than B&V's recommended 18 HCF.

After establishing the tier breakpoints, B&V used City's billing data "to project the volume of consumption by tier" and used these amounts "in the final rate calculation for each tier." B&V calculated that less than 17 percent of water usage by SFR customers as a whole fell into the proposed Tiers 3 and 4; over 45 percent of usage was in Tier 2; and over 38 percent was in Tier 1.

Next, B&V allocated the Base, Max Day, and Max Hour cost buckets for the SFR customer class to the four tiers. Specifically, Max Hour costs were allocated 30 percent to Tier 3 and 70 percent to Tier 4; no portion of Max Hour costs were allocated to Tiers 1 or 2. Max Day costs were allocated 15 percent to Tier 1, 45 percent to Tier 2, 30 percent

14

to Tier 3, and 10 percent to Tier 4.  Base Costs were allocated 40 percent to Tier 1, 50 percent to Tier 2, 10 percent to Tier 3, and 0.00 percent to Tier 4.  City claims the total Base, Max Hour, and Max Day costs allocated to each tier represent "the total cost to provide water service at the consumption levels represented by each tier."

Last, B&V calculated the rate for each tier.  At this stage, B&V adjusted the Base, Max Hour, and Max Day costs allocated to each tier based on several factors.  For example, water usage in Tier 1 was priced "at the lowest rate" because usage at that level "represent[ed] the City's least expensive source of water—local supply."  B&V followed the same cost allocation methods in the 2015 COSS.  Additional details concerning City's water rates are discussed below in connection with our analysis of City's claims on appeal.

C. *Procedural History*

This action was originally filed in July 2015 as part of the class action complaint in *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, review denied October 24, 2024, S286596 (*Coziahr*).  The action by the plaintiff Mark Coziahr against Otay Water District (Otay) was later severed from this action by plaintiffs Patz and Chesner against City.  (*Coziahr,* at p. 792 & fn. 3.)  In April 2019, Patz and Chesner filed their operative fifth amended complaint, alleging City's tiered water rates violate section 6(b)(3) and seeking a writ of mandate, declaratory and injunctive relief, and damages, including a refund award.  In June 2019, the trial court certified plaintiffs' suit as a class action by "[a]ll single-family residential customers of the City of San Diego who received water service after August 21, 2014."

15

Trial proceeded in two phases: Phase I on liability; Phase II on remedies. In Phase I, the parties submitted extensive pretrial briefing and relied on expert witness testimony, reports, and other evidence. Class's expert was Rodney T. Smith. As noted, City's expert was Ann Bui. On June 21, 2021, the parties presented their Phase I oral argument.

On September 13, 2021, the trial court issued its Phase I statement of decision, ruling City's tiered water rates for SFR customers did not comply with section 6(b)(3). The court concluded the tiered rates had similar defects to the rate structures in *Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493 (*Capistrano*) and *City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926 (*Palmdale*). At the Phase II trial on remedies, the parties agreed, assuming City's liability, that Class was entitled to a refund but disputed whether City was entitled to a credit or offset.

On March 30, 2022, the court entered judgment in favor of Class, finding City "failed to demonstrate by substantial evidence that the tiered water rates imposed on . . . Class by the City's 2013 and 2015 ratemakings did not exceed the City's proportional cost of providing water service to each class member's parcel, as required by Proposition 218." The judgment orders City "to impose new water rates consistent with the requirements" of article XIII D "by the later of (a) January 1, 2023, or (b) not more than 9 months after the City fully exhausts its right to appeal the judgment." The judgment awards Class a refund of $79,541,880 for August 14, 2014 through March 31, 2022, plus

16

$643,750 for each month thereafter, "until the City imposes water rates consistent with" section 6(b)(3).

Both Class and City appealed. Two groups have filed amicus curiae briefs supporting City's appeal: (1) California Water Agencies, California State Association of Counties, and League of California Cities ("Municipal Amici"), and (2) California Coastkeeper Alliance and Los Angeles Waterkeeper ("Water Alliance Amici"). Mesa Water District has filed an amicus curiae brief supporting Class's opposition to City's appeal. The parties have filed answering briefs.[4]

In March 2024, the parties' appeals were transferred from Division One of this court to this division, Division Two. On July 15, 2024, Division One issued its decision in *Coziahr*. *Coziahr* addressed many of the issues raised in this case, including (1) whether the agency's standard of proof in section 6(b)(3) litigation is "reasonableness," and, more generally, (2) why Otay did not meet its burden of showing that *its* tiered rates for SFR customers—which were based on data and methods similar to

---

[4] In granting Mesa leave to file its amicus brief, we deferred considering to this appeal City's evidentiary objections to a declaration, other materials, and related content in Mesa's brief. City objects that the declaration and materials are not part of the trial or appellate record, lack foundation, were not subjected to adversarial processes, and do not qualify for judicial notice. Although we decline to strike the declaration, materials, and related content in Mesa's brief, we have not considered them in our decision. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 405, fn. 14 [Courts are not inclined to strike the contents of amicus curiae briefs but may disregard untested or irrelevant material.]; *People v. Davis* (2022) 75 Cal.App.5th 694, 725 [" ' "Amicus curiae must accept the issues made and propositions urged by the appealing parties," ' " and " ' "any additional questions presented in a brief filed by an amicus curie will not be considered." ' "].) Nonetheless, Mesa's brief assists this court "by broadening its perspective on the issues raised by the parties." (*Bily*, at p. 405, fn. 14.)

those used here—complied with section 6(b)(3).  (*Coziahr, supra,* 103 Cal.App.5th at pp. 800-819.)  The trial judge in this case, Eddie C. Sturgeon, was the trial judge in *Coziahr* .  (*Coziahr*, at p. 785.)

In September 2024, the Governor signed Assembly Bill No. 1827 (2023-2024 Reg. Sess.) and Senate Bill No. 1072 (2023-2024 Reg. Sess.), adding sections 53750.6 and 53758.5 to the Government Code, effective January 1, 2025.  In October 2024, after our Supreme Court denied review in *Coziahr* (2024 Cal.Lexis 5879, S286596), we granted City's motion for leave to file, and City filed, a supplemental brief addressing the relevance of *Coziahr* and Government Code sections 53750.6 and 53758.5 to the parties' appeals.  In November 2024, Class filed a response.[5]

## III.  CITY'S APPEAL

City claims the trial court held City to an incorrect substantive burden or standard of proof in showing that its tiered rates satisfy section 6(b)(3).  City claims an agency's

---

[5] Concurrent with its response to City's supplemental brief, Class filed a motion asking this court to take judicial notice of City's October 14, 2024 letter to the California Supreme Court in support of Otay's petition for review in *Coziahr, supra,* 103 Cal.App.5th 758, review denied October 23, 2024, S286596.  City does not oppose the request, and we grant it.  (Evid. Code, §§ 452, subd. (d), 459; *Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325 [appellate court may take judicial notice of matters not before the trial court]; *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 418 [party requesting judicial notice must show the matter is "both relevant to and helpful toward resolving the matters" before the court].)  Class argues City's letter "directly contradicts" City's argument in its supplemental brief that *Coziahr* " 'has little relevance to this case' " because, in the letter, City argues "the legal standards and rulings applied" in *Coziahr* and *Patz* are similar.  Although the letter is of marginal relevance because it echoes the arguments City makes in its supplemental brief, the letter is helpful to our understanding City's arguments, and thus, to resolving the issues on appeal.  We therefore judicially notice the letter but not the truth of its factual assertions.  (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 193-194.)

burden of proof under section 6(b)(3) is to show that its rates reasonably reflect its costs of service, and here, *undisputed* evidence shows City's tiered rates do not exceed its costs of providing water at the tiered levels of usage.

Before we address City's claims, we provide further background on Proposition 218, and the two seminal water rate cases the trial court relied on in its Phase I statement of decision, *Palmdale* and *Capistrano*. We then summarize the trial court's Phase I statement of decision, and the subsequent decision in *Coziahr*.

A. *Additional Background*

1. Proposition 218, Relevant Provisions

Approved by voters in 1996, Proposition 218 is one of a series of voter initiatives restricting the ability of the state and local governments to impose taxes and fees. (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 380 (*Plantier*).) The first of these measures was Proposition 13, approved by voters in 1978, which limited ad valorem property taxes to 1 percent of a property's assessed valuation, and limited annual increases in valuation to 2 percent without a change in ownership. (*Ibid*; *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258-259; art. XIII A, §§ 1, 2.) In the years following Proposition 13, local government agencies were able to circumvent Proposition 13's limitations by labeling a levy a " 'special assessment,' " rather than " 'special tax.' " (*Plantier,* at p. 381; see *Jacks*, at p. 258; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 839.) To address these and related concerns, voters approved Proposition 218, which added articles XIII C and XIII D to the California Constitution in 1996. (*Plantier,* at p. 381.)

"Article XIII C concerns voter approval for many types of local taxes other than property taxes," while article XIII D "imposes distinct procedural and substantive limitations" on property-related assessments, fees, and charges. (*Plantier*, *supra*, 7 Cal.5th at p. 381.) We are concerned with section 6 of article XIII D, which imposes procedural and substantive limitations on property-related fees and charges, as opposed to section 4 of the article, which governs assessments. (*Ibid.*)

Section 6(a) sets forth the procedures an agency must follow before "imposing" a property-related fee or charge. (*Plantier, supra,* 7 Cal.5th at p. 381.) The agency must hold a public hearing and send written notice of the hearing to the owner of each affected parcel, specifying the amount of the proposed fee or charge, the basis of its calculation, the reason for it, and the date, time, and location of the hearing. (§ 6(a)(1); *Plantier,* at p. 381.) At the hearing, the agency "shall consider all protests," and "shall not impose the fee or charge" if a majority of the property owners present written protests. (§ 6(a)(2); *Plantier*, at p. 381.)

Section 6(b) sets forth substantive limitations on property-related fees and charges. At issue here is "the substantive proportionality requirement" of section 6(b)(3), which provides: The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership " '*shall not exceed the proportional cost of the service attributable to the parcel*.' " (*Plantier, supra,* 7 Cal.5th at p. 382.) Section 6(b)(3) "concerns the *method* used to allocate a property-related service's aggregate cost among fee payors" and " 'ensures that the aggregate fee collected on all parcels is . . . in proportion to the cost of service for each parcel.' " (*Id.* at pp. 381-382.) These costs of

20

service "include[e] all the required costs of providing service, short-term and long-term, including operation, maintenance, financial, and capital expenditures." (*Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637, 648.) In a legal action challenging the validity of a fee or charge under article XIII D, section 6(b)(5) places the burden of proof on the agency to show that the fee or charge complies with the article.

The other substantive limitations are as follows: (1) "revenues from fee 'shall not exceed the funds required to provide the . . . service,' " (2) the revenues " 'shall not be used for any purpose other than that for which the fee . . . was imposed,' " (3) the fee or charge " 'may be imposed' unless the 'service is actually used by, or [is] immediately available to' " the property owner, and (4) the fee or charge may not be " 'imposed for general governmental services,' " where the " 'service is available to the public at large in substantially the same manner' as property owners." (*Coziahr, supra,* 103 Cal.App.5th at p. 795, fn. 6.)

    2. *Palmdale* and *Capistrano*

      (a) *Palmdale*

In *Palmdale*, the City of Palmdale sued the Palmdale Water District (PWD), claiming the PWD's water rates violated section 6(b)(3) in several respects. (*Palmdale, supra*, 198 Cal.App.4th at p. 926.) The PWD served a population of 145,000 with 26,000 service connections, and its customers used water in the following percentages: single family residential SFR (72 percent); commercial/industrial (10 percent); multi-family residential (MFR) (9 percent); irrigation (5 percent), and construction and other customers, including schools and municipalities (4 percent). (*Id*. at p. 928.)

21

Based on a rate study, the PWD adopted a rate structure designed to recover 75 percent of the PWD's costs of providing water service from a fixed monthly service charge and to recover the other 25 percent from a "per unit commodity charge" based on the volume of water used. (*Palmdale, supra*, 198 Cal.App.4th at pp. 928-930.) The amount of the commodity charge depended upon the customer's adherence to the PWD's "allocated water budget" for a member of the customer's class. (*Id*. at p. 930.) All customers paid "tier 1" rates at the same price for up to 100 percent of the customer's budget allocation. (*Ibid*.) Thereafter, the commodity charges increased, at varying amounts, depending on the customer class. (*Palmdale,* at pp. 929, 937.) Irrigation customers were charged higher per unit rates, beginning at 130 percent of their budget allocation, while SFR and MFR customers were not charged the higher rates until their usages exceeded 175 percent of their budget allocations, and commercial customers were charged the higher rates after they exceeded 190 percent of their budget. (*Ibid*.)

In the litigation, the PWD did not attempt to show that the disparities in rates between the customer classes, at the levels of usages stated, were attributable to "*a corresponding disparity in the cost of providing water to these customers at such levels*." (*Palmdale, supra,* 198 Cal.App.4th at p. at p. 937, italics added.) *Palmdale* noted that the PWD's irrigation customers were designated " 'irrigation only' users," but the PWD did not "segregate the recognized outdoor and irrigation usage of its other customers such as residential or commercial users." (*Ibid*.) As a result, residential (SFR and MFR) and commercial users "(constrained only by [their] historical three-year average usage) could waste or inefficiently use water . . . without the same proportional cost because of the

22

significant disparity in tiered rates for water use in excess of the customer's allotted water budget." (*Ibid.*) Under this rate structure, an "irrigation-only" user was paying higher rates for "maintaining playing fields, playgrounds, and parks, for example . . . without a corresponding showing" that the higher rates were based on higher costs. (*Ibid.*)

Thus, *Palmdale* held the PWD did not meet its burden of showing that its rates complied with section 6(b)(3). (*Palmdale, supra,* 198 Cal.App.4th at pp. 936-937.) *Palmdale* also rejected the PWD's claim that article X, section 2, which prohibits " 'the waste or unreasonable use' " of water, excused the PWD's failure to comply with section 6(b)(3). Article X, section 2, "is not at odds with article XIII D so long as, for example, conservation is attained in a manner that 'shall not exceed the proportional cost of the service attributable to the parcel.' " (*Id.* at pp. 936-937.)

(b) *Capistrano*

In *Capistrano*, the City of San Juan Capistrano, like City here, served as its own municipal water district, and was referred to in the case as " 'City Water.' " (*Capistrano, supra,* 235 Cal.App.4th at p. 1498.) City Water adopted a rate structure, recommended by B&V and Ann Bui, City's consultant and expert in this case, based on "a pattern generally recommended" in the M-1 manual. (*Ibid.*) City Water first identified its customer classes (e.g., residential, construction, agricultural); then, for each class, City Water calculated four usage budgets: low, reasonable, excessive, and very excessive. (*Ibid.*) The four usage budgets were based on "historical data for usage patterns" and served as the "basis for four distinct 'tiers' of pricing." (*Id.* at p. 1499.)

For residential customers, tier 1, the low budget, was assumed to be for indoor usage only; tier 2, the reasonable budget, included "an outdoor allocation based on 'typical landscapes' "; and tiers 3 and 4 were for excessive and very excessive usages of water. (*Capistrano, supra,* 235 Cal.App.4th at p. 1499.) The tiered rates were designed to make the rate structure revenue neutral; that is, to ensure that total revenues would not exceed the total costs of providing water service to all customers. (*Ibid.;* § 6(b)(1).)

*Capistrano* held City Water did not meet its burden of showing that its tiered rates for SFR customers satisfied section 6(b)(3) because City Water "did not try to calculate the cost of actually providing water at its various tier levels. It merely allocated all its costs among the price tier levels, *based not on costs*, *but on predetermined usage budgets.*" (*Capistrano, supra,* 235 Cal.App.4th at pp. 1498-1499, 1516-1517; § 6(b)(3), italics added.)

*Capistrano* observed that, when water customers are charged based on their levels of usage, section 6(b)(3) "requires public water agencies to calculate the actual costs of providing water at [these] various levels of usage." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1497; *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 221.) That is, Proposition 218 requires water agencies to "figure out the true cost of water, not simply draw lines based on water budgets." (*Capistrano*, at p. 1511.) *Capistrano* also recognized that section 6(b)(3) allows agencies to "pas[s] on the true, marginal cost of water to those consumers whose extra use of water forces water agencies to incur higher costs to supply that extra water." (*Capistrano*, at p. 1516.) But the "fractional precision" between the four tiers in *Capistrano*—the difference between tier 1 and tier 2 was "a tidy

24

one-third extra"—indicated that *the tiers were not based on the costs* of providing water service at the usage levels represented in the tiers. (*Id*. at p. 1504.)

Like *Palmdale*, *Capistrano* also rejected City Water's argument that "the 'cost-of-service principle of Proposition 218' must be 'balanc[ed]' against 'the conservation mandate of article X, section 2.' " (*Capistrano, supra,* 235 Cal.App.4th at pp. 1508, 1510 ["[N]othing in article X, section 2, requires water rates to exceed the true cost of supplying that water, and in fact pricing water at its true cost is compatible with the article's theme of conservation with a view toward reasonable and beneficial use."].)

3. The Trial Court's Phase I Statement of Decision

In its Phase I statement of decision, the trial court concluded based on its "independent review" of the record that City's tiered rates for SFR customers suffered from "the same constitutional flaws identified" in *Palmdale* and *Capistrano*. The court noted *Capistrano* "held that water rates that do not correlate with the actual cost of providing water at those tiered levels violate Proposition 218," and *Palmdale* held that, "water districts cannot discriminate against certain classes of customers by charging them less, and others more, when the inequality cannot be justified by the cost of providing water to those classes."

Regarding City's burden of proof, the court said City had the burden of proving "by substantial evidence that withstood the trial court's independent review, that City charged SFR customers "the actual cost of providing water at those tiered levels for a given parcel." (*Capistrano, supra,* 235 Cal.App.4th at p. 1507 ["[I]t is not enough that the agency have substantial evidence to support its action. That substantial evidence

25

must itself be able to withstand independent review."]; see § 6(b)(5).)  The court found City did not meet this "demanding standard for the straightforward reason that it never did the work necessary to base its pricing methodology on actual customer data.  Indeed, the City's expert [(Bui)] (the same consultant as in *Capistrano*) admits that the City never did that work because it would have cost the City more money.  It's apparently far more cost effective for the City to follow an industry manual than to obtain and use customer data.  And that is what City did here, even after *Capistrano* rejected that approach.  To be sure, water districts may use the M1 manual as a resource, but mere adherence to national guidelines do not prove compliance with California's substantive proportionality requirement."

The court concluded there was "no evidence in the record to substantiate that the City's particular tiered rates actually reflect the costs of delivery to a given parcel."  The court made several factual findings, which we discuss by category.

*City's Conservation Goals*.  The court found the record showed that City's purpose in imposing tiered rates for SFR customers, in 2014 and 2016, was to " 'encourage conservation' " rather than to base rates on costs.  The court pointed to Bui's admission in her deposition testimony that the purpose of City's SFR tiered rate structure was not to "recoup the variable costs" of different levels of water use but to " 'encourage conservation.' "  Bui also testified that City instructed B&V to "maintain" tiered rates for SFR customers in the 2013 and 2015 COSSs, and that City " 'did not want to change' " from tiered rates for SFR customers.  Bui also confirmed that the purpose of

the new, zero to four HCF tier 1, in the 2013 COSS, was " to provide an 'incentive for those who conserve.' "

*Tier 1 is Not Based on the Lower Cost of Local Water Supplies.* The court also found no evidence to support the statements in the 2013 and 2015 COSSs that the lower, zero to four HCF tier 1, first imposed in 2014, was based on City's lower cost of obtaining water from City's local supply sources, as opposed to City's more expensive supplies from other sources. Bui conceded, in her rebuttal report and deposition, that City's local supplies were "not enough to cover all tier 1 water use." And, even if it was, the court reasoned, "because the City commingles all of its water and delivers it to customers using the same infrastructure, the City cannot ensure that higher-cost 'alternative sources of supply' are being delivered to customers whose use led to the City's 'greater investments' in those sources of supply."

The court noted Bui agreed with Class's expert, Smith, that "tying tiered pricing to the cost of source of supply 'would be impossible'—especially with regard to the City's local water supply, which is unpredictable and 'may provide anywhere between 0 percent and 15 percent of City's [aggregate] water needs in any given year.' " Bui also admitted City had "never" delivered local supplies of water "to tier 1 SFR customers only." Based solely on City's failure to present evidence supporting City's "source-of-supply justification" for its 2014 and 2016 Tier 1 rate, the court found City's 2014 and 2016 tiered rates did not comply with section 6(b)(3).

*The Tier Breakpoints Are Based on Usage Budgets, Not Costs.* The court also found that the breakpoints between the SFR tiered rates were not based on costs but on

27

usage budgets and "the assumed use of water" by SFR customers, as in *Capistrano*. The court noted Bui admitted the " 'AWWA household usage survey data,' " which estimated " 'typical' " indoor, outdoor, and excessive usages for an SFR of two persons, was "not specific to San Diego's [SFR] customers," and City pointed to "no evidence" that the 19th and 20th HCF of water delivered to an SFR customer cost "over 200 percent more than the cost of delivering the first and second HCF to that same customer." Further, B&V looked to "the *irrigation class's* usage patterns" in setting the rates for tiers 3 and 4 because B&V "assumed" that usage in tiers 3 and 4 was "for landscaping." But City pointed to "no evidence" to support this assumption, and "worse still," City charged SFR customers "more for water above 12 HCF" than irrigation customers. The court observed that, in 2014, the Tier 4 rate was "precisely" 2.25 times the Tier 1 rate; and, in 2016, this multiplier was "almost exactly" 2.25, indicating that the rates were not based on costs. Under the 2014 and 2016 rate structures, SFR customers were charged 225 percent more for usage in Tier 4 than in Tier 1, while all other customer classes were charged "approximately the Tier 2 rate for all usage, regardless of volume."

*Unsupported Peaking Factor Analysis*. Next, the court found the record did not support City's claim that B&V's use of the "M1 Manual's base-extra capacity peaking factor method" in allocating costs to the SFR tiers, and to set the tiered rates, showed that the tiered rates did not exceed the costs of delivering water at the tiered usage levels. (§ 6(b)(3).) The court wrote: "City's justification for using this method is that the City incurs 'greater costs' to size its water system to meet customers' demands at peak times—on the day and at the hour of highest use—'than it would if all customers always

28

received water at a uniform rate of use,' and that the customers who cause that peak demand should be made to bear the cost of sizing the system to meet it.  [Citation.]

"The base-extra capacity method, which provides for calculating 'peaking factors' based upon 'maximum day' and 'maximum hour' usage—that is, the amount of water used on the day and at the hour of maximum usage for the water system—purports to 'allocate these higher peak demand costs to those customers who exhibit the greatest peaking behavior,' and are thus responsible for causing the City to incur those extra costs. [Citation.]  For example, as [Bui] explains, '[r]esidential customers typically would have high water usage in the morning due to shower and other morning chores . . . .' . . . 'Max Day extra capacity consumption . . . typically occurs on the hottest day of the year.' . . . Peak use, therefore, depends on *when* the water is used, not on the overall volume used in a monthly or bi-monthly period, and relies on the assumption that water costs more to deliver at different times."

The court reasoned:  "The problem with this theory is that the peaking factor ratios and the cost allocations are not based on actual data."  Bui admitted City "did not know when customers used water," and City "did not perform the studies necessary to collect that information."  City's "explanation for its lack of data" was that it is " 'very expensive to do customer demand studies to determine Max Day and Max Hour Extra Capacity factors.' "  Although, in 2021, City was in the process of implementing "Advanced Metering Infrastructure which would enable it to track customer [time of] use," at the time of the 2013 and 2015 ratemakings, City did not track customers' hourly and daily usage (i.e., City did not have "time-of-use data").  Bui testified, "At the time of

29

the studies [(the 2013 COSS and 2015 COSS)], *we did not have that level of granularity*, no . . . . [¶] . . . [W]e did not have the metering capability." (Italics added.)

Bui also admitted that the " 'peak factors' in the City's Master Plan are simply the historical maximum day and maximum hour usage ever observed at each facility for *all* users." But the Master Plan did not "break down" Max Day or Max Hour data by customer class and, because all customers use water from the same facilities, City did not know "whether or how much" SFR customers "contributed to those peak usage levels." Thus, the court found that City did not, and could not, "know whether the demand levels it used to set the [SFR] rates even came from [SFR] customers" and not from other customer classes. "Despite" the lack of supporting data, B&V used peaking factors of 1.5 for Max Day and 2.25 for Max Hour "demand" set forth in City's Master Plan. "[B&V] then used these peaking factors to allocate nearly half of peak day costs, and all of peak hour costs to [SFR] customers in Tiers 3 and 4."

The court found City's justification for the Tier 3 and Tier 4 rates appeared to be the "assumption that those users are 'more likely' to be using water at peak times than average and below average users because they use a higher total volume of water in a given period period." But the court found the record did not support this assumption: Bui admitted Tier 1 and Tier 3 SFR customers, and all other customers, "also used water during peak day and peak hour times, thus contributing to the need for the maximum system capacity." Yet, the City did not charge nonSFR customers tiered rates. Bui conceded that MFR customers exhibited the same peaking factors as SFR customers, and that irrigation and construction customers exhibited "*much higher* peaking factors" than

SFR customers; thus, these customers "contribut[ed] *more* to the need for maximum system capacity" than SFR customers.

In sum, the court found "the peaking factors do not reflect the actual cost of service to a given parcel given that *all* [SFR] users," and nonSFR customers, used water at peak times. City did not "produce any evidence" that SFR users in Tiers 3 and 4 were any more "responsible for peak" use than SFR users in Tiers 1 and 2, or other customers. That is, City's pricing differentials, both between customer classes, and among the SFR tiers, were not "explained by time of use."

*Price Discrimination Against the SFR Customer Class.* Last, the court found City's tiered rates for SFR customers discriminated against SFR customers in favor of irrigation customers, in violation of *Palmdale*. The court found City did not articulate "an adequate cost-based justification for using a tiered-rate structure for [SFR customers] and a flat rate" for other customer classes. The court rejected City's claim that tiered rates for SFR customers were justified because SFR customers were relatively homogenous in size and usage. The court noted SFR customers "using more than 12 HCF of water per month because they have large homes and large families are charged for water services at Tier 3 or 4 rates—even if 'they use water efficiently for their size' "; thus, City was not justified in charging other customers lower, flat rates for unlimited usage based on the assumption they used water efficiently for their size. The court concluded that "City impose[d] these disproportionate rates on [SFR] Tier 3 and 4 users, 'without any showing . . . of a corresponding disparity in the cost of providing to these customers at such levels." (*Palmdale, supra,* 198 Cal.App.4th at p. 937.)

31

*Conclusion.* In sum, the court found, based on its "independent review of the evidence," that City's 2014 and 2016 tiered water rates were not "proportional to the cost of service attributable to each customer's parcel, as required by Proposition 218." The court elaborated: "[T]he record shows plainly that the City charges [SFR] customers more for the same water that it delivers to all other customer classes, regardless of the time of day or the burdens their use places on the system. This practice, the court finds, fails to show compliance with the requirements of Proposition 218."

### 4. *Coziahr*

*Coziahr* involved a section 6(b)(3) challenge to the Otay Water District's (Otay's) tiered rates for SFR customers. (*Coziahr, supra,* 103 Cal.App.5th at pp. 789, 803.) The plaintiffs comprised a certified class of " '[a]ll [SFR] customers of the Otay Water District who received water service' after July 14, 2014." (*Id.* at pp. 792-793.) In 2013, Otay adopted tiered rates based on a 2013 rate study by WS Atkins (Atkins), which followed the "best management practices" of the M1 Manual and the California Urban Water Conservation Council. (*Id.* at p. 803.) These practices promote " 'water conservation rate structures' " and recommend that water agencies recover no more than 30 percent of their revenues from fixed charges in order to " 'achieve conservation pricing,' " which " 'provides economic incentives (a price signal) to customers to use water efficiently.' " (*Id.* at pp. 803-804.) Under these practices, agencies seek to recover 70 percent of their revenues from tiered rates, at increasing price levels, and the higher the rate, the stronger the conservation incentive (price signal). (*Ibid.*)

Based on a " 'water usage analysis' " of Otay customer usage during the prior year, the Atkins 2013 rate study calculated winter and summer month usage averages for Otay's SFR customers. (*Coziahr, supra,* 103 Cal.App.5th at p. 804.) The winter average of 10 HCF was for " 'estimated interior water usage' " and was used as the Tier 1 breakpoint. (*Ibid.*) The summer average, 22 HCF, " 'equate[d] to normal interior plus exterior water usage' " and became the Tier 2 breakpoint. The Tier 3 breakpoint of over 22 HCF was " 'considered to be excessive and for irrigation.' " (*Ibid.*) With these breakpoints, 14 percent of SFR water usage was in the Tier 3 category. (*Ibid.*)

Next, the Atkins 2013 rate study established a price for each tier, using the " 'base-extra capacity cost allocation methodology' " and AWWA guidelines. (*Coziahr, supra,* 103 Cal.App.5th at p. 804.) This method divided " 'consumption-related cost . . . into the base, maximum-day, and maximum-hour cost of service.' " (*Ibid.*) "Block 1" or Tier 1 pricing was set just below the average cost of water; Tier 2 pricing was set just above the average cost, and Tier 3 pricing was " 'set at a higher price differential.' " (*Ibid.*) The Atkins's 2013 rate study "elaborated that above-average users use a 'larger portion of the . . . system' and should pay for the 'extra capacity to serve their needs,' noting '[a]ll water systems must be designed for peak . . . use, not average use.' " (*Ibid.*) The Atkins 2013 rate study stated that, according to the AWWA, " 'block 2 should be set at a level 30 percent higher than block 1 to reflect the cost incurred for increased capacity costs and supply purchases. Block 3 is then set at a price differential of 2 times the rate of block 1 because the capacity requirement is twice that of block 2 (e.g., single family block 1 breakpoint is 10 HCF and block 3 begins at 23 HCF.)' " (*Ibid.*)

33

Otay's board of directors approved the proposed rates at meetings in early 2013. (*Coziahr, supra,* 103 Cal.App.5th at p. 804.) In those meetings, Otay's finance manager said the tiers were " 'created to promote conservation,' " and an Atkins representative said, " 'You wish to have 10 to 15 percent of your users within tier III, top water users, to encourage conservation.' " (*Id*. at p. 805) When asked "if Otay gave 'any thought to those customers with larger lots who have implemented efficient landscaping, but are still paying the highest tier,' " Otay's chief financial officer responded that, " 'customers on larger lots will pay the higher water rate due to their consumption. It is a lifestyle choice.' " (*Ibid*.)

In 2017, Otay hired HDR Engineering, Inc. (HDR) to review Otay's water rates "in light of 'recent court decisions' and the 'need to continue to maintain cost-based water rates.' " (*Coziahr, supra,* 103 Cal.App.5th at pp. 792, 805.) HDR asserted that its approach did not consider " 'noncost-based goals,' like conservation," and HDR had developed " 'peaking factors' to capture demand" for each customer class and SFR tier. (*Id*. at p. 805.) In a 2017 rate study, HDR eliminated Tier 1 for SFR customers, noting it was "put in place to encourage efficient use" but " 'noncost-based pricing tiers [had] recently [been found] to be illegal,' " and the tier 1 rate " resulted in 'two different prices for essentially the same volume of water . . . .' " (*Ibid*.) But HDR concluded that the sizes of the other tiers " 'remained relevant and appropriate' " based on " 'consumption data' " and the 2013 Atkins rate study. (*Ibid*.) HDR noted " 'additional cost detail was needed . . . to justify the cost-basis' for the tiered rates" and concluded that Otay's tier 1 and tier 3 pricing was too high, and its tier 2 pricing was below cost. (*Ibid*.) Thus, HDR

recommended revised tier pricing, and noted that " 'high-use customers' " would see lower bills, mainly due to " 'the reduction of the tail block price to a cost-based level.' " (*Id*. at p. 806.) HDR also recommended moving commercial and irrigation customers to uniform rates. (*Ibid*.) At an April 2017 meeting of Otay's board of directors, an HDR representative indicated that SFR customers were not moved to uniform rates because their rates " 'should encourage efficient use' " and conservation. (*Ibid*.) Otay's board later approved HDR's recommended rate structure. (*Ibid*.)

As noted, in its 2017 rate study, HDR stated it had "developed 'peaking factors' to capture [maximum day and hour] demand for each customer class and SFR tier." (*Coziahr, supra,* 103 Cal.App.5th at p. 805.) The " 'key assumption' " of HDR's peaking factor analysis was that the water system " 'must be built to . . . meet the demand of higher use customers.' " (*Ibid*.) At trial in *Coziahr*, the parties presented competing expert testimony.

Otay's expert, Jason Mumm, an executive consultant at a firm specializing in municipal water rate development, opined that the 2013 and 2017 rates studies showed that the tiered SFR rates " 'result[ed] in a proportional allocation of costs among classes based on customer and demand-related factors.' " (*Coziahr, supra,* 103 Cal.App.5th at pp. 793, 806.) As evidence that the SFR tier prices were cost-based, Mumm cited "the 'difference in peak requirements' " and Mumm's " 'independent analysis' " finding that the rates were materially "proportional to costs." (*Id*. at pp. 806-807.) The plaintiffs' expert, David Vondle, "a management consultant with experience in utility-related matters," disagreed with Mumm's claim that the 2013 rate study used "a peaking factor

35

concept"; noted that Mumm's analysis "focused primarily" on the 2017 HDR rate study, not the 2013 Atkins study; and disagreed with Mumm's conclusion that Otay's rates were cost-proportional in compliance with section 6(b)(3). (*Ibid.*)

The trial court in *Coziahr* found that "Otay did not provide substantial evidence that its 2013 and 2017 tiered water rates were proportional to the cost of providing water service." (*Coziahr, supra,* 103 Cal.App.5th at p. 807.) In setting the tiered rates, the trial court noted Otay "merely 'followed AWWA guidelines' " in setting, for example, Tier 2 " 'exactly 30 percent higher than Tier 1.' " (*Ibid.*) The trial court noted that adherence to the AWWA industry standards did not show that the tiered rates did not exceed the proportional costs of delivering water at the tiered usage levels. (*Ibid.*)

The trial court also noted that Atkins " 'candidly acknowledge[d]' " that dividing costs into base and extra capacity costs, and setting the tiers below and above those costs, was to " 'promote conservation.' " (*Coziahr, supra,* 103 Cal.App.5th at p. 807, italics added.) HDR admitted that " 'higher-use customers had been charged more than the cost of service' "; and the 2017 rate study was " 'also based on non-cost objectives such as conservation.' " (*Ibid.*) The trial court found that, although Otay addressed " 'the admittedly below-cost conservation tier,' " Otay did not address " 'the underlying flaws' " in the rate structure," and " 'kept the other tiers' " while failing to address whether the other tiers were " 'proper based on the cost of . . . service.' " (*Ibid.*) The trial court found HDR " 'worked backwards to try to justify' the tiers with 'AWWA's "peaking factors" methodology,' " but as plaintiffs' expert Vondle noted, HDR did not develop " ' "additional cost detail" ' " through studies of the Otay system. (*Ibid.*)

36

Applying the independent judgment standard of review, *Coziahr* concluded that Otay did not show that its tiered rates for SFR customers, and uniform rates for other customers, were cost-based, and substantial evidence supported the trial court's findings on disputed issues of fact. (*Coziahr, supra,* 103 Cal.App.5th at pp. 798-800, 808-819.) In rejecting Otay's claims, *Coziahr* made six points relevant to City's section 6(b)(3) claims here. First, *Coziahr* held the record supported the trial court's finding that Otay failed " 'to correlate its tiered prices with the actual cost of providing water at those tiered levels.' " (*Coziahr,* at p. 808; § 6(b)(3), (b)(5).) Citing *Capistrano*, *Coziahr* agreed that "Otay's SFR tiered rate structure rested on nonspecific data and assumptions, rather than on the actual cost of providing water service to the parcel." (*Coziahr,* at p. 808.) The court noted Atkins " 'followed AWWA guidelines in setting Tier 2 exactly 30 percent higher than Tier 1, and Tier 3 at exactly 100 percent more than Tier 1.' " (*Id*. at p. 809.) As in *Capistrano*, these "precise percentages" indicated that Otay's 2013 SFR tiered rates were not cost-based. (*Ibid.; Capistrano, supra,* 235 Cal.App.4th at pp. 1504-1505 [" 'fractional precision' between the tiers 'suggested . . . [the agency] did not attempt to correlate its rates with cost of service,' as 'mathematical tidiness is rare in multidecimal-point calculations' "].) Otay also had " ' "no objective evidence" ' based on Otay's system data" to support the precise percentage differentials between the tiers. (*Id*. at p. 809.)

Second, following *Palmdale* and *Capistrano*, *Coziahr* rejected Otay's reliance on the water conservation mandate of article X, section 2, in defending Otay's rate structures. (*Coziahr, supra,* 103 Cal.App.5th at pp. 810-811.) *Coziahr* stressed that

pricing water "at its true cost" in accordance with article XIII D, section 6(b)(3), is "compatible with" article X, section 2's "theme of conservation with a view toward reasonable and beneficial use." (*Id*. at p. 810.)

Third, *Coziahr* rejected Otay's argument that its consultants properly relied on the M1 Manual in setting Otay's 2013 and 2017 rate structures. In contrast to *Capistrano*, where the agency made no attempt to tie its tiered rates to its cost of service, Otay used the M1 Manual's " 'engineering principles to identify and allocate' costs, based on peak demand." (*Coziahr, supra,* 103 Cal.App.5th at p. 811.) In sum, *Coziahr* held the record supported the trial court's finding that the 2013 and 2017 rate studies did not show that Otay's tiered rates for SFR customers were based on costs of service to SFR customers. (*Id*. at pp. 811-812 ["The trial court properly recognized that under California law, reliance on the M1 Manual [to establish water rates], without more, is insufficient."].)

Fourth, *Coziahr* concluded that Otay's tiered rates "discriminated against SFRs, in violation of *Palmdale*." (*Coziahr, supra,* 103 Cal.App.5th at p. 812.) In *Palmdale*, irrigation customers were charged higher tiered rates "without a 'corresponding disparity' in costs." (*Ibid*.) Otay offered no " 'cogent reason for this differential treatment.' " (*Id*. at pp. 813-814.) The " 'only explanation' " for the disparity in rates between customer classes was Otay's decision " 'to keep non-cost-based rates' " for SFR customers " ' "to encourage efficient use." ' " (*Id*. at p. 814.)

Fifth, *Coziahr* rejected, as unsupported by the record, Otay's argument that Atkins and HDR used peaking factors (i.e., ratios meant to capture peak versus average demand) to justify Otay's tiered rates for SFR customers. (*Coziahr, supra,* 103 Cal.App.5th at

38

pp. 814-815.) The Atkins 2013 rate study "did not expressly apply a peaking factor analysis" and "did not identify peaking factors or describe any allocation of costs to base or extra capacity categories." (*Id*. at p. 815.) And, although the HDR 2017 rate study indicated that it applied peaking factors "at both the cost of service and ratesetting steps," "there was no evidence Otay 'determined actual peaking costs' and allocated them to 'customers actually causing' increased system costs." (*Id*. at p. 815.) Vondle opined that HDR " 'arbitrar[ily] misallocate[ed]' expenses as extra capacity costs, such as bulk water purchased, and 'without time-of-use-meters,' [and] Otay had no way to identify customers with higher use periods." (*Id.* at pp. 793, 814-815.) Vondle contrasted this with electrical utilities, where there was a " 'legitimate higher cost of "peak" use,' and they used time-of-use meters to allocate costs based on particular customers' energy use." (*Id*. at p. 815.)

*Coziahr* agreed with the trial court that HDR's peaking factor analysis was " 'flawed for two main reasons.' " (*Coziahr, supra,* 103 Cal.App.5th at pp. 816-818.) One, there was no evidence in the record that " 'there is a difference in the cost of water used during high-use or low-use times.' " (*Id*. at p. 816.) That is, the record did not show that "the costs characterized as extra capacity, such as water purchase[d] and infrastructure," were disproportionately greater for larger volumes or uses of water. (*Ibid*.) Two, Otay did not collect " 'time-of-use data' "; thus, Otay could not have charged customers more based on their peak demand, or *when* they used water. (*Ibid*.) Citing *Capistrano*, *Coziahr* noted that " 'peak use depends on *when* the water is being used,' not [the] '*overall quantity* [of water used] . . . .' " (*Ibid*.) Thus, *Coziahr* held that

39

Otay did not establish that peaking-related costs existed, and if they did, Otay did not have the time-of-use data needed to allocate such costs. (*Id.* at p. 817.)

*Coziahr* rejected Otay's claim that Otay's "use of 'data connecting customers' seasonal patterns of use to peak demands' and 'reasonable estimates' [were] sufficient to support its peaking analyses . . . ." (*Coziahr, supra,* 103 Cal.App.5th at p. 817.) *Coziahr* emphasized that the trial court was entitled to accept Vondle's opinion that there was "*no evidence . . . , not simply no time-of-use data,*" showing that HDR's 2017 rate study and peaking analysis properly allocated costs based on peak usages, and therefore, that Otay's rate structure was cost-based. (*Coziahr,* at p. 818, italics added.)

*Coziahr* also rejected Otay's claim that the trial court erroneously credited Vondle's opinion that Otay "could not use a peaking justification without time-of-use data," reasoning that Otay was asking the court to "reweigh the evidence and reach a different factual conclusion" than the trial court, which the court could not do. (*Coziahr, supra,* 103 Cal.App.5th. at p. 817.) Vondle opined that Mumm's independent analysis did " 'not show that HDR's cost allocation method [was] correct; it only show[ed] that Mr. Mumm's cost allocation methodology [was] the same as HDR's,' " and because they both 'use the same flawed cost allocation . . . both are incorrect.' " (*Id.* at p. 818.) *Coziahr* reasoned, "[t]he trial court's key findings" that Mumm "replicated the flawed HDR study, and provided an unsupported, post hoc rationalization . . . are consistent with the record, and support the court's rejection of his analysis without more." (*Id.* at p. 819.) Thus, *Coziahr* concluded Otay did not establish that the SFR tiered rates Otay set during its 2013 and 2017 ratemaking processes complied with section 6(b)(3).) (*Ibid.*)

B.  *The Standard and Burden of Proof Under Section 6(b)(3) Is Not Reasonableness*

In any legal action concerning the validity of a property-related fee or charge, section 6(b)(3) places the burden of proof on the agency to show that the fee or charge complies with article XIII D.  City claims the *standard of proof*  that is required of an agency to meet its burden of proof under section 6(b)(3)) is "reasonableness," and here, the trial court held City to an unspecified higher "quantity and quality of proof" than reasonableness.  We find no merit to this claim.

First, under the reasonableness standard of proof, an agency would meet its burden of proving that a property-related fee does "not exceed the proportional cost of service attributable to the parcel" (§ 6(b)(3)) if it shows (1) there is a reasonable basis for the fee, and (2) the fee is reasonably allocated among the fee payors or parcels.  (See *California Building Industry Assn., v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1021, 1050-1053 (*California Building Industry Assn.*) [distinguishing reasonableness burden of proof for regulatory fees under article XIII A from burden of proof for property-related fees under article XIII D].)  Thus, as applied here, the reasonableness standard of proof would mean that City met its burden of proof under section 6(b)(3) if it showed (1) there was reasonable basis for its SFR tiered rates, and (2) City's costs of service attributable to the SFR customer class was allocated among the class members in a reasonable manner.

Second, City does not dispute that the standard of *review* in section 6(b)(3) cases, both at trial and on appeal, is the independent judgment standard.  (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448-449 (*Silicon Valley*) [independent judgment standard applies in reviewing

Proposition 218 determinations]; *Coziahr, supra,* 103 Cal.App.5th at p. 797; *Capistrano, supra,* 235 Cal.App.4th at p. 1507.)  As *Capistrano* explained:  "*Silicon Valley . . .* clarified the standard of review for Proposition 218 cases" and "made it clear that in Proposition 218 challenges to agency action, the agency . . . bear[s] the burden of . . . demonstrating compliance with Proposition 218, and both trial and reviewing courts are to apply an independent review standard, not the traditional, deferential standard *usually* applicable in challenges to government action."  (*Capistrano,* at pp. 1506-1507 [To prove compliance with § 6(b)(3), it is not enough that the agency has substantial evidence to support its action; that evidence must "withstand independent review."].)

City argues that, even though *Silicon Valley* established the standard of *review* for agency determinations under Proposition 218, it did not establish the substantive standard of proof under section 6(b)(3).  City claims City satisfied this standard by showing it relied on "reasonably accurate data and reasonable assumptions" in setting the tiered SFR rates.  That is, City claims there is a reasonable basis for its tiered rates, and those rates were reasonably allocated among SFR customers.  To support its claim that the reasonableness standard (and burden) of proof applies in section 6(b)(3) cases, City relies on post-Proposition 218 cases, discussed below, in which City claims the Courts of Appeal, "clearly defined the standard of proof that the City must meet in this case as reasonableness.  City argues:  "Under this line of cases, the City meets its burden of proof if it puts forth evidence, satisfying this court's independent judgment, that the agency reasonably allocated the costs of service to each tier and then calculated tiered rates that reasonably reflect the City's cost of providing water service . . . at each tier."

42

City's claim that the standard or burden of proof under section 6(b)(3) is reasonableness was expressly rejected by the trial court here and later by the appellate court in *Coziahr.* We find *Coziahr's* analysis of the reasonableness claim persuasive. As *Coziahr* explained, none of the cases City relies on here, which are the same cases Otay relied on in *Coziahr*, support the proposition that the standard of proof under section 6(b)(3) is reasonableness. (*Coziahr, supra,* 103 Cal.App.5th at pp. 801-803, discussing *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, 600-601 (*Griffith*); *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892 (*Morgan*); *Capistrano, supra,* 235 Cal.App.4th at p. 1493; *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363 (*Moore*).) We discuss these cases in turn.

In *Griffith,* the court affirmed a judgment that a water agency's groundwater augmentation charges were proportional to the agency's cost of service. (*Griffith, supra,* 220 Cal.App.5th at pp. 600-601, 606; § 6(b)(3).) City relies on language in *Griffith* that, "[a]pportionment is not a determination that lends itself to precise calculation," and " '[t]he question of proportionality is not measured on an individual basis. Rather, it is measured collectively, considering all rate payers.' " (*Griffith*, at p. 601.) *Griffith* also said: "Given that Proposition 218 prescribes no particular method for apportioning a fee or charge other than that the amount shall not exceed the proportional cost of the service attributable to the parcel, defendant's method of grouping similar users together for the same augmentation rate and charging the users according to usage is a reasonable way to apportion the cost of service. That there may be other methods favored by plaintiffs does

43

not render defendant's method unconstitutional. Proposition 218 does not require a more finely calibrated apportion." (*Ibid.*)

*Capistrano* addressed the reasonableness standard-of-proof claim before *Coziahr*. *Capistrano* concluded *Griffith* did not establish a reasonableness standard of proof under section 6(b)(3), if that standard would excuse the agency from complying with the proportionality mandate of section 6(b)(3): "When read in context, *Griffith* does not excuse water agencies from ascertaining the true costs of supplying water to various tiers of usage." (*Capistrano, supra*, 235 Cal.App.4th at p. 1514.) *Capistrano* explained that *Griffith* relied in part on inapposite, pre-Proposition 218 case law, and its comments on proportionality "necessarily relate[d] only to variations in property location, such as what side of a water basin a parcel might fall into," and do not excuse water agencies from basing water charges on the "true costs of supplying water to various tiers of usage." (*Ibid.*; *Coziahr, supra,* 103 Cal.App.5th at p. 801 [accord].)

In *Morgan*, rate payers challenged an agency's water rates under section 6(b)(3), claiming among other things that the cost-of-service study upon which the rates were based was "based on poor quality data." (*Morgan, supra,* 223 Cal.App.4th at p. 915.) *Morgan* affirmed the judgment for the agency, concluding substantial evidence showed the agency's data was "reliable" because it was "reasonably dependable and adequate." (*Id*. at pp. 915-918 ["In reviewing the record, it is clear that the adequacy of the data was a vehemently disputed factual issue at trial."].) On appeal, the plaintiffs "fail[ed] to articulate why the evidence [was] insufficient. Instead, they merely cite[d] to evidence they believed[d] showed the District's data was inadequate . . . ." (*Id*. at p. 916.) The

trial court found the agency's explanation of its data "more persuasive." (*Id*. at pp. 916-918.)  *Morgan* noted that an agency's showing under section 6 "does not require perfection" (*id*. at p. 918), and the plaintiffs were "essentially asking [the court] to reweigh" conflicting evidence concerning the adequacy of the agency's data (*id*. at p. 916).

Similarly, in *Moore*, the plaintiffs claimed that a district's sewer service charges did not comply with section 6(b)(3) because the city, whose employees performed "most functions required for [the district] to operate," did not use "a reasonable methodology" in apportioning the city's costs attributable to providing the sewer services.  (*Moore, supra,* 237 Cal.App.4th at pp. 369-373.)  The trial court found the district and city adduced "ample evidence" that the sewer charges were " 'based on [r]eliable estimates of time spent by City workers on sanitation issues,' " and that the methods used to apportion the city's costs were " 'reasonable under the circumstances.' "  (*Id*. at pp. 372-374.)

*Moore* agreed with the trial court's conclusion that the charges complied with section 6(b)(3).  (*Moore, supra,* 237 Cal.App.4th at pp. 373-375.)  As in *Morgan*, the plaintiffs in *Moore* did not present any evidence that the cost allocation methods were "illegal or otherwise improper," or violated section 6(b)(3).  (*Id*. at pp. 374-375.)  Instead, the plaintiffs argued the allocation methods were "unreasonable," " 'too ad hoc,' " and " 'not subject to any kind of objective criteria.' "  (*Id*. at p. 371.)  Based on its independent review of the record, *Moore* found the plaintiffs' arguments unpersuasive, and upheld the trial court's determination of no section 6(b)(3) violation.  (*Id.* at pp. 373-375.)

City also relies on *KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015 (*KCSFV*) for the undisputed principle that " 'the section 6(b) fee or charge must reasonably represent the cost of providing service.' " (*Id.* at p. 1029, quoting *Howard Jarvis Taxpayers Assn. v. City of Roseville, supra,* 97 Cal.App.4th at p. 648; *Coziahr, supra,* 103 Cal.App.5th at p. 801; *Moore supra,* 237 Cal.App.4th at p. 368.) *KCSFV* held that the defendants did not meet their burden of showing that their rate increases did not "exceed what it costs to provide the water service," where the defendants relied solely on a *conclusory statement* in the notice of the proposed rate increases that the rates were based on the cost of service. (*KCSFV,* at p. 1029.)

Here, as in *Coziahr*, City "appears to derive its '[reasonableness] standard from select quotations' " from *Griffith*, *Morgan*, *Capistrano*, *Moore*, and *KCSFV*, and other " 'Proposition 218 decisions that used the word "reasonable." ' " (*Coziahr, supra,* 103 Cal.App.5th at p. 801.) "But the courts were not using the term 'reasonable' in defining a standard of proof. Rather, they were discussing the nexus between the rate and cost of service, or describing the record while reviewing it for substantial evidence." (*Ibid.*)

Moreover, in *California Building Industry Assn.*, a case involving article XIII A, our Supreme Court recognized that an agency does not meet its burden of proof under section 6(b)(3) by showing that the fee or charge is " 'reasonably allocated' " among property owners. (*Coziahr, supra,* 103 Cal.App.5th at p. 800, discussing *California Building Industry Assn.* (2018) 4 Cal.5th 1032, 1049-1053.) In *California Building Industry Assn.*, an industry group claimed that the state's storm water permit fees, a regulatory fee governed by article XIII A, were not "allocated in a reasonable manner"

46

among fee payors as article XIII A requires. (*Id.* at p. 1050.) The court disagreed, holding the storm water permit fees were reasonably allocated among the fee payors, and explaining that a regulatory fee does not " 'require a precise cost-fee ratio' " but "must bear a fair or reasonable relationship to the fee payers' burdens on or benefits from the regulatory activity." (*Id.* at p. 1052.) The court noted that, in this context, " 'flexibility' " is an " 'inherent component of reasonableness,' " and a regulatory fee will not be an unconstitutional tax under article XIII A "[s]o long as 'there is a reasonable basis in the record for the manner in which the fee is allocated . . . .' " (*Ibid.*)

In rejecting the plaintiff's reliance on *Capistrano*, the court in *California Building Industry Assn.* distinguished the proportionality burden of proof for property-related fees under article XIII D, section 6(b)(3), from the reasonableness burden of proof for regulatory fees under article XIII A: "[T]he restrictions on property-related fees in article XIII D . . . are different from those imposed on regulatory fees by article XIII A. Article XIII D provides that the amount of a property-related fee 'shall not exceed the proportional cost of the service attributable to the parcel.' [Citation] . . . Under article XIII A, all that is required is that the record demonstrate a reasonable basis for the manner in which the fee is allocated among those who pay it." (*California Building Industry Assn., supra,* 4 Cal.5th at p. 1053.)

Thus, the court in *California Building Industry Assn.* "made clear" that section 6(b)3) "demands something *more* than the reasonable basis standard under article XIII A. To satisfy [s]ection 6(b)(3), . . . it is not enough for a water agency to show it uses a reasonable allocation method. Rather, an agency must show that the method produces

47

rates that are proportional to costs." (*Coziahr, supra,* 103 Cal.App.5th at p. 801, discussing *California Building Industry Assn.*, *supra*, 4 Cal.5th at p, 1053; see *City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 118-119 [The independent judgment standard that applies in Proposition 218 cases also applies in Proposition 26 (art. XIII C) cases] (*San Buenaventura*).)

In sum, the burden of proof under section 6(b)(3) is not reasonableness. Rather, it is to show, with substantial evidence withstanding independent review, that the agency's "water rates are proportional to the 'ascertainable cost[s] of service that can be attributed to . . . specific . . . parcel[s].' " (*Coziahr, supra,* 103 Cal.App.5th at p. 800; *Capistrano, supra,* 235 Cal.App.4th at pp. 1505, 1516 [Section 6(b)(3) prohibits "above-cost-of-service pricing for tiers of water service," and City Water "did not meet its burden of proving its higher tiers reflected its costs of service."].)

Our dissenting colleague argues *Coziahr* created a split of authority with pre-*Coziahr* case law on the question of whether "reasonableness" is the standard of proof under section 6(b)(3), that our majority opinion "deepens" that split by following *Coziahr*, and that *Coziahr* and our majority opinion "fail to articulate any standard to replace the reasonableness standard . . . ." (Dis. Opn., pp. 3-4, 14-19.) Respectfully, we disagree with the dissent's interpretation of the pre-*Coziahr* case law, including *Griffith*, *Morgan*, and *Moore*. Under all of these cases, as under *Coziahr* and our majority opinion, the agency has the burden of proving that a fee or charge for a property-related service is cost proportional, in that it does not exceed the cost of providing the service. (§ 6(b)(3).) It is not enough that the agency show it used a "reasonable [cost] allocation

method" and relied on "reasonably accurate data"—particularly when, as in *Coziahr* and here, substantial evidence, credited by the trial court and withstanding independent review, shows the agency's cost allocation method or supporting data is unreliable as a measure of the costs of the service. (*Coziahr, supra,* 103 Cal.App.5th at p. 819 [upholding trial court's determination that Otay provided "an unsupported, post hoc rationalization" to support its tiered rates]; *Capistrano, supra,* 235 Cal.App.4th at p. 1514 [water rates must be based on the "true costs of supplying water to various tiers of usage"].)

Applying the same cost-proportionality standard of review applied in *Coziahr* and here, the courts in *Griffith*, *Morgan*, and *Moore* concluded that the challenged fees or charges complied with section 6(b)(3), given that substantial evidence sufficient to withstand independent review supported the trial courts' conclusions that the fees or charges were in fact cost proportional. (*Griffith, supra,* 220 Cal.App.4th at pp. 601; *Morgan, supra,* 223 Cal.App.4th at pp. 915-916; *Moore, supra,* 237 Cal.App.4th at pp. 369-373.) As the dissent indicates, these cases also show (1) there is not necessarily only one reasonable or acceptable method of cost apportionment in section 6(b)(3) cases, and (2) agencies are not required to rely on "perfect" data. (*Morgan*, at p. 918 [section 6 "does not require perfection"].). Rather, " 'the section 6(b) fee or charge must reasonably represent the cost of providing service.' " (*KCSFV, supra,* 64 Cal.App.5th at p. 1029.)

But here and in *Coziahr*, the substantial evidence shoe is on the other foot. That is, substantial evidence sufficient to withstand our independent appellate review supports the trial courts' (Judge Sturgeon's) conclusions that Otay's and City's tiered water rates

for SFR customers were *not* cost proportional; rather, the rates exceeded the costs of delivering water to SFR customers using water at the higher-tier usage levels. (*Coziahr, supra*, 103 Cal.App.5th at p. 819.). Like the courts in *Griffith*, *Morgan*, *Moore*, and *Coziahr*, we are not at liberty to "reweigh the evidence and reach a different factual conclusion" than the trial court. (*Coziahr,* at p. 817.) In brief, the trial court credited substantial evidence showing City imposed the tiered rates to encourage conservation among SFR customers using above-average amounts of water, and that City's use of the base-extra capacity method, detailed in the 2013 and 2015 COSSs, was, as in *Coziahr*, an "unsupported, post hoc rationalization" for the tiered rates. (*Id.,* at p. 819.)

We discuss the substantial evidence supporting the judgment in Section D, below, following our discussion in Sections B and C of City's claims regarding (1) the quantum of proof the trial court required, and (2) the independent judgment standard of review.

B. *The Trial Court Did Not Impose an Incorrect Quantum of Proof on City*

City further suggests the trial court required City to meet its substantive burden of proof under section 6(b)(3) with higher *quantum* of proof than section 6(b)(3) requires. City argues the trial court's Phase I statement of decision "jumbled the question of the applicable standard of proof with two undisputed points: (1) the City bears the *burden of proof*; and (2) the applicable *standard of review* is the Court's independent judgment." City complains the court "misstated" that City was arguing its burden of proof was "minimal"; that the "*standard of review*" was " 'reasonableness' "; and that the court "mischaracterize[d]" City's reasonableness claim "as an argument that the trial court should apply 'rational-basis review.' "

50

City does not demonstrate error. First, the Phase I statement of decision shows the trial court correctly understood City's *claim* that City's substantive burden of proof under section 6(b)(3) was reasonableness. With reasoned analysis, the court rejected the claim and correctly required City to prove, with substantial evidence withstanding the court's independent review, that City's tiered rates for SFR customers did not exceed the cost of providing water at the tiered usage levels. (*Silicon Valley, supra,* 44 Cal.4th at pp. 448-449; *Capistrano, supra,* 235 Cal.App.4th at pp. 1505-1506, 1516; *KCSFV, supra,* 64 Cal.5th at pp. 1022-1023.) The trial court did not impose an incorrect, substantive burden of proof on City.

Second, to the extent City suggests the trial court required City to meet its burden of proof with an inapplicable *quantum* of proof, such as proof by clear and convincing evidence or beyond a reasonable doubt, the record does not support this claim. That is, the record does not indicate that the trial court required City to prove its case by a quantum of proof higher than proof by a preponderance of the evidence, the default standard in civil cases and the applicable standard in this case. (Evid. Code, § 115; *Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 364-365.) Thus, we presume the court required City to prove its case by the correct, preponderance of the evidence standard. (*Coziahr, supra,* 103 Cal.App.5th at p. 802; *People v. Castellano*

51

(1983) 140 Cal.App.3d 608, 612 [The presumption that "official duty has been regularly performed" (Evid. Code, § 664) encompasses applying "proper standard of proof."].)[6]

C. *City's Claims Regarding the Independent Judgment Standard of Review*

Throughout its briefings, City claims that the independent judgment standard of review, as it applies in this case, requires us to conclude, based on the *undisputed contents* of City's 2013 and 2015 COSSs and Bui's opening report, that City's SFR tiered rates comply with section 6(b)(3). City's argument assumes, mistakenly, that this evidence ("City's evidence") permits only one factual inference: that City's tiered rates comply with Section 6(b)(3). City's argument overlooks the parties' conflicting expert evidence, on the question of whether City's SFR tiered rates comply with Section 6(b)(3). (See Coziahr, supra, 103 Cal.App.5th at pp. 802-803 [appellate courts presume all facts and inferences in favor of the judgment, and Otay's argument rested "on a one-sided, incomplete view of the record and the trial court's decision"].)

1. The Liability Issues Here Are Primarily Factual and Disputed, Not Legal

Since *Silicon Valley,* our trial courts and Courts of Appeal have applied the independent judgment standard of review in section 6(b)(3) cases. (*Silicon Valley, supra,* 44 Cal.4th at pp. 441, 447-448; *Palmdale, supra,* 198 Cal.App.4th at pp. 928, 933; see *Griffith, supra,* 220 Cal.App.4th at pp. 600-601; *Morgan, supra*, 223 Cal.App.4th at pp.

---

[6] The record also does not support City's claim that the court required City to "present precise and granular customer-by-customer data to prove that the tiered water rates comply with section 6(b)(3). (See *Coziahr, supra,* 103 Cal.App.5th at pp. 802-803; *Morgan, supra,* 223 Cal.App.4th at p. 918 [section 6 "does not require perfection"].) We address City's "granular, precise data" argument in Section D, *post*, in addressing City's substantial evidence-related claims.

912, 915-919; *Capistrano, supra,* 235 Cal.App.4th at pp. 1505, 1512-1513, *Moore, supra,* 237 Cal.App.4th at pp. 368-369; *KCSFV, supra,* 64 Cal.App.5th at p. 1023; *Coziahr, supra,* 103 Cal.App.5th at p. 798-799.)  Like the trial court's, our task under the independent judgment standard is to determine whether substantial evidence—not just any substantial evidence, but substantial evidence sufficient to withstand our independent judgment—shows that the property-related fee or charge complies with section 6(b)(3)'s proportionality requirement.  (*Silicon Valley,* at pp. 441, 447-448.)  Whether the entire record contains sufficient substantial evidence to show compliance with section 6(b)(3) is a legal question we decide de novo, meaning we defer neither to the agency's nor the trial court's determinations of *this* question.  (*KCSFV,* at p. 1023; *Moore,* at p. 368.)

But " '[e]ven when we exercise our independent judgment in reviewing the record, we do not take new evidence or decide disputed issues of fact.' " (*Coziahr, supra,* 103 Cal.App.5th at p. 798, quoting *Morgan, supra,* 223 Cal.App.4th at p. 912 [distinguishing de novo standard of review on appeal from agency's burden of proof at trial].)  Although we use a de novo standard of review in determining the legal question of the agency's section 6(b)(3) compliance, "we do not transform into a trial court." (*Morgan*, at p. 913.)  "*Silicon Valley's* independent review standard 'does not change the substantial evidence standard of review and does not allow us to resolve issues of disputed fact already decided by the trial court.  If an appellant challenges a finding of fact, we must employ the substantial evidence standard of review.  As such, we are not concerned about a conflict in the evidence.  "Rather, it is simply whether there is substantial evidence in favor of the respondent.  If this 'substantial' evidence is present,

53

no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." ' " (*San Buenaventura, supra,* 79 Cal.App.5th at pp. 119-120, quoting *Morgan, supra,* 223 Cal.App.4th at p. 917.)

"Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

City argues that, in this case, the *contents* of the 2013 and 2015 COSSs and Bui's opening report are *undisputed*, whereas in *Coziahr*, "the trial court was asked to rule on disputes as to foundational facts, *such as arguments about the reliability of cost of service data and the factual credibility of their analyses*." (*Coziahr, supra,* 103 Cal.App.5th at pp. 806-807.) Thus, City claims "the substantial evidence standard that governed much of *Coziahr's* analysis does not apply here because this court is asked to review the trial court's *legal decisions* and analysis" under section 6(b)(3).

City's argument misunderstands the disputed nature of City's evidence and the additional evidence in this case. Here, as in *Coziahr*, the liability issues are primarily factual, not legal. (*Coziahr, supra,* 103 Cal.App.5th at pp. 798-799 ["To the extent Otay is suggesting the liability issues here are primarily legal, rather than factual, we do not

54

agree"].)  Here, as in *Coziahr*, "[t]he parties strongly disagreed at trial about whether [City's] evidence was adequate to prove compliance with section 6(b)(3), presenting disputed facts and inferences whose resolution we review for substantial evidence." (*Id.* at p. 799, italics added.)  The parties here and in *Coziahr* also "produced considerable [conflicting] expert evidence to support their positions," which we also review for substantial evidence. (*San Buenaventura, supra,* 79 Cal.App.5th at p. 121.)

To be sure, there is no factual dispute concerning *what* data, assumptions, and methods B&V and City relied on and used in calculating and designing City's 2014 and 2016 rates.  City used the base-extra capacity method, and City's cost calculations are well documented in the 2013 and 2015 COSSs.  But contrary to City's assumption, this evidence, City's evidence, does not *indisputably show* that City's tiered rates comply with section 6(b)(3).  This issue was very much in dispute at trial, as it was in *Coziahr*. (See *Coziahr, supra,* 103 Cal.App.5th at pp. 799, 803.)  And here, as in *Coziahr*, substantial evidence, credited by the trial court and discussed below, shows City's tiered rates are not cost-proportional. (*Coziahr*, at p. 803, quoting *Capistrano*, *supra*, 235 Cal.App.5th at p. 1505 [" ' "proportional cost" ' means 'there really *is* an ascertainable cost of service that can be attributed to a specific . . . parcel' "].)

City attempts to distinguish *Coziahr* on the ground that the parties' experts here, Bui and Smith, both relied on City's "undisputed" evidence, whereas *Coziahr* involved disputed issues of fact concerning "the reliability" of Otay's data, and "multiple," conflicting expert reports.  But this case, too, involved multiple disputed issues of fact concerning the reliability or adequacy of City's evidence (City's data, assumptions, and

55

methods) as a means of calculating rates for the SFR customer class that did not exceed the proportional cost of service to SFR customers.  (§ 6(b)(3); *Howard v. Owens Corning, supra,* 72 Cal.App.4th at p. 631 [undisputed evidence may permit differing reasonable inferences]; cf. *Silicon Valley, supra,* 44 Cal.4th at pp. 453-458 [assessment invalid as a matter of law based on undisputed contents of engineer's report]; *Morgan, supra,* 223 Cal.App.4th at p. 917 ["[T]he challenge to the report [in *Silicon Valley*] was not that its data was flawed or otherwise unreliable, but that [the report] did not show the special benefits that were tethered to the proposed assessment."].)

Here, as in *Coziahr*, the parties submitted conflicting expert evidence on whether the data, assumptions, and methods B&V and City used in calculating and designing City's SFR tiered rates adequately *showed* that the rates did not exceed the proportional cost of delivering water to SFR customers at the above-average usage levels reflected in the higher tiers.  (§ 6(b)(3).)  The independent judgment standard of review requires us to (1) uphold the trial court's findings on these disputed issues of fact if substantial evidence supports them, and (2) determine, independently of the trial court, whether the record contains sufficient substantial evidence to show that City's rates comply with section 6(b)(3).  (*Coziahr, supra,* 103 CalApp.5th at pp. 802-803.)[7]

---

[7] To be sure, whether an agency's water rates comply with section 6(b)(3) is a mixed question of fact and law implicating constitutional rights.  (*Silicon Valley, supra,* 44 Cal.4th at pp. 448-449)  As our cases have noted, the legal question of section 6(b)(3) compliance is reviewed de novo.  (*Moore, supra,* 237 Cal.App.4th at p. 368; see *Silicon Valley,* at pp. 448-450.)  But when, as here, the resolution of the mixed question of law and fact " ' " 'requires an inquiry that is "essentially  factual," . . . and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous

*[footnote continued on next page]*

2. <u>City's Briefings Misunderstand the Independent Judgment Standard of Review</u>

Throughout its briefing, City argues that because City's evidence is undisputed, and the reasonableness standard of proof applies, the independent judgment standard of review compels this court to conclude, as a matter of law and based on City's undisputed evidence, that City's tiered rates comply with section 6(b)(3). For example, City argues "City's evidence *substantially* proved that the City reasonably relied on available data and information to calculate the tiered water rates for the SFR customer class, such that the rate for each tier reflects the City's cost to deliver water service at the consumption level represented by each tier." City argues the 2013 and 2015 COSSs, and Bui's reports explaining them, "*were robust and more than sufficient to support the tiered water rates for the [SFR] customer class*."

As Class summarizes it, "City's principal argument on appeal is that the weight of the evidence before the trial court demonstrated the City had a reasonable basis for its actions. The City asks this court to reverse based on its independent review of that evidence." Indeed, City, joined by Water Amici and Municipal Amici, asks this court to analyze City's SFR tiered rate structure in depth, and place our constitutional imprimatur on the rate structure, in all of its particulars, as sufficiently reasonable and adequate to comply with section 6(b)(3). This we cannot do. (*Coziahr, supra,* 103 CalApp.5th at pp. 802-803; *Morgan, supra,* 223 Cal.App.4th at p. 917 [court would not "engage in a

---

standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then . . . the question should be classified as one of law and reviewed de novo.' " ' " (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800-801.)

57

detailed review 'at a word and phrase level' of the Cost of Service Study" for water rates, where the plaintiffs challenged the reliability of the data underlying the study, and the trial court credited the agency's conflicting substantial evidence, showing the data was reliable].)[8]

As Class argues, City is improperly seeking a "do over" of the Phase I liability trial because City believes the dispositive, liability-related evidence (City's evidence) is undisputed. But as noted, the liability issues are primarily factual, not legal; they turn on disputed factual inferences permitted by City's evidence, together with the additional evidence presented at trial, including the relative strengths of the parties' conflicting expert opinion evidence. It is not our function to reweigh this evidence in determining

---

[8] City argues *Coziahr* "misapplies the substantial evidence standard of appellate review because it applied the standard to *all legal* and factual findings in the trial court's liability decision." (Italics added.) Thus, City argues we should "distinguish *Coziahr* and review the primary legal question of the City's compliance with section 6(b)(3) independently and without deference to the trial court's legal findings." As explained, however, and contrary to City's assumptions, City's evidence is *disputed*, and the question of City's compliance is primarily *factual*, not legal.

City also argues C*oziahr* missed the "second step" of the independent judgment standard of review, by failing to "independently examine whether the rates comply with section 6's substantive requirements" and "rubber-stamping the trial court's legal conclusion that the rates violated section 6(b)(3) because substantial evidence supported the underlying factual findings." *Coziahr's* analysis did not miss this "second step." In sum, *Coziahr* concluded that substantial evidence, including the plaintiffs' expert evidence explaining the data, assumptions, and methods used in calculating Otay's tiered rates, showed that Otay's tiered rates did not comply with section 6(b)(3). (*Coziahr,* at pp. 803-819.) Thus, *Coziahr* "independently examined" whether Otay's tiered rates complied with section 6(b)(3). (*Ibid.*)

We also disagree with City's criticism of *Coziahr* as "unhelpful to this court" due to what City calls its "cursory analysis of key legal questions" (based in part on forfeiture) and "cursory evaluation of most arguments." *Coziahr* thoroughly discussed the issues presented. (*Ibid.*)

whether substantial evidence supports the trial court's determination that City's evidence did not adequately (or indisputably) show that City's tiered rates for SFR customers comply with section 6(b)(3). (*Coziahr, supra*, 103 Cal.App.5th at pp. 799-803, 817 & fn. 15; *San Buenaventura, supra,* 79 Cal.App.5th at pp. 120-121; *Morgan, supra,* 223 Cal.App.4th at p. 898, 916-917.)

### 3.  City Has Forfeited Its Substantial Evidence Claims

Although City couches its argument as legal, not factual, City is challenging the sufficiency of the evidence supporting the trial court's contrary determination that City's tiered rates *do not* comply with section 6(b)(3) by arguing City's evidence, standing alone, is sufficient to prove and indisputably proves  that City's tiered rates comply with section 6(b)(3). (*Morgan, supra,* 223 Cal.App.4th at p. 916 [challenge to trial court's section 6(b)(3) determination challenges the sufficiency of the evidence supporting it].) As Class argues, City has forfeited this substantial evidence claim by failing to address the proper standard of review and by discussing only City's evidence, while disregarding the evidence supporting the trial court's Phase I statement of decision on City's liability.

In its extensive original and supplemental briefings, City does not address the substantial evidence standard or seek to apply it.  That is, City does not attempt to explain how the evidence the trial court relied on does not support the trial court's Phase I statement of decision on liability.  Instead, City discusses the evidence favorable to City, and argues, as it did in the trial court, that City's evidence compels the conclusion that City's tiered rates comply with section 6(B)(3).  (*Hauselt v. County of Butte* (2009) 172 Cal.App.4th 559, 563 [substantial evidence claim forfeited where appellant only cites

evidence favorable to him]; *Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [substantial evidence claim forfeited where appellant did not "fairly state all of the evidence as is required" and "merely" challenged respondent and court to "find the evidence" supporting the judgment]; *Bates v. Rubio's Restaurants, Inc.* (2009) 179 Cal.App.4th 1125, 1135 [appellant who fails to address proper standard of review "fail[s] to meet its burden to show reversible error"].)

Nonetheless, we exercise our discretion to address City's claims related to the evidence supporting the trial court's Phase I liability decision. (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1030, fn. 10 [appellate court has discretion to review otherwise forfeited claim presenting important question of constitutional law].) In addressing City's substantial evidence claims, *post*, we explain why substantial evidence supports the trial court's liability decision and requires us to affirm it.

D. *Substantial Evidence Shows City's SFR Tiered Rates Are Not Cost Proportional*

In the following discussion, we conclude, based on our independent judgment, that the substantial evidence the trial court credited in its Phase I statement of decision shows that City's tiered rates for SFR customers are not cost-proportional, and thus do not comply with Section 6(b)(3). City did not meet its burden of showing otherwise.

1. City's Burden to Show Error on Appeal

On appeal, the judgment is presumed correct, and the appellant, here City, has the burden of demonstrating error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) In considering City's substantial evidence claims, we view the record in the light most favorable to the judgment, resolving all conflicts in the evidence in favor of the judgment.

60

(*Coziahr, supra*, 103 Cal.App.5th at pp. j802-803; *Nolte Sheet Metal, Inc. v. Occupational Safety & Health Appeals Bd.* (2020) 44 Cal.App.5th 437, 442-443 [trial court findings may not be set aside on appeal unless they are so lacking in evidentiary support to be unreasonable].)  As discussed, City's burden of proof at trial was to show that its SFR tiered rates did not exceed City's cost of providing water to SFR customers at the tiered usage levels.  (*Capistrano, supra,* 235 Cal.App.4th at pp. 1506, 1516.)

    2.  <u>"Granular" and "Precise" Data Including "Time-Of-Use" Data</u>

We begin with City's claim that section 6(b)(3) does not require agencies to show that their "ratesetting decisions relied upon or are supported by:  (a) granular and precise data regarding usage by customer class, and (b) time-of-use data on a class by class and customer by customer basis."  City argues, "section 6(b)(3) and the applicable case law do not require *exact precision and voluminous granular data* to prove that tiered rates comply."  Rather, City claims *Griffith*, *Morgan*, and *Moore* only required City to show City "used 'reasonably accurate' available data to reasonably apportion the cost of service to customers."

City's argument is based on the erroneous premise that the standard of proof under section 6(b)(3) is reasonableness.  As discussed, reasonableness is not the standard of proof under section 6(b)(3); cost-proportionality is.  (*Coziahr, supra,* 103 Cal.App.5th at pp. 800-803.)  But apart from City's reliance on the inapplicable reasonableness standard, City claims the trial court held City to a standard of *substantive* proof, not required under *Griffith*, *Morgan*, and *Moore*, by requiring City to present "granular time-of-use data to support" City's SFR tiered rates.

City argues, "[u]nder *Griffith*, a water agency does not need to allocate the incremental costs to meet peak demand on a customer-by-customer and hour-by-hour basis in order to use a tiered rate structure. Additionally, *Morgan* and *Moore* make clear that detailed data and mathematical precision are not required to demonstrate that cost allocations and rate structures are reasonable and comply with section 6(b)(3)." City says *Griffith*, *Morgan* and *Moore* "acknowledge the necessarily imperfect nature of data used in the cost allocation and ratesetting processes."

We agree with City that section 6(b)(3) does not require agencies to base their cost of service allocations on "perfect" data, particularly when such data is unavailable or impractical to obtain. That is the salient point of the cases City relies on. (*Morgan, supra,* 223 Cal.App.4th at p. 918 ["[S]ection 6 does not require perfection."]; *Moore, supra,* 237 Cal.App.4th at p. 368 [upholding cost allocations " 'based on [r]eliable estimates' " of time spent on sanitation issues were " 'reasonable under the circumstances.' "]; *Griffith, supra,* 220 Cal.App.4th at pp. 600-601 ["method of grouping similar [well] users together for the same augmentation rate and charging the users according to usage [was] a reasonable way to apportion the cost of service"].) But, as discussed, the trial courts in *Griffith, Morgan,* and *Moore,* found that the agencies' data, though not perfect, was sufficient to show that the charges complied with section 6 (b)(3), and the plaintiffs did not show that the agencies' data was unreliable or otherwise insufficient to show cost-proportionality. Thus, theses courts affirmed the judgments for the agencies. (*Griffith,* at pp. 600-601; *Morgan,* at pp. 914-919; *Moore,* at pp. 368, 371-375.) Here, as we have also noted, the substantial evidence shoe is on the other foot. The

trial court concluded based on substantial evidence, and on independent review we agree, that the data, assumptions, and methods B&V and City relied on in designing City's SFR tiered rates (e.g., the base-extra capacity method, historical billing records) did not adequately show that the tiered rates comply with section 6(b)(3). Like the plaintiffs in *Griffith*, *Morgan*, and *Moore*, City has not shown that any of the substantial evidence the trial court relied on in support of its Phase I liability decision is unreliable or does not support the decision.

3. City's Lower-Cost Local Water Supplies Do Not Support the Tiered Rates

The 2013 and 2015 COSSs explain that the " 'pricing differentials between the tiers' " for SFR customers were based in part " 'on local and nonlocal water supply costs' " and " 'changing the mix of water supplies through the tiers.' " The 2013 and 2015 COSSs attempted to justify the "units of water included in Tier 1" being charge at the " 'lowest rate' " by stating that those units "represent[ed]" City's least expensive source of water—local supply.[9] That is, City told its customers that Tier 1 was priced at the lowest rate because Tier 1 represented lower cost, local supply, whereas Tiers 2 through 4 were priced higher because consumption in those tiers required City to acquire more expensive sources of water. Bui restated these claims in her opening report.

But as the trial court found, no evidence showed that the units of water consumed by SFR customers in Tier 1 came from City's lower cost, local water supplies. Rather,

---

[9] The 2013 and 2015 COSSs stated: "Because water resource supply in San Diego is limited and expensive, it is reasonable to base the Tier 1 breakpoint at 3-4 HCF per month [(2013 COSS); 4 HCF per month (2015 COSS)]. This range would serve to recognize water efficiency within this customer class."

City commingled all of its water sources in reservoirs before delivering the water to customers. Thus, City was unable to tie its local water supplies, and lower costs, to Tier 1 usage. As the trial court put it, "because the City commingles all its water and delivers it to customers using the same infrastructure, the City cannot ensure" as City had claimed, that City's "higher-cost 'alternative sources of supply' [were] being delivered to customers whose use led to the City's 'greater investments' in those sources of supply."

In addition, Bui conceded, in her rebuttal report and deposition, that City's local water supplies were "not enough to cover all tier 1 water use" in a given year, and even if they were, City's commingling of its water sources meant that lower cost supplies could not be traced to Tier 1 usage. Bui agreed with Class's expert, Smith, that "tying tiered pricing to the cost of source of supply 'would be impossible,'" especially for City's local water supply, which may provide between 0 percent and 15 percent of City's total water needs in a given year. Bui also admitted City had "never" delivered local supplies of water "to Tier 1 [SFR] customers only."

Based on City's failure to present evidence supporting City's "source-of-supply justification" for its 2014 and 2016 Tier 1 rate, the court found City's 2014 and 2016 tiered rates did not comply with section 6(b)(3). We agree with this conclusion. The lack of evidence tying the lower Tier 1 rate to its purported justification of lower-cost, local water supplies, undermines the integrity of the entire Tier 1 through 4 rate structure, insofar as all of the tiers purport to be based, in part, on the lower cost, local water supplies underlying the lower Tier 1 rates. Thus, the lack of evidence justifying the lower Tier 1 rates, standing alone, shows City's entire 2014 and 2016 tiered rate

64

structures are not proportional to the costs of delivering water to SFR customers at those tiered usage levels, as section 6(b)(3) requires. (*Capistrano, supra,* 235 Cal.App.4th at pp. 1506, 1516 ["[I]f a local government body chooses to impose tiered rates unilaterally without a vote, those tiers must be based on cost of service for the incremental level of usage."].) Affirmance of the liability portion of the judgment is proper on this ground alone.

### 4. City's "Peaking Factor" Analysis Also Lacks Evidentiary Support

At two stages of its 2013 and 2015 ratemaking processes, City applied "demand factors" or "peaking factors" in allocating costs, first to the five customer classes using "unique customer class peaking factors differ[ent] from the demand peaking factors used to size the system," and second, to the tiers in the SFR customer class, "based on the peaking characteristics of users in those tiers." The trial court found City failed "to point to any evidence in the record that shows that these allocations were based upon actual calculations of cost of service for water to be provided to a particular parcel, as required by Proposition 218 and *Capistrano*." We agree with the trial court.

#### (a) *The Trial Court's Findings*

The trial court found that City's justification for using peaking factors in allocating costs was that "City incurs 'greater costs' to size its water system to meet customers' demand at peak times—on the day and at the hour of highest use—'than it would if all customers always received water at a uniform rate of use,' and that the customers who cause that peak demand should be made to bear the cost of sizing the system to meet it." Thus, City used the base extra capacity method in allocating costs, "which provides for

calculating 'peaking factors' based on 'maximum day' and 'maximum hour' usage—that is, the amount of water used on the day and at the hour of maximum usage for the water system . . . ." The base extra capacity method "purports to 'allocate these higher peak demand costs to those customers who exhibit the greatest peaking behaviors' and are thus responsible for causing the City to incur those extra costs."[10]

The trial court found: "The problem with this theory is that the peaking factor ratios [1.5 for Max Day; 2.25 for Max Hour] and the cost allocations are not based on actual data." The record supports this finding.

First, as the trial court found, City did not have "time-of-use data" for any of its customers, showing *when* those customers used water. Bui admitted City "did not know when customers used water," and City "did not perform the studies necessary to collect that information." City also did not have the metering capability necessary to track "granular" customer time-of-use. Bui explained it was "very expensive to do customer demand studies," and the Public Utilities Department did not "conduct such studies."

In her opening report, Bui further explained that, because City did not have time of use data or customer demand studies, B&V established the Max Day and Max Hour Extra Capacity factors using " 'industry guidelines,' '[i]n accordance with M1 standards'

---

**10**  As explained, *ante*, "base costs" are attributable to average demand, and to building and operating the system to meet average demand, while "extra capacity costs" are capital and operating costs attributable to above average demand, needed to build and operate the system to meet above average demand. Extra capacity costs include Max Day and Max Hour costs, respectively defined as costs attributable to building and operating the system at Max Day Size (1.5 times Base size, to meet Max Day demand) and Max Hour Size (2.25 times Base Size, to meet Max Hour demand).

and 'peak factors' that it obtained from the City's s 2011 'Water Facilities Master Plan' and the 'City Engineering Department.' " That is, Bui said B&V examined "historical data and usage patterns for the customer classes to estimate the Max Day and Max Hour Extra Capacity factors." But Bui later admitted that the 1.5 and 2.25 system sizing "peak factors" in City's Master Plan (which B&V and City used in allocating Max Hour and Max Day costs to all customer classes and to the SFR tiers) were "simply the historical maximum day and maximum hour usage ever observed at each facility for *all* users." The Master Plan did not "break down" Max Day or Max Hour data by customer class, and all customers used water from the same facilities. Based on this evidence, the trial court found B&V and City "had no usage data for the [SFR] customer class (or any other customer class) . . . ." Thus, as the trial court found, "City did not know whether the demand levels it used to set the [SFR] rates even came from [SFR] customers . . . ." "Despite lacking the necessary data" B&V "adopted" the 1.5 Max Day and 2.25 Max Hour peaking factors " 'set forth in the City's Master Plan.' " B&V then use these 1.5 and 2.25 peaking factors "to allocate nearly half of peak day costs, and all peak hour costs, to [SFR] customers in Tiers 3 and 4." The court found City had no data to support *these* allocations, given that City had no time or use data, or other data, showing SFR customers using water in Tiers 3 and 4 during a given billing cycle *used more water at peak times* than SFR customers in Tiers 1 and 2.

The court accordingly found that "City's sole justification for charging Tier 3 and 4 users much higher rates appears to be an assumption that those users are 'more likely' to be using water at peak times than average and below average users because they use a

67

higher total volume of water in a given billing cycle." The court pointed to City's Phase I trial brief, in which City argued, "It is a reasonable assumption that proportionally higher rates of consumption have correspondingly higher contribution to peak demand and, therefore, peak demand costs. Customers with usage at Tier 3 and Tier 4 are far more likely to be consuming more water at peak times than average and below average users." But, as the trial court found, no evidence showed that Tier 3 and 4 users (SFR customers using above average amounts of water during a given billing cycle) were "far more likely," or even at all likely, to consume more water at peak times than average and below average SFR users in Tiers 1 and 2, or nonSFR customers. Bui admitted that Tier 1 and Tier 2 users, and other customer classes, *also use water* during peak day and peak hour times, "thus contributing to the need for the maximum system capacity." Bui also conceded that nonSFR customers, whose uniform rates were lower than the Tier 4 rates, contributed "*more* to the need for maximum system capacity" than SFR customers.

In sum, the trial court found City did not show that City's "use of peaking factors" in setting the SFR tiered rates complied with section 6(b)(3). We agree. The evidence the trial court relied on in its Phase I statement of decision shows City had *no cost-based justification* for charging SFR customers more for using water in Tiers 3 and 4 than in Tiers 1 and 2.

(b) *City's Arguments*

City argues the trial court's liability decision is contrary to *Griffith*, *Morgan*, and *Moore*, to the extent the court faulted City for not adducing what City calls "granular" time-of-use data to support City's SFR tiered rates. We disagree. The liability decision

is not contrary to *Griffith*, *Morgan*, or *Moore*.  The trial court did not require City to adduce unnecessarily "precise" or "granular" data to show the tiered rates were cost-based.  Rather, the court properly found that, because City chose to base its tiered pricing "on the supposition that it costs the City more to deliver water at certain peak times," coupled with the theory that Tier 3 and Tier 4 users use more water at peak times than Tier 1 and 2 users (and other customer classes), City had an obligation to support its "pricing regime" with "actual observed data" from San Diego SFR customers.  But City did not adduce *any evidence* that City's Tier 3 and 4 rates did not exceed the cost of delivering water to SFR customers using water in those higher tiers.[11]

City argues "[t]he undisputed evidence demonstrates that B&V reasonably relied on data and information obtained from the City regarding system sizing and functions to set the demand peaking factors.  Likewise, B&V reasonably used the Base-Extra Capacity Method to allocate the cost categories to the functional cost buckets using

---

[11]  The trial court did not demand that City adduce "perfect" evidence to support City's SFR tiered rates; it only required City to prove that the peaking factors City used in allocating costs to arrive at those tiered rates were based on substantial evidence that SFR customers using water in Tiers 3 and 4 cause City to incur correspondingly higher costs to deliver that water.  The City did not do so.

City claims *Coziahr* "carries little weight" here because its "demand for time of use data" likewise conflicts with *Griffith*, *Morgan*, and *Moore*.  We disagree.  Like the trial court here, *Coziahr* concluded Otay did not adduce any evidence to support its SFR tiered rates, including time of use data.  (*Coziahr, supra*, 103 Cal.App.5th at pp. 815-819 ["the record supports the trial court's finding that Otay lacked data to allocate peaking costs"].)  Like City's SFR tiered rates here, Otay's SFR tiered rates were based on the unsupported assumption that SFR customers using water in higher tiers caused Otay to incur correspondingly higher costs to upsize its water system.  (*Id*. at pp. 816-819.)  Thus, *Cozihar* did not demand "perfection" from Otay, and *Coziahr* appropriately rejected Otay's reliance on *Morgan*.  (*Id*. at pp. 802-803.)

demand peaking factors." In the same vein, City argues, "[t]he undisputed evidence demonstrates that B&V used demand factors from the City's Water Master Plan, historic operating data, and information gathered from City's engineers responsible for sizing the system. Therefore, B&V based the demand factors on reasonably accurate information."

These arguments do not demonstrate error. They do not address the substantial evidence supporting the trial court's liability decision or attempt to explain why that evidence does not support the decision. (*Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 514 ["[W]hen the substantial evidence standard of review applies, the appellant is required ' "to demonstrate that there is *no* substantial evidence to support the challenged findings." ' "].) In sum, substantial evidence, detailed here, supports the trial court's liability decision and belies City's "undisputed" evidence arguments.[12] (See *Coziahr, supra*, 103 Cal.App.5th at pp. 807, 816-819 [Otay adduced no time-of use-data or other evidence showing that its peaking factor analysis justified its SFR tiered rates]; *Capistrano, supra,* 235 Cal.App.4th at p. 1499 ["City Water did not try to calculate the incremental cost of providing water at the level of use represented by each tier . . . ."].) As the trial court found, City's failure to justify charging SFR Tier 3 and 4 users more for water than Tier 1 and 2, with time-of-use data, users shows that City's SFR tiered rates

---

[12] City also argues, "[i]t is undisputed that the City's incremental cost (above Base costs) to design, build, and operate upsized facilities to meet above-average demand are a significant portion of the total revenue requirement." But as Class points out, City adduced no evidence to support this assertion.

70

are not cost-proportional, as section 6(b)(3) requires.  This ground, alone, justifies affirming the trial court's liability decision against City.[13]

    5.  The Breakpoints in City's SFR Tiers are Also Not Cost-Based

Additional evidence shows that City set the breakpoints for its SFR tiers based on budgets designed to encourage conservation by penalizing above-average excessive use, rather than on the cost of building and operating City's water system, or delivering water to SFR customers at the tiered usage levels.  These usage budgets were based on historical data, including City's billing records, showing that an SFR unit used an average of 12 HCF per month.  (*Capistrano, supra,* 235 Cal.App.4th at pp. 1498-1499; *Coziahr, supra,* 103 Cal.App.5th at pp. 811-812.)

City argues—and its tiered breakpoints are based on the assumption—that "usage above [12 HCF] in a billing cycle represent[s] above-average usage for an SFR customer"; *therefore*, usage above 12 HCF "contributed to the City's need to upsize the

---

    **13** City argues *Capistrano* "mandates that when customers use water at below average or average levels in a billing cycle (Tiers 1 and 2) they cannot be charged for upsizing facilities to meet demand that they do not place on the system," and "customers who have above-average usage in a billing cycle should be charged rates that recover most of the incremental costs to upsize the system to meet above-average demand." (*Capistrano, supra,* 235 Cal.App.4th at pp. 1503-1504)  This argument takes *Capistrano's* observations about charging higher users for correspondingly higher costs out of context.  *Capistrano* was discussing City Water's recycling program and remanded the matter for further findings on whether City Water's charges to develop its "recycling operation have been improperly allocated to users whose levels of consumption are so low that they cannot be said to be responsible for the need for that recycling." (*Id.* at p. 1504.)  Thus, in *Capistrano*, the record before the court contained no evidence to justify charging lower water users for the recycling program. (*Ibid.*)  Similarly here, City adduced no evidence to justify charging SFR users more for water in Tiers 3 and 4 than in Tiers 1 and 2.  Likewise, in *Capistrano*, "City water did not carry its burden of proving its higher tiers reflected its costs of service." (*Id.* at p.1516.)

71

system to meet above-average demand." Although City's billing records show that 12 HCF is the average amount an SFR unit *in City* uses in a billing cycle, it does not follow, and no evidence shows, that above-average *usage* by SFR units (in Tiers 3 and 4) correlates to above-average *costs* of "upsizing" City's water system.

Further, as the trial court found, City pointed to "no evidence" that the 19th and 20th HCF of water delivered to an SFR customer cost "over 200 percent more than the cost of delivering the first and second HCF to that same customer." (*Capistrano, supra,* 235 Cal.App.4th at pp. 1505, 1516 [tiered pricing must correlate to cost of service].) City's reliance on the usage patterns of the irrigation customer class as "a proxy" for City's Tier 3 and Tier 4 pricing is unsupported. In setting the pricing for Tiers 3 and 4, City *assumed* that usage in Tiers 3 and 4 was for landscaping. But contrary evidence shows that SFR above-average usage may be attributable to larger families (more than two people) living in an SFR. Further, City never correlated the usage for which Tier 3 and Tier 4 water is put, whether landscaping *or larger families*, to the costs of delivering water at those usage levels, *or* to "upsizing" the system.

The fractional precision between City's 2014 and 2016 tiered rates also indicates that the SFR tiered rates are not correlated to costs. (*Capistrano, supra,* 235 Cal.App.4th at pp. 1504-1505 ["fractional precision" between shares suggested City Water did not attempt to correlate its rates with cost of service]; *Coziahr, supra,* 103 Cal.App.5th at p. 809 ["trial court could impliedly find Otay's SFR rates reflected questionable consistency"].) For 2014, City's Tier 4 rate was "precisely" 2.25 times the Tier 1 rate, and in 2016, this multiplier was "almost exactly" 2.25. And under these rate structures,

72

SFR customers were charged 225 percent more for usage in Tier 4 than in Tier 1, while all other customer classes were charged "approximately the Tier 2 rate for all usage, regardless of volume." City's instruction to B&V to retain tiered rates for SFR customers in the 2013 and 2015 ratemaking processes further indicates City wanted B&V to find a way to justify City's SFR tiered rates based on costs, rather than to actually base those rates on costs.

6. *Palmdale* Discrimination

"*Palmdale* stands for the proposition that rate differentials between groups, whether customer classes or tiers, support an inference of disproportionality—and, to be constitutional, must be supported by evidence of costs justifying the differences." (*Coziahr, supra,* 103 Cal.App.5th at p. 814; *Palmdale, supra,* 198 Cal.App.4th at p. 934.)

The trial court found City's SFR tiered rates discriminated against SFR customers in favor of irrigation customers, in violation of *Palmdale*, because City did not articulate "an adequate cost-based justification" for using a tiered-rate structure for SFR customers and uniform rates for all other customer classes. It is indisputable that City charged SFR customers far more for "the same water" than other customer classes. To use the trial court's example, in 2014, an SFR customer would have paid $8.19 for every HCF over 18 used in a billing cycle, while a "dry cleaner next door would have been charged [a flat rate of] only $4.17 for the same water," and an MFR unit using the "same amount of water would have been charged only $4.34 per HCF." "Worse still," this rate structure resulted in SFR customers being charged more for usage above 12 HCF than irrigation

73

customers. The court found City failed to support these price differentials. (§ 6(b)(3).)
We agree.

First, the price differentials cannot be explained by higher costs in Tiers 3 and 4, based on peaking factors or time of use. As explained, City's evidence showed that all customers used water at peak times, and *did not show* that SFR customers (as a whole, or in any tiers) used more water at peak times than other customer classes. To the contrary, the record shows that both irrigation and construction customers exhibited "much higher peaking factors" than SFR customers. Yet, only SFR customers were charged tiered rates, and were charged more than other customers in the higher tiers, "based on their alleged [but unsupported] peak use."

Second, City attempted to justify the price differentials between the SFR customers and other customer classes based on the assumption that SFR customers using over 12 HCF per month (above average use for an SFR customer) were using water *inefficiently for their size* in comparison to non-SFR customers. But as the trial court found, this rationale is unsound. City claims "there was no reasonable way for B&V to document one single average monthly HCF usage amount" for the nonSFR customer, given that non-SFR customers vary greatly in size and operations. As a result, under a tiered rate structure larger nonSFR customers (e.g., Walmart stores, apartment complexes, golf courses) would pay the highest tiered rates for *most of their water, even though they used water efficiently *for their size*. Bui explained that this would be "inequitable" to large nonSFR customers, and for this reason City did not adopt tiered rates for the nonSFR customer classes.

74

But as the trial court explained, SFR customers using more than 12 HCF in a billing cycle "because they have large homes and large families are charged for water services at Tier 3 or 4 rates"—higher than the flat rates other customers are charged—even if these SFR customer are using water efficiently.  Thus, we agree with the trial court that City's rationale for using tiered rates for SFR customers and flat rates for other customers is unsound.  City adduced no other evidentiary support for the rate disparities between the SFR class and other customer classes.  In sum, substantial evidence, credited by the trial court, showed that City's SFR tiered rates price-discriminate against City's SFR customer class, including SFR customers using water in Tiers 3 and 4, in favor of City's other customer classes.  (*Palmdale, supra,* 198 Cal.App.4th at p. 937 [unjustified prices between customer classes violate § 6(b)(3) ]; *Capistrano, supra,* 235 Cal.App.4th at pp. 1507-1508 [unjustified prices between tiers violate § 6(b)(3)].)[14]

7. Conclusion

City did not establish that City's SFR tiered rates, which went into effect in 2014 and 2016 pursuant to City's 2013 and 2015 ratemaking processes, were compliant with section 6(b)(3).   Thus, we affirm the trial court's Phase I liability decision.

The dissent agrees with City's arguments (including that the standard of review is reasonableness, which we have addressed above) and concludes that City's evidence is

_____

[14] Given our conclusion that the disparities in rates between customer classes are unsupported by the record, it is unnecessary to address Class's claim that City violated *Palmdale* in a second way, by using unsupported peaking factors in allocating City's total revenue requirement to the customer classes, thus "tainting" (by unduly inflating) the total SFR revenue requirement.  *Coziahr* also declined to consider this issue.  (*Coziahr, supra,* 103 Cal.App.5th at p. 814, fn. 14.)

both indisputable and legally sufficient to show that City's SFR tiered rates comply with section 6(b)(3). (Dis. Opn., pp. 1-4.). The dissent argues there are no material disputed factual issues, our majority opinion does not identify any, and judgment must therefore be entered in favor of City. (Dis. Opn., pp. 1, 57.) But as we have attempted to explain in addressing City's claims, the record as a whole does not permit only one reasonable inference—in favor of City. Rather, substantial evidence, credited by the trial court, shows City's SFR-tiered rates are not cost-proportional; rather, they *exceed* the costs of delivering water to SFR customers using water in Tiers 3 and 4 (more than 18 HCF) in a billing cycle) and therefore violate section 6(b)(3). As discussed, City presented no evidence that SFR Tier 3 and Tier 4 users were "far more likely," or at all likely, to consume more water at peak times than SFR customers whose usage remained within Tiers 1 and 2, or City's other customers, and, therefore, that Tier 3 and 4 users contributed more to the need to upsize the system to meet Max Day and Max Hour demand on the system. Yet, City allocated all of the SFR's class's estimated Max Hour costs to SFR Tiers 3 and 4.

We agree that there is not necessarily only one way to calculate and allocate the cost of providing water service to various parcels, and that future costs of such services must be projected, or estimated. (Dis. Opn., pp. 5-7, 13.) But this does not mean that trial courts must accept an agency's cost projections, or cost allocations, particularly when other evidence shows the agency's projections or allocations are based on faulty assumptions or insufficient data. (*Coziahr, supra,* 103 Cal.App.5th at p. 803 ["[H]aving rate studies, and an expert who agrees with them, [was] not enough." Rather, "Otay still

had to substantiate the analysis with data that meaningfully captured the cost of service to the parcel for Otay's SFRs," and "[w]hether [Otay] did so was for the trial court to decide in the first instance."].) We also agree that section 6(b)(3) theoretically *permits* agencies to impose either uniform rates or tiered rates (Dis. Opn., pp. 8-9), but it does not follow that agencies must necessarily be allowed to impose tiered rates (see Dis. Opn., pp. 9-13).

The dissent faults *Coziahr* and our majority opinion for not explaining "how a defendant agency is supposed to carry its burden in a section 6(b)(3) suit." (Dis. Opn., pp. 15, 30.) But the agency's burden of proof is straightforward: the agency must show that the fee or charge for the property-related service does not exceed the proportional cost of delivering the service to the parcel. (§ 6(b)(3).) As to how water agencies are to meet this burden in defending tiered water rates, we suggest that water agencies not impose tiered rates (without a vote), where substantial evidence shows the tiered rates are not cost proportional, despite the agency's purportedly "reasonable" cost projections, allocation methods, and data. In such cases, water agencies risks violating section 6(b)(3) if they impose tiered rates. Further, tiered rates are not necessarily constitutional. (§ 6(b)(3).) Although *Capistrano*, in dictum, called tiered rates "a good idea" (*Capistrano, supra,* 235 Cal.App.4th at p. 1511), section 6(b)(3) does not necessarily permit them. Contrary to the dissent's argument, California courts have *not* "repeatedly held that tiered water rates can be made consonant with Proposition 218." (Dis. Opn., p. 31.).

The dissent discredits and dismisses the substantial evidence, credited by the trial court, showing that City's SFR tiered rates are not cost proportional. (Dis. Opn., pp. 29-

77

51.)  Regarding City's claim that Tier 1 was based on the lower costs of local water supplies, the dissent argues City has never claimed "that water billed at tier 1 rates comes exclusively from local supply," or if it did, the claim would be "outlandish," and in any event, "the alleged claim that tier 1 water comes from local supply" is irrelevant because it played "no role" in City's cost calculation and allocation.  (Dis. Opn., pp. 35-40, italics omitted.)  But the 2013 and 2015 COSSs stated that the " 'the pricing differentials between the tiers' " were "based in part on 'local and nonlocal water supply costs' " and " ' changing the mix of water supplies through the tiers.' "  Bui later conceded that Tier 1 pricing was not based on the lower costs of local supply.  The relevance of this is that it discredits City's original justifications for the SFR tiered pricing and shows that City's cost allocations amounted to " an unsupported, post hoc rationalization" for the tiered rates.  City's lack of time-of-use data, and any other evidence showing that SFR customers who use water in Tiers 3 and 4 contribute more to Max Day and Max Hour costs than other water customers, further undermines City's analysis.

E.  *Government Code Section 53750.6 Does Not Assist City's Argument*

City argues this court should disregard *Coziahr's* peaking factor analysis (*Coziahr, supra,* 103 Cal.App.5th at pp. 808-812) because it does not consider and conflicts with newly enacted Government Code section 53750.6.  (Stats. 2024, ch. 359 (A.B. No. 1827), § 1, eff. Jan. 1, 2025.).)  There is no conflict.

*Coziahr* concluded that Otay did not show that Otay's tiered rates did not exceed Otay's cost of service (§ 6(b)(3)), in part because Otay presented insufficient evidence that it incurred higher costs for delivering water to SFR customers on peak days and

78

during peak hours.  (*Coziahr*, *supra*, 103 Cal.App.5th at pp. 815-819.)  Government Code

section 53750.6 merely allows, but does not require, fees or charges for water services

governed by article XIII D to include "the incrementally higher costs of water service due

to" a parcel's "higher water usage demand" "maximum potential water use," and

"[p]rojected peak water usage."  (Gov. Code, § 53750.6, subd. (a).)  The new statute also

allows such higher costs to be allocated (1) "using any method that reasonably assesses"

the cost of serving the parcels, and (2) among or within customer classes, or both, "based

on meter size or peaking factors. . . ."  (Gov. Code, § 53750.6, subds. (b)(1)-(2).)  The

statute is declaratory of existing law.  (*Id*. at subd. (c).)[15]

Government Code section 53750.6 does not excuse agencies from complying with

section 6(b)(3), nor could it.  (*Wright v. Compton Unified Sch. Dist.* (1975)

46 Cal.App.3d 177, 183 [statutes inconsistent with or contrary to constitutional

---

[15]  The full text of Government Code section 53750.6 states:  "(a) The fees or
charges for property-related water services imposed or increased pursuant to Section 6 of
Article XIII D of the California Constitution may include the incrementally higher costs
of water service due to any of the following:  [¶]  (1) The higher water usage demand of
parcels.  [¶]  (2) The maximum potential water use.  [¶]  (3) Projected peak water usage.
[¶]  (4) Any combination of paragraphs (1) to (3), inclusive.  [¶] (b) (1) The incrementally
higher costs of water service associated with higher water usage demands, the maximum
potential water use, or projected peak water usage may be allocated using any method
that reasonably assesses the water service provider's cost of serving those parcels that are
increasing potential water usage demand, maximum potential water use, or projected
peak water usage.  [¶] (2) In addition to any other method consistent with Section 6 of
Article XIII D of the California Constitution, the incrementally higher costs of water
service associated with higher water usage demand, maximum potential water use, or
projected peak water usage may be allocated among customer classes, within customer
classes, or both, based on meter size or peaking factors, as those methods reasonably
assess the water service provider's cost of serving parcels that increase water usage
demand, maximum potential water use, or projected peak water usage.  [¶] (c) This
section is declaratory of existing law."

provisions cannot stand].)  Section 6(b)(3) mandates that, if an agency imposes tiered water rates, it must show that the rates do not exceed the proportionate cost of delivering water at the tiered usage levels.  (*Coziahr, supra,* 103 Cal.App.5th at pp. 808, 819.) "Section 6(b)(3) does not require or bar use of any particular type of supporting data, so long as it meaningfully reflects cost of service to the parcel." (*Coziahr,* at p. 818, fn. 15; *Capistrano, supra,* 235 Cal.App.4th at p. 1516 [Section 6(b)(3) does not allow "above-cost-of-service pricing for tiers of water service"].)  The water agency in *Coziahr,* Otay, did not meet this burden.  (*Coziahr,* at pp. 809-819.)  Neither did City here.[16]

## F. *Class Certification Was Properly Granted*

City claims the trial court abused its discretion in certifying Class, defined as "all single-family residential customers of the City of San Diego who received water service after August 21, 2014.  City claims certification should have been denied for two reasons: first, Class was "fatally overbroad" because it includes "uninjured" members," namely,

---

[16]  The Senate Rules Committee Analysis of Assembly Bill No. 1872 (Off. of Sen. Floor Analyses, Rep. on Assem. Bill No. 1827 (2023-2024 Reg. Sess.), June 28, 2024, at pages 2-3, mentions the pending appeal in *Coziahr,* and the 2021 trial court decision in this case, and comments:  "Recent trial courts' imposition of increasing degrees of granularity and precision, instead of well accepted methods of cost allocation, have made the allocation of costs to higher water users nearly impossible.  AB 1827 affirms that existing law allows water suppliers to use reasonable and well-accepted method of assessing the incremental costs associated with high water usage demands to high water users; thereby, confirming what Proposition 218 requires for water rates and charges." (*Id*. at p. 4.)  The bill "ensures, if someone is using enough water to increase the costs of operating a water system, the higher water user pays for those costs, not those who are making efforts to conserve water." (*Id*. at p. 5.)  Thus, the Analysis confirms what Government Code section 53750.6 allows:  agencies *can* impose tiered rates, provided the rates are based on and do not exceed higher costs of service, if any, for higher usage. (§ 6(b)(3).)

80

SRF customers who are not entitled to a refund; second, Class members had "inherent and irreconcilable conflicts of interest in the outcome" of Class's section 6(b)(3) claim. We conclude certification was properly granted.

1. Additional Background

Plaintiffs moved for class certification in July 2019, following the filing of their fifth amended complaint in April 2019. Following a hearing, the court granted the motion in an August 16, 2019 minute order, but deferred defining the class period, temporarily defining Class as "All single-family residential customers of the City . . . who received water service after a date to be determined . . . based on the applicable limitations period." In a December 6, 2019 order, the court granted Class's motion to define the class period as beginning August 21, 2014, one year before Patz filed his administrative claim.

In its August 16 order granting certification, the court noted that plaintiffs were seeking a judicial declaration that City's "overall water rate structure operates as an illegal tax, fee, or charge in violation of article XIII D," and, if the rate structure was unconstitutional for the named plaintiffs, it was unconstitutional for everyone in the proposed class. Thus, the court found "the common legal issue" was whether City's rate structure was constitutional.

In its December 6 order defining the class period, the court elaborated on its reasons for certifying the class: "[P]laintiffs are challenging a uniform policy both in this suit, and in the severed action *Coziahr.* . . . [P]laintiffs seek a declaration the overall water rate structure operates as an illegal tax, fee, or charge in violation of article XIII D .

81

. . and that the revenues defendant derives from its water rates exceed the funds required to provide the property related service . . . .  [¶]  Notwithstanding defendant's position that plaintiffs are challenging the rate of the increase, plaintiffs are primarily challenging the *method* of assessment."  The court cited *Plantier, supra,* 7 Cal.5th 372, where our Supreme Court observed that section § 6(b)(3) "concerns the *method* used to allocate a property-related service's aggregate cost among fee payors," given that the provision, " 'ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel.' "  (*Id*. at p. 382.)

2.  City's Argument Supporting Denial of Certification

City offers the following evidence in support of its claims that Class had (1) a large portion of "uninjured" members, and (2) members with conflicts of interest in whether Class prevailed on its section 6(b)(3) claim:  "[W]ater ratesetting is a zero-sum game.  As [City] explained to the trial court, . . . [plaintiffs] must prove that the City set SFR rates that charged some SFR customers more than they should pay for water while charging other SFR customers less.  Therefore, [plaintiffs] necessarily contend that in each billing cycle the City charged some SFR customers (those paying Tier 3 and/or Tier 4 rates) more for water than the City's cost to provide those customers with water (Overpayers).  If [plaintiffs] are correct, then the other SFR customers in that billing period necessarily paid less for water than the City's cost to provide water to those customers (Underpayers).  Thus, City argues that, although an SFR customer "may be an Overpayer in one billing cycle and an Underpayer in the next billing cycle," "only those

82

class member[s] calculated to have a net overpayment for water *during the entire class period* are entitled to a refund."

City next points out that, in opposing certification, "City presented evidence that at least 68.8 percent of the proposed class members were Net Underpayers who underpaid for water during the class time period and would not be entitled to a refund if [plaintiffs] prevailed." Further, during the Phase II trial on damages, City's expert determined that "only about 20 percent of class members [were] Net Overpayers entitled to a refund. The remaining 80 percent of class members [were] Net Underpayers who will receive no refund" if the judgment for plaintiffs is upheld. City argues this Phase II trial evidence "backs up the City's earlier evidence demonstrating that the proposed class was grossly overbroad because at least 68.8 percent of class members were unharmed and would not be entitled to a refund."

City claims its "evidence and the expert's analysis" showed that "the new SFR rates adopted by the City [in the judgment] will necessarily reduce water charges for approximately 20 percent of current SFR customers" and increase water charges for the other 80 percent of current SFR customers. City claims its evidence showed that the 80 percent of the class members who will not receive a refund, but who will remain City water customers, "will be forced to pay higher water rates in the future to fund the refund payments to the 20 percent of the class members entitled to a refund—a large portion of whom are no longer customers and will not face rate increases." Thus, City argues, "not only will class members who are continuing customers face increased rates" due to City's adoption of new rates compliant with section 6(b)(3), these class members "and all new

83

system customers will be required to pay dramatically higher rates for years into the future to fund the more than $79 million in refund payments" the City will be required to make to only 20 percent of the Class.

3. Legal Principles

"Section 382 of the Code of Civil Procedure authorizes class suits in California when 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impractical to bring them all before the court.' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (*Linder*).)  Generally, "a class [action] suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.]  But because group action also has the potential to create injustice, trial courts are required to ' " carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue to both litigants and the courts." ' " (*Ibid.*)

"The party seeking certification as a class representative must establish the existence of an ascertainable class and a well-defined community of interest among the class members.  [Citation.]  The community of interest requirement embodies three factors:  (1) predominant common question of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469-470 (*Richmond*).)

Trial courts are "afforded great discretion in granting or denying [class] certification. . . . [I]n the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]' [citation]. Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] Accordingly, we must examine the trial court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.' " (*Linder, supra,* 23 Cal.4th at pp. 435-436.) When a class certification motion depends on the evaluation of disputed evidence, we review the trial court's factual determinations under the substantial evidence standard. (*Sav-On Drugs Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 328 (*Sav-On*).) That is, we uphold the trial court's express or implied factual findings if substantial evidence supports them. (*People v. Memro* (1995) 11 Cal.4th 786, 905.)

4. *City's Overbreadth Claim Lacks Merit*

City claims Class is "fatally overbroad" because it includes "uninjured" members, namely, SFR customers who are net "overpayers" and will not receive a refund. City relies on *Sevidal v. Target Corp.* (2010) 189 Cal.App.4th 905 (*Sevidal*), where class certification was denied on the grounds the class was (1) unascertainable (*id.* at pp. 920-923), and (2) "overbroad because a substantial portion of the class would have no right to

85

recover on the asserted legal claims" (*id.* at p. 923).[17] *Sevidal* is inapposite because, here, all Class members had a "right to recover" declaratory and injunctive relief on Class's predominate claim that City's method of calculating water rates for SRF customers was unconstitutional under section 6(b)(3). *Sevidal*, in contrast, did not involve a classwide injury.

In *Sevidal*, the proposed class was comprised of people who purchased clothing items from Target's website that were misidentified as " 'Made in the USA.' " (*Sevidal, supra,* 189 Cal.App.4th at pp. 909-911.) The representative *primarily sought monetary relief* on behalf of all class members, under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and Fair Advertising Law (FAL) (Bus. & Prof. Code, § 17500 et. seq.). (*Sevidal*, at pp. 910, 923.) A plaintiff is not entitled to restitution under the UCL or the FAL without " ' "individualized proof of deception, reliance, and injury." ' " (*Id.* at p. 925.) Thus, a plaintiff who was " 'not exposed' " to the alleged misrepresentation cannot show injury and is not entitled to restitution. (*Ibid.*, italics added.)

Although the class representative in *Sevidal* clarified at the certification stage that the class was only to include "those who purchased an item *when the country of origin*

_____

[17] Class construes City's reliance on *Sevidal* as arguing Class's certification should have been denied because Class was not ascertainable. (*Sevidal, supra,* 189 Cal.App.4th at pp. 918-923 [upholding denial of class certification on the ground the proposed class was not ascertainable].) But City does not argue the Class was not ascertainable. Rather, City argues Class was overbroad because it included uninjured members, namely SFR members who were "underpayers" and therefore not entitled to a refund for overpaid water rates.

86

*was misidentified*," the proposed definition of the class included "consumers who purchased an item from Target.com without selecting the ' "Additional Info." ' icon, and thus who were never exposed to the country-of-origin information." (*Sevidal, supra,* 189 Cal.App.4th at pp. 920-921.)  Target's statistical evidence showed that around 80 percent of the proposed class did not have a restitution claim because they had purchased an item without viewing the country-of-origin information.  (*Id.* at pp. 921, 925-926.)  Thus, the *Sevidal* court concluded the proposed class was " 'overbroad' " because there was no " 'classwide injury.' " (*Id.* pp. 925-926, 928.)

City argues that here, as in *Sevidal*, "80 percent of the class [the underpayers] were unharmed and would have no claim for liability."  We disagree.  Substantial evidence supports the trial court's finding that one classwide issue predominated among all proposed class members:  whether City's method of calculating water rates for SFR customers satisfied the proportionality requirement.  (§6(b)(3).)  As Class points out, "all class members were subject to a tiered system that was not based on the cost of service for the incremental level of usage in violation of article XIII D of the Constitution.  The remedy for this classwide injury was classwide injunctive relief ordering the City to comply with the Constitution."  The remedy also includes classwide declaratory relief:  the court's decree that City failed to meet its burden of proving that the tiered water rates imposed on Class based on City's 2013 and 2015 ratemakings complied with section 6(b)(3).

City's reliance on *Mazur v. eBay, Inc.* (N.D. Cal. 2009) 257 F.R.D. 563, 567 and *Junod v. NWP Servs. Co.* (C.D. Cal 2016) [2016 U.S. Dist. Lexis 195195] is similarly

misplaced. In these cases, as in *Sevidal*, certification was properly denied because no classwide injury was shown. (*Mazur* at p. 567; *Junod* at pp. *7-*12; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 633-634.) In contrast here, all class members have been injured by City's unconstitutional water rate methodology and structure.

Further, and as Class points out, that only some Class members may be entitled to a refund does not defeat Class's common interest in its Proposition 218 claim. "The requirement of a community of interest does not depend upon an identical recovery, and the fact that each member of the class must prove his separate claim to a portion of any recovery by the class is only one factor to be considered in determining whether a class action is proper." (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809, superseded by statute as stated in *Flores v. Southcoast Automotive Liquidators, Inc.* (2017) 17 Cal.App.5th 841, 851.) "Predominance is a comparative concept, and 'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate.' " (*Sav-On, supra,* 34 Cal.4th at p. 334.) Thus, a common monetary recovery is not required in order to establish a community of interest. (*Daar v. Yellow Cab. Co.* (1967) 67 Cal.2d 695, 707.) "Nor is it a bar to certification that individual class members may ultimately need to itemize their damages." (*Sav-On*, at p. 334.) Here, all Class members had a common interest seeing that City corrected its unconstitutional method of calculating water rates for SFR customers, going forward, even if some Class members were not "overpayers" and entitled to a refund.

88

*Schwartz v. Citibank, N.A.* (9th Cir. 2002) 50 Fed.Appx. 832 is instructive.  In

upholding class certification, the court explained that, "[r]egardless of the potential

differences in damages suffered by class members, all of their claims stem from Citibank

and Universal's failure to credit payments to consumers' accounts as of the date on which

they were received, unless the payments were received before 10:00 AM that day. . . .

[T]he named class members adequately and fairly represent[ed] the interests of the

class. . . .  There is no inherent conflict of interest between the named plaintiffs, all of

whom actually suffered late fees or finance charges as a result of defendants' policies,

and those class members who suffered no similar injury.  [Citation.]  The overarching

goal of this litigation was to reimburse cardholders for finance charges and late fees

actually incurred as a result of the defendants' early cut-off policy, *and to change that

policy*.  Each of the class plaintiffs, regardless of whether a monetary loss was suffered,

had a similar interest in obtaining relief from the defendants' policy."  (*Id*. at p. 835,

added italics.)

Similarly here, the overarching goal of this litigation has been to obtain relief from

City's unconstitutional tiered rate structure for SFR customers, by enjoining City from

continuing with the rate structure and reimbursing SFR customers who were overcharged

for water services after August 14, 2014.  All Class members have a common interest in

having City adopt water rates that comply with section 6(b)(3).  That Patz and Chesner

may be entitled to refunds as "overpayers," while other Class members who did not

overpay for water service may not be entitled to refunds, does not undermine the

89

predominant, common interest of all Class members in having City adopt a constitutional water rate structure, going forward.

Thus, as Class argues, its representatives' claims are "typical" of Class's claims. " ' " 'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.' " [Citations.] The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." ' " (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.) The test of typicality was met here. Class's action against City is not based on a course of conduct that uniquely affects the representative members, or other members who are or may be entitled to a refund. Rather, all Class members have been injured by City's adoption of an unconstitutional method of calculating water rates for SRF customers.

City argues Class members who were not entitled to a refund (i.e., who were not charged for water service in an amount that exceeded City's " 'proportional cost of the service attributable to the parcel' " (§ 6(b)(3)) did not suffer a constitutional violation and were therefore uninjured. City argues Class's alleged "constitutional injury . . . is clearly defined by section 6(b)(3) as paying a 'fee or charge' for water that 'exceed[s] the [City's] proportional cost of the service attributable to the parcel.' "

City's argument disregards Class's predominant, classwide interest in enjoining City's unconstitutional rate structure. As Class argues, "every class member risks an unexpected event catapulting them into an exorbitant bill detached from the actual cost of

90

their water service. . . . [S]omething as simple as a leak could push even the most conservation-minded [SRF] customer into higher-tier usage." Thus, Class was awarded declaratory and injunctive relief, while members who suffered economic loss were *additionally* awarded refunds.[18]

City's argument is also at odds with section 6(b)(3). As noted in *Plantier,* section 6(b)(3) " 'ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel.' " (*Plantier, supra,* 7 Cal.5th at p. 382, quoting *Morgan, supra,* 223 Cal.App.4th at p. 908.) Thus, section 6(b)(3) "concerns the *method* used to allocate a property-related service's aggregate cost among fee payors." (*Plantier,* at p. 382.) Here, Class's predominate, section 6(b)(3) claim concerns the method City used to calculate its tiered rates for SFR customers, and the constitutionality of this method concerns all Class members.

---

**18** City further argues that, by seeking to certify Class as an "opt-out" class, Class "admitted that the monetary refund claim is [Class's] predominate goal," and "the declaratory and injunctive relief claims are incidental." City observes that mandatory class actions are appropriate when "indivisible" injunctive or declaratory relief is appropriate for the entire class, and "individualized monetary claims" do not predominate. (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 823-824.) Thus, City argues, if Class's declaratory relief claim was its "overarching goal" and its refund claim "incidental," than Class "should have sought certification [as] a mandatory class," and because Class did not seek certification as a mandatory class "Class admitted that the monetary refund claim is the predominant goal . . . , and the declaratory and injunctive relief claims are incidental." We disagree. Class was not required to seek certification as a mandatory class, and its failure to do so does not indicate that its claims for declaratory and injunctive relief did not predominate over its refund claim.

91

5.  City's Conflict of Interest Claim Lacks Merit

A conflict of interest among class members will defeat certification when the conflict " 'goes to the very subject matter of the litigation.' " (*Richmond, supra,* 29 Cal.3d at pp. 470-471.)  Such a conflict of interest undermines the adequacy of representation, an element of the community-of-interest requirement.  (*Id*. at p. 470; see *J.P. Morgan & Co. v. Superior Court* (2003) 113 Cal.App.4th 195, 213 (*J.P. Morgan*).)  As *Richmond* explained:  "when the party opposing certification presents evidence that indicates widespread antagonism to the class suit, the adequacy of representation is called into question.  'It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent.  But only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.' "  (*Id*. at p. 470.)

As detailed above, City claims it presented evidence, in the Phase II damages trial (after certification), that 80 percent of class members "will not receive a refund but will be forced to pay higher water rates in the future to fund the refund payments to the 20 percent of the class members entitled to a refund—a large portion of whom are no longer customers and will not face rate increases."  On this basis, City argues "the named class members and similar Net Overpayers (only about 20 percent of the class members) had an  interest in prevailing on the section 6(b)(3) legal claims *at the heart of the dispute* so that they can obtain lower water rates in the future and the largest possible refund amount.  In contrast, the interests of the Net Underpayers (about 80 percent of the class members) who benefited under the current rate structure would be best served if the

92

named class members fail on the section 6(b)(3) legal claim." This is so, City argues, because the Net Underpayers "will be required to pay significantly higher rates for years into the future to fund the $79 million in refund payments due to the other 20 percent of class members [the Net Overpayers].

Class disputes City's conflict-of-interest theory on several grounds. One is dispositive: Class shared a common, classwide interest in remedying City's unconstitutional method of calculating water rates for SFR customers. (§ 6(b)(3).) As Class points out, "[t]here simply is no 'zero-sum game' within the class here—*all* class members faced a rate structure designed to recover a portion of the revenue requirement that the City failed to prove . . . was cost-justified," that is, was based on City's cost of delivering water services to SFR customers as a whole.

Moreover, City did not prove, during the Phase II trial on damages and remedies, that the money portion of the judgment ($79 million) "must be satisfied by rate increases" on SFR customers, as opposed to being paid from City's water fund reserves. During Phase II, City submitted an expert report from City's consultant, Mark Hildebrand, stating that any refunds to the Class "must be paid using ratepayer funds and assets," and that these funds and assets would, in turn, have "to be recovered through future rate increases in order for rate increases to keep pace with the water enterprise's operating, capital, and debt obligations." Thus, Hildebrand opined that Class's proposed refund remedy would, "only penalize current and future ratepayers for the benefit of a small portion of past and present ratepayers." But, when asked about these statements in his report during his deposition, Hildebrand admitted he did not "actually know" that City

93

would have to raise rates to pay a judgment in favor of Class. Hildebrand also said he did know whether City had insurance or a fund that could cover a refund award to Class. Thus, as Class argues, "any purported conflict on the theory that a judgment here would require the City to raise its rates is speculative and cannot support decertification." (See *Vogt v. State Farm Life Ins. Co.* (8th Cir. 2020) 963 F.3d 753, 767-768.)

Further, any future rate increase on SFR customers to pay the judgment in favor of Class, would not create a conflict of interest between Net Overpayers and Net Underpayers, sufficient to predominate over Class members' common, classwide interest in seeing that City adopts a ratemaking methodology and rate structure that complies with section 6(b)(3).) As discussed, all Class members are at risk of paying higher, noncost-based water rates in Tiers 3 and Tier 4, under City's current, unconstitutional ratemaking methodology and rate structure. (*Ward v. Dixie Nat'l Life Ins. Co.* (4th Cir. 2010) 595 F.3d 164, 180 ["For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental,' " and "[a] conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].' "]; *Sav-on Drug Stores, Inc. v. Superior Court, supra,* 34 Cal.4th at pp. 329-332 [certification upheld where substantial evidence supported trial court's determination that common issues predominated over questions affecting individual class members].)

The premise of City's conflict argument—that Class members not entitled to refunds would prefer continuing City's unconstitutional rate system—is that many courts have rejected the argument that an individual can object to class certification on the

94

ground they would prefer not to remedy the unlawful circumstance the class seeks to remedy. (*Scanlan v. Am. Airlines Grp., Inc.* (E.D. Pa. 2021) 567 F.Supp.3d 521, 532 ["Defendants cannot defeat class certification based on a conflict on the ground that some proposed class members favor the continuation of unlawful conduct."]; *Ruggles v. Wellpoint, Inc.* (N.D.N.Y. 2011) 272 F.R.D. 320, 338 ["Adequacy is not undermined where the opposed class members' position requires continuation of an allegedly unlawful practice."]; *Capital People First. v. State Dept. of Development Services* (2007) 155 Cal.App.4th 676, 699 ["Interveners have no legitimate interest in furthering any continuing violations of the law, or in preventing other class members from seeking systemic relief to correct any violations found by the court."].)

In sum, City has not shown the trial court disregarded evidence of a conflict of interest among Class members, based on whether a Class member is entitled to a refund or would prefer to continue with City's ratemaking methodology and rate system—either at the time the Class was certified or at the Phase II trial. Further, City never moved to decertify Class based on City's Phase II trial evidence or other evidence. "Before judgment, a class should be decertified 'only where it is clear there exist changed circumstances making continued class action treatment improper.' " (*Green v. Obledo* (1981) 29 Cal.3d 126, 148-149.) City's Phase II evidence did not show that the original certification was improper, or that continued certification would be improper.

City's reliance on *J.P. Morgan, supra,* 113 Cal.App.4th 195 and *Seastrom, supra,* 149 Cal.App.4th 1496 is unavailing. In *Seastrom,* the proposed class representatives and plaintiffs were themselves "potential *defendants*" because they were seeking to retain

95

profits that their complaint alleged were illegal and that other class members had an interest in suing them to disgorge. (*Id*. at p. 1502.) Thus, *Seastrom* involved an "insurmountable" conflict that went "to the very subject matter of the litigation," rendering the proposed representatives unable to adequately represent the interests of the class. (*Seastrom*, at p. 1502; *Richmond, supra,* 29 Cal.3d at p. 470.)

*J.P. Morgan* involved insurmountable conflicts among class members regarding the class's predominate legal claim. (*J.P. Morgan, supra,* 113 Cal.App.4th 195, 214-215.) The plaintiffs in *J.P. Morgan* and its companion case, *Global Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal.App.4th 836 (*Global Minerals*), "were purchasers of copper products who alleged that the defendants had manipulated the price of copper . . . causing an artificial inflation of prices" (*In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 415). Nationwide class certification was denied in both cases, based on, among other things, "potential conflicts of interest among the proposed class members because they acted in different capacities as both buyers and sellers of copper products in various transactions, and there was a question whether the overcharges were passed on to the next purchaser. . . ." (*Ibid*.) In contrast here, there is no conflict of interest among class members regarding Class's Proposition 218 claim or refund claims, the subject matters of this class action. Thus, City's conflict of interest claim lacks merit.

## IV. CLASS'S APPEAL

In the judgment, City was ordered to pay Class $79,541,880 to refund the amount class members paid for water in excess of the City's proportional cost of providing water service to each class member's parcel from August 14, 2014 through March 31, 2022,

96

with the amount to increase by $643,750 each month thereafter until City imposes water rates consistent with section 6(b)(3).)[19]

In its appeal, Class challenges the amount of its refund award, claiming it should have been $107,124,971, or $27,583,091 more than the $79,541,880 the court awarded. Class argues that the $27,583,091 difference is an unpled "setoff," that has no legal or equitable basis, and amounts to retroactive, "impermissible shadow ratemaking" in violation of the procedural requirements of Proposition 218. We reject these claims of error and conclude, on independent review, that City's method of calculating the refund award complies with section 6(b)(3).

1. Additional Background

For the Phase II trial, the parties submitted extensive briefing and evidence on the amount of the refund due to Class. At the Phase II trial, the parties told the court they had "narrowed" their dispute to whether the principal amount of the refund award should be $107,124,971, as Class claimed, or $79,541,880, as City argued. City's experts calculated the $79,541,880 refund in what we will describe as four parts.

In part one, City calculated a series of flat, uniform rates, one rate for each "rate period" during the "refund time period" of August 14, 2014 through September 30, 2021. There were seven rate periods during the RTP, one for each period City imposed a distinct set of tiered rates. The initial uniform rate of $4.28 per HCF for the rate period of

---

[19] The judgment also awards Class prejudgment interest and postjudgment interest, and orders City "to impose new water rates consistent with the requirements of . . . section 6(b)(3) by the later of (a) January 1, 2023, or (b) not more than 9 months after City fully exhausts its right to appeal the judgment."

January 1 through December 31, 2014 was calculated by dividing City's proportionate cost of providing water services to all SFR customers during the rate period, less the costs of service City recovered from SFR customers through fixed charges, by the number of HCF of water the SFR customer class used during the rate period.[20] Thus, each uniform rate is based on City's proportionate cost of delivering one HCF of water to an SFR customer during the rate period, and excludes the customer's proportionate share of City's fixed costs of delivering water services to all SFR customers.[21]

In part two, City calculated how much City billed "each [SFR] class member for all water delivered to the class member's parcel" during each billing period in the RTP, by multiplying the number of HCF of water the SFR customer used by the tiered rates charged. For example, a customer who used 26 HCF in one billing period was charged tiered rates of $5.257 in Tier 1 for the first 8 HCF; $5.888 in Tier 2 for the next 16 HCF; and $8.412 in Tier 3 for the last 2 HCF, for a total of $153.09 for the 26 HCF. In comparison, if the customer had been charged a uniform rate of $6.068 for the 26 HCF, the customer would have been charged $157.77 (26 x $6.068 equals = $157.77).

In part three, City calculated the refund amount, if any, due to each Class member for each billing cycle during the over 7-year RTP. For each bill City issued during the RTP, City subtracted (1) the amount the SFR customer was actually charged for all HCF

---

[20] This was the same process that consultant B&V used to calculate the uniform rates imposed on City's nonSFR customer classes in 2014 and 2016.

[21] For rate periods after 2014, the uniform rates were calculated based on "the increases adopted by the City" for the tiered rates; thus, for example, the uniform rate for the rate period year 2015 was 7 percent higher than in 2014.

used in the billing cycle, using the tiered rates ($153.09, in the above example) from (2) the amount the customer would have been charged using the applicable uniform rate ($157.77, same). A negative amount means the customer was "undercharged" in the billing cycle; that is, the customer was charged *less* for each HCF of water used than City's cost of delivering the HCF to the customer, as reflected in the uniform rate. In the above example, the customer was undercharged a total of $4.68 for the 26 HCF of water the customer used in the billing cycle, the $4.68 being the difference between (1) the $153.09 the customer was charged using tiered rates, and (2) the $157.77 the customer would have been charged using the applicable uniform rate. The City performed these calculations for each SFR customer, for each billing cycle during the RTP. The "data set" set for the RTP "contained nearly 10 million records covering more than 413,000 customer accounts."

In part four, City calculated the refund amount, if any, due to each Class member during the RTP, by totaling the member's overcharges and undercharges during the RTP. In the trial court, City presented slides showing how it calculated the refunds due to two hypothetical Class members, Customer No. 4 and Customer No. 5. Each customer received water service from City in six billing cycles, from December 2019 to November 2020. Customer No. 4 was undercharged in the first two cycles but overcharged in the last four. Customer No. 4's undercharges and overcharges totaled a positive number, $534.58, making Customer No. 4 a "Net Overpayer," due a refund of $534.58.

In contrast, Customer No. 5 was undercharged in five of the six billing periods, and the five undercharges totaling $40.72, exceeded the customer's single overcharge, in

99

one billing period of $11.74, making Customer No. 5 a "Net Underpayer" of $28.98, with no refund due, despite being overcharged $11.74 in one billing cycle. Likewise, if Customer No. 4's undercharges had not been credited against Customer No. 4's overcharges, Customer No. 4 would have been owed an *additional* refund of $12.79, the total of the two undercharges.

Using the above methodology, City calculated that the refund due to Class for the period August 14, 2014 through March 31, 2022 (including the RTF ending September 30, 2021) totaled $79,541,880, after adjusting the amount to reflect uniform rates without peaking cost allocations. The undercharges for the period of August 14, 2014 through March 31, 2022 totaled $27,583,091. At the Phase II trial, Class agreed that City's method of calculating the refund award, which "zeroed out" the undercharges, resulted in a refund of $79,541,880.

Following the Phase II trial, the trial court did not issue a statement of decision, but the judgment shows the court accepted City's refund calculation. As noted, the March 30, 2022 judgment orders City to pay Class "$79,541,880 to refund the amount class members paid for water in excess of the City's proportional cost of providing water service to each class member's parcel from August 14, 2014 through March 31, 2022, with the amount to increase by $643,750 each month [thereafter] until City imposes water rates consistent with . . . section 6(b)(3)."

2. Standards of Review

" 'An appellant's challenge to damages, depending upon its specific nature, may be subject to a substantial evidence, abuse of discretion, or de novo standard of review.' "

100

(*Coziahr, supra,* 103 Cal.App.5th at p. 820.) "[W]hether 'a certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review.' " (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 583; *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287 [questions of law about the meaning of Proposition 218 are reviewed de novo].)

"The trial court's choice among several legally permissible measures of damages . . . is a matter of discretion." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843.) "The scope of discretion always resides in the particular law being applied, i.e., , in the 'legal principles governing the subject of [the] action . . . .' " (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [cleaned up].) Additionally, the amount of damages awarded " 'must, in all cases, be reasonable,' " that is, "no more than reasonable damages can be recovered." (Civ. Code, § 3359; *Coziahr, supra,* 103 Cal.App.5th at p. 821.)

### 3. City's Method of Calculating the Refund Complies with Section 6(b)(3)

City argues Class's appeal presents the legal question of whether City's method of calculating the refund amount complies with section 6(b)(3). Under section 6(b)(3), a fee or charge for a property-related service may not "exceed" the government's proportional costs of providing the service to the parcel. On de novo review, we conclude City's method of calculating the refund complies with section 6(b)(3).

As we have explained, City calculated the $79,541,880 refund by crediting each SFR customer's undercharges against overcharges (the differences between the tiered

101

rates the customer was charged and the uniform rates the customer could have been charged) for each billing cycle during the RTP. City's method of calculating the refund complies with section 6(b)(3) because it ensures that each Class member who is a "net overpayer" (whose overcharges exceeded their undercharges for the entire RTP) will receive a refund for the member's net overpayment, that is, for the amount the member was overcharged for water usage under the City's tiered rate structure, from and after August 14, 2014.

City's method accounts for how much each SFR customer or Class member was both *undercharged and overcharged* for water usage during the RTP, and awards a Class member a refund only if the member was a "net overpayer," that is, if the member was overcharged more than the member was undercharged under City's tiered rate structure, measured by the uniform rates the member could have been charged during the remedy period. As City's expert explained, "Overpayment in the upper tiers necessarily demonstrates underpayment in lower tiers. . . . Any refund calculation for individual customers must reflect both the underpayment in lower tiers and overpayment in upper tiers, netting the two to arrive at a make-whole remedy. Any proposed remedy that ignores this fact would be granting a windfall by refunding high tier overpayments to a customer without accounting for the customer's lower-tier underpayments." City's evidence illustrates that *only a net overpayer* was charged more than City's proportional cost of providing water services to the member's parcel. If only the overcharges were counted in calculating the refund award, each Class member would, to the extent of the

102

member's uncounted undercharges, receive a refund *in excess* of City's proportionate cost of providing water service to the member SFR customer.[22]

    4.  <u>The Undercharges Are Not an Unproven, Unpled Setoff</u>

Class claims the $27,583,091 in undercharges was "an unpled and unproven offset," without legal or equitable basis. *Coziahr* considered and rejected the same claim, finding the plaintiffs did not show that including the undercharges in the refund calculation was error, or "involved an unpled offset." (*Coziahr, supra,* 103 Cal.App.5th at pp. 827-828.) The same is true here.

The refund award in *Coziahr*, like the refund award here, "considered both undercharges and overcharges, to assess net damages." (*Coziahr, supra,* 103 Cal.App.4th at p. 829.) Like Class here, the plaintiffs in *Coziahr* claimed the undercharges were "an unpled offset without legal or equitable justification." (*Id.* at p. 827.) In rejecting the plaintiffs' setoff claim, Coziahr began by noting that "[s]etoff is a defense 'founded on the equitable principle that "either party to a transaction involving mutual debts and credits can strike a balance, holding himself owing or entitled only to the net difference . . . ." ' " (*Id.* at p. 828, quoting *Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 (*Granberry*).)

Regarding pleading the defense of setoff, the court observed that "Code of Civil Procedure section 431.70, which now codifies setoff, 'authorizes a party who has been

---

[22] As in *Coziahr*, we need not and do not address whether City's method of calculating the refund was the only method that complies with section 6(b)(3). (*Coziahr, supra,* 103 Cal.App.5th at p. 830, fn. 23; *Griffith, supra,* 220 Cal.App.4th at p. 601 [there may be more than one method of apportioning costs of service under Proposition 218].)

sued and has a "cross-demand[] for money" against the plaintiff to "assert in the answer the defense of payment." ' " (*Coziahr*, *supra*, 103 Cal.App.5th at p. at p. 828.)

*Coziahr* rejected the plaintiffs' argument that "the right to offset applies when the parties have 'mutual debts and credits' and 'may assert cross-demands for money,' summarizing offset principles from *Granberry* and elsewhere." (*Coziahr, supra,* 103 Cal.App.5th at p. 828, citing *Granberry, supra,* 9 Cal.4th at pp. 741-744.) In sum, *Coziahr* found no merit to the plaintiffs' "attempt to label parts of the court's Phase II refund calculation as 'debts' and 'credits' " or as "cross-demand[s] for money." (*Coziahr*, at pp. 828-829.)

Here, as in *Coziahr*, the undercharges are best understood as part of City's refund calculation, rather than as debts that Class members owed City, which City could use to offset the refund award. (*Coziahr, supra,* 103 Cal.App.4th at p. 828 & fn. 22 [noting that cases involving improper, unpled setoffs were inapposite].) As in *Coziahr*, City did not assert a right to recover the undercharges as offsets against the refund award, and the trial court did not find City was " 'owed a credit' " for the undercharges, that is, for amounts " 'charged . . . below the proportional cost of service. ' " (*Id*. at p. 828.) Indeed, Class admits City "ha[s] never had a legal right to assert a cross-demand for money from any class member" based on the undercharges, given that City billed class members (SFR customers) for water usage based on the tiered rates.

Thus, as in *Coziahr*, the undercharges and overcharges were not " 'cross-demand[s] for money' " within the meaning of Code of Civil Procedure section 431.70.

104

(*Coziahr*, at pp. 828-829.)  As such, the undercharges were not an improper, unpled setoff.[23]

Class argues *Coziahr* "incorrectly found that the trial court did not improperly grant an unpled and unproven offset" and, in reaching this conclusion, "*Coziahr* gave short shrift" to *Title Ins. Co. v State Bd. of Equalization* (1992) 4 Cal.4th 715, 731 (*Title Ins.*).  *Coziahr* cited *Title Ins.* in a footnote as one of several "inapposite" cases the plaintiffs relied on in asserting their refund amount involved an unpled, improper offset.  (*Coziahr, supra,* 103 Cal.App.5th at p. 829, fn. 22.)

*Title Ins.* is inapposite here, as it was in *Coziahr*.  In *Title Ins.*, several title insurers sued the State Board of Equalization for tax refunds.  As a setoff to the refund claims, the Board claimed the insurers should not receive a refund for taxes they paid "on the claims that the underwritten title companies paid pursuant to the[ir] underwriting agreements" with the insurers because "the insurers should have paid taxes on the full amount of the premiums received by the underwritten title companies, rather than only on the portion passed on to them by the title companies."  (*Title Ins*., 4 Cal.4th at pp. 729, 830.)  *Title Ins.* held the Board could not assert the setoff, both because (1) it did raise the setoff defense in the administrative proceedings on the insurers' refund claims, and (2) it did not plead the setoff in its answer in the insurers' refund action.  (*Id*. at p 730-731.)

---

[23] Class argues City has waives its right to credit the undercharges against the overcharges because City failed to plead setoff as an affirmative defense.  (*California Academy of Sciences v. County of Fresno* (1987) 192 Cal.App.3d 1436, 1442 ["A party who fails to plead affirmative defenses waives them."].)  But because the undercharges were not a setoff against the refund award, City's failure to plead the undercharges as an offset does "waive" the undercharges.  (*Coziahr, supra,* 103 Cal.App.5th at p. 829.)

*Title Ins.* observed that allowing the Board to assert the setoff in the refund action, without having pled the setoff in its answer, "would place an unacceptable burden on taxpayers seeking refunds." (*Title Ins., supra,* 4 Cal.4th at p 732.) The court said these "taxpayers would be forced to prepare for trial and conduct discovery in ignorance of any possible setoffs or defenses the state might assert. Taxpayers cannot prepare for unknown attacks on their refund claims." (*Ibid.*) The court said this burden was "particularly severe" in the insurers' refund case because the insurers "could not have expected" the setoff to be at issue. (*Ibid.*)

Relying on *Title Ins.*, Class argues, "[t]he burden that unpleaded offset defenses places on ratepayers is 'particularly severe' here" because Class members "paid their bills in full on the City's promise that the rate system complied with the Constitution. By raising the defense of offset [i.e, setoff] at trial, but not in its answer, the City deprived . . . Class of a fair opportunity to respond, including to develop an argument that the City's offset defense is barred by laches, unclean hands, or estoppel." For this reason, Class argues, the trial court abused its discretion in awarding City an "offset," by accepting City's refund calculation with undercharges, despite City's failure to plead the undercharges as setoff in its answer.

Class's claim that it did not have "a fair opportunity to respond" to City's refund calculation or to "develop" the defenses of laches, unclean hands or estoppel, is unsupported by the record. In the Phase II trial, the parties fully litigated whether the $27,583,091 in undercharges should have been credited against the overcharges in calculating the refund award. Indeed, the parties ultimately "narrowed" their dispute to

106

this issue. Thus, Class had every opportunity to litigate, and did litigate, the undercharges issue in the trial court. Class also had every opportunity to "develop" claims of laches, unclean hands, and estoppel, in opposing the undercharges, and its failure to do so means it has forfeited these claims. (*Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567.) In sum, the undercharges were not an improper, unpled setoff against the refund award.

 5.  The Undercharges Are Not "Shadow Ratemaking"

Like the plaintiffs in *Coziahr*, Class claims City's refund calculation amounts to a " 'impermissible shadow ratemaking,' " which violates the notice and hearing procedures an agency must follow in " 'imposing or increasing any fee or charge.' " (*Coziahr, supra,* 103 Cal.App.5th at pp. 829-830; quoting Art. XIII D, § 6(a) [setting forth procedures agencies must follow "in imposing any fee or charge" including notice, public hearing, and consideration of protests].) Class reasons that Class members entitled to a refund, the net overpayers, are being retroactively charged the higher, uniform rates for their usage in the lower tiers, while the net underpayers remain charged under the lower tiered rates because they do not have to reimburse City for their underpayments. Class argues, "holding some class members accountable for rates that were not in place [during the refund period] circumvents the notice and hearing requirements of Proposition 218 by allowing the City to engage in an impermissible shadow ratemaking."

In rejecting this claim, *Coziahr* pointed out that, under Otay's refund calculation, Otay was not "increasing" any fees or charges, and no levy was being imposed on any person or parcel. (*Coziahr, supra,* 103 Cal.App.5th at p. 829-830; citing Gov. Code, § 53750(h) [the term "increased," when applied to a property-related fee or charge, "

107

'means a decision by an agency' " that either " 'increases any applicable rate' " used to calculate the fee or charge, or " 'revises the methodology' " by which the fee or charge is calculated, " 'if that revision results in an increased amount being levied on any person or parcel' "]; *Plantier, supra,* 7 Cal.5th at p. 385 ["[A] change to the method for calculating a fee is considered an increase in the fee for purposes of Proposition 218 [only] if it results in an increased amount being levied on *any* person or parcel."].)  Here as in *Coziahr*, City's refund calculation, and Class's refund award, does not involve any person or parcel being "levied on" for an increased fee.  Thus, City's refund calculation and the refund award is not "impermissible shadow ratemaking" in violation of the notice, hearing, and protest requirements of section 6(b).[24]

B. *Remand Is Necessary for the Trial Court To Consider Whether Newly Enacted Government Code Section 53758.5 Applies to the Refund Award*

On September 20, 2024, the Governor signed Senate Bill 1072, adding section 53758.5 to the Government Code, effective January 1, 2025.  (Cal. Const., art. IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865-866 [" ' "a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment . . . ." ' "].)  The statute requires agencies to credit refund awards in Proposition 218 cases against future increases in or impositions of the property-related charge, unless the refund award is

---

**24** Because we reject Class's claims of error regarding City's refund calculation and the refund award, it is unnecessary for us to address, and we do not address, City's claim that Class is judicially estopped from arguing that only overpayments should be considered in calculating the refund award.

explicitly provided for by statute.  (Gov. Code, § 53758.5, subd. (a).)[25]  Thus, the statute does not allow agencies in Proposition 218 cases to pay a refund award as a money judgment, unless a statute explicitly allows the agency to do so.  (Cf.  Code Civ. Proc., § 1095 [writ applicant's award of "damages and costs" is enforceable "in the manner provided for money judgments generally"].)

City asks this court to "apply" Government Code section 53758.5 by reversing the refund award and remanding the matter so the trial court "can craft a remedy compliant" with the statute.  City relies on the principle that an appellate court is more likely to consider, for the first time on appeal, an issue involving undisputed facts and important questions of public policy or public concern, if the parties have had a reasonable opportunity to address the issue.  (*Duran v. Obesity Research Institute, LLC* (2016) 1 Cal.App.5th 635, 646; *Saurman v. Peter's Landing Property Owner, LLC* (2024) 103 Cal.App.5th 1148, 1167.)  City argues these standards are present here:  the refund award is "undisputed and fixed," "no additional facts are required to decide" whether Government Code section 53758.5 applies to the refund award, and the question of whether the new statute applies involves important questions of public policy and public concern, namely, "the fiscal health of one of the state's largest water agencies and the

---

[25]  Government Code section 53758.5, subdivision (a) provides:  "If a court determines that a fee or charge for a property-related service, including water, sewer, and refuse collection, violates Section 6 of Article XIII D of the California Constitution, then the local agency shall, in the next procedure to impose or increase the fee or charge, credit the amount of the fee or charge attributable to the violation against the amount of the revenues required to provide the property-related service unless a refund is explicitly provided for by statute."  (Stats. 2024, ch. 323, § 1.)

refund's burden on current and future customers."  In addition, the parties have addressed the issue in their supplemental briefs.  For these reasons, we agree it is appropriate for us to determine, in the first instance, whether Government Code section 53758.5 applies to Class's refund award.  We conclude it does.  However, we disagree with the City's proposed disposition that we reverse the Class's refund award.

In construing statutes, our fundamental task is to ascertain the Legislature's intent so we may effectuate the Legislature's purpose in enacting the statute.  (*In re  Brownlee* (2020) 50 Cal.App.5th 720, 724; *People v. Velasco* (2015) 235 Cal.App.4th 66, 74.)  To ascertain intent, we look first to the words of the statute.  If the language is clear and unambiguous, its plain meaning governs, and it is unnecessary to consider the legislative history of the statute to determine its meaning.  (*People v. Baltazar* (2020) 57 Cal.App.5th 334, 341; *People v. Lopez* (2003) 31 Cal.4th 1051, 1056.; see *Safety-Kleen of California, Inc. v. Department of Toxic Substances Control* (2024) 100 Cal.App.5th 172, 184-185 ["Generally, courts do not consult the legislative history where, as here, the relevant statutory language is unambiguous"].)

The language of Government Code section 53758.5 is clear and unambiguous:  If a court finds that a fee or charge violates Proposition 218, then "in the next procedure to impose or increase the fee or charge," the agency must "credit the amount of the fee or charge attributable to the violation "against the amount of the revenues required to provide the property-related service unless a refund is explicitly provided for by statute." (Gov. Code, § 53758.5, subd. (a).)  By its terms, the statute applies to Class's refund award for City's Proposition 218 violation.

110

If there could be any doubt that the statute applies to City's refund award, that doubt is dispelled by the statute's legislative history which shows the statute was enacted with the refund awards in this case and in *Coziahr* specifically in mind. (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1072 (2023-2024 Reg. Sess.) Aug. 28, 2024, pp. 2-5 [discussing the trial court refund awards in *Coziahr* and in this case].) The most recent Senate Floor Analysis of S.B. 1072 states: "This bill prevents ratepayers that a court found overpaid for a property-related service from getting a refund. Instead of refunding these ratepayers, any excess fees collected would go to reduce the cost for the local agency to provide that service moving forward. On the one hand, the ratepayers that overpaid would not get their money back. On the other hand, all ratepayers, including those that overpaid, would pay less for that service moving forward." (*Id*. at p. 4.)

Regarding the refund award in *Coziahr*, the Senate Floor Analysis asks, "Should the Legislature intervene before the appeal has played out in court?" and, for all such refund awards, "Does this bill achieve the right balance of fairness for both ratepayers a court has found overpaid and everyone else?" (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 1072 (2023-2024 Reg. Sess.), *supra,* at pp. 4-5.) In passing Senate Bill 1027, the Legislature answered these questions in the affirmative. In the uncodified section of the bill the Legislature found and declared, among other things, that "Proposition 218 does not contain any affirmative intent to authorize a refund remedy"; "lawsuits seeking refunds for property-related service rate determinations threaten to compromise the financial stability of water and sewer agencies and local

111

governments providing property-related services"; and "any refund would need to be funded by raising rates on future ratepayers, further reducing the affordability of essential public services." (Stats 2024, ch. 323, § 2.)

This legislative history fully supports our conclusion that Government Code section 53758.5 applies to City's Proposition 218 refund award. When the Legislature enacts a statute " 'with the relevant constitutional prescriptions clearly in mind,' " the " 'statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary [citation], a focused legislative judgment on the question enjoys significant weight and deference by the courts.' " (*Greene v. Martin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 291.)

Class argues Government Code section 53758.5 does not apply because Class's refund award is "explicitly provided for by statute." (Gov. Code, § 53758.5, subd. (a).) Class relies on *Coziahr*, which rejected Otay's claim that monetary relief was unavailable for a constitutional, section 6(b)(3) violation. (*Coziahr, supra,* 103 Cal.App.5th at pp. 820-825.) *Coziahr* reasoned that a monetary award for a constitutional violation may be available in a mandate proceeding, and that such a refund is also "consistent with" the Government Claims Act (Gov. Code, § 810 et. seq.) (the Act) (*Coziahr*, at pp. 821-825; discussing *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300.) Moreover, Otay offered "no substantive argument that the trial court was unable to grant" the refund award; thus, Otay forfeited "any" claim that the class was not entitled to a refund for Otay's section 6(b)(3) violation. (*Coziahr*. at p. 823.)

112

Class argues Government Code section 53758.5 "does not take away the right to a refund that *Coziahr* recognized is explicitly available under the Government Claims Act or writ of mandate." But, *Coziahr* did not involve a statute that "explicitly provided" that a refund award in a Proposition 218 case may be enforced as a money judgment. (*Coziahr, supra,* 103 Cal.App.5th at pp. 821-825; Gov. Code, § 53758.5, subd. (a).) Thus, *Coziahr* does not support Class's argument Government Code section 53758.5 does not apply to Class's refund award.[26]

Class does not point to any statute that "explicitly provides" that a refund award in a Proposition 218 case may be enforced as a money judgment. (Gov. Code, § 53758.5, subd. (a).) By its terms, Government Code section 53758.5 applies to all refund awards in Proposition 218 cases, except as "explicitly provided by statute." Neither the Act nor the mandate statutes (Code Civ. Proc., §§ 1087-1097) explicitly provide that a refund award in a Proposition 218 case does not have to be credited against future fees but is, rather, enforceable as a money judgment. (See *Coziahr, supra,*103 Cal.App.5th at pp. 824-825; cf. Code Civ. Proc, § 1095 [writ applicant's "damages and costs" award

---

[26] Class also argues City has forfeited its right to claim that Class is not entitled to a monetary refund because, like Otay in *Coziahr*, City offered "no substantive argument" that the trial court was unauthorized to grant a refund under the Act or Code of Civil Procedure section 1095. There is no forfeiture. Unlike Otay in *Coziahr*, City does not challenge Class's entitlement to a refund award. (*Coziahr, supra,* 103 Cal.App.5th at pp. 821-825.) Rather, City argues Government Code section 53758.5 applies to Class's refund award. City has not forfeited its right to raise *this* question on appeal, given that City could not have raised the question in the trial court. (Cf. *Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 565 [Generally, issues not raised in the trial court cannot be asserted for the first time on appeal.].)

enforceable as money judgment].)  Thus, Class has not shown that Government Code section 53578.5, subdivision (a) does not apply to Class's refund award.

Class argues that applying Government Code section 53758.5 to the refund award "would raise significant constitutional concerns."  Class claims:  "To satisfy due process requirements of the United States and California Constitutions, a meaningful post-deprivation remedy—a refund—is necessary when a taxpayer successfully challenges an unconstitutionally levied and collected tax."  But the cases Class relies on stand for a different principle:  "If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the [D]ue Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation."  (*McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco* (1990) 496 U.S. 18, 31; *River Garden Retirement Home v. Franchise Tax Bd.* (2010) 186 Cal.App.4th 922, 938-939 (*River Garden*).)

In this context, " 'meaningful backward-looking relief' " means giving the taxpayer "both a 'fair opportunity to challenge the accuracy and legal validity of their tax obligation' [citation], as well as a ' "clear and certain remedy" ' for the erroneous or unlawful tax collection."  (*River Garden, supra,* 186 Cal.App.4th at p. 938.)  Class does not explain how applying Government Code section 53758.5 to the refund award, by requiring City to credit the refund award against future rate increases and impositions, would deny Class " 'meaningful backward-looking relief' " in the form of a " 'clear and

114

certain remedy' " for City's section 6(b)(3) violation. (*Ibid*.) Thus, Class has not shown that applying the statute to the refund award will deny Class due process.

Although we conclude that Government Code section 53758.5 applies to Class's refund award, the proper disposition is not to reverse the refund award, as City argues. In their respective appeals, neither party has shown that the *amount* of the refund award is in error. However, remand is necessary so the trial court may, as City argues, "craft a remedy" to ensure that the refund award is credited in accordance with Government Code section 53758.5. This means the judgment must be amended to require City to credit an award in accordance with Government Code section 53758.5, and to not allow Class to enforce the refund award as a money judgment. (Cf. Code Civ. Proc., § 1095.)

C. *Class's Request for Attorney Fees on Appeal Is Denied Without Prejudice*

Class claims it is entitled to attorney fees under the common fund doctrine and Code of Civil Procedure section 1021.5. Class requests that, in our disposition, we direct the trial court to award Class appellate attorney fees and costs when it determines trial court fees and costs.[27] We decline the request, without prejudice.

" 'Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees . . . .' " (*Moore v. Teed* (2020) 48 Cal.App.5th 280, 299.) It is appropriate to allow the trial court to determine whether Class is entitled to attorney fees on appeal, given that the trial court has not yet addressed

---

[27] At the parties' requests, the trial court retained jurisdiction in the judgment to award costs and attorney fees following the parties' appeals.

Class's entitlement to attorney fees, and Class did not prevail in its cross-appeal. (*Coziahr, supra,* 103 Cal.App.5th at p. 833.)

## V.  DISPOSITION

The March 30, 2022 judgment is affirmed with directions.  On remand, the trial court is directed to amend the judgment to allow City to satisfy the refund award pursuant to Government Code section 53758.5.  (Stats 2024, ch. 323, § 1.)  The parties shall bear their respective costs on appeal.  (Cal. Rules of Court, rule 8.278.)

CERTIFIED FOR PUBLICATION

FIELDS
J.

I concur:


McKINSTER
Acting P. J.

116

[*Patz v. City of San Diego*, E083543]

MENETREZ, J., Dissenting.

This is an appeal from a $79 million judgment that is based on nothing. Plaintiffs' briefing in the trial court and on appeal relentlessly misrepresents the record and the law, and the trial court's statement of decision—drafted by plaintiffs' counsel and adopted virtually without alteration by the court—does as well. We should reverse with directions to enter judgment for the defense, and I therefore respectfully dissent.

Plaintiffs Daniel Patz and Joan Mann Chesner brought this class action on behalf of all single-family residential customers (SFRs) of defendant City of San Diego's water service. Plaintiffs alleged that defendant's water rates for SFRs violated subdivision (b)(3) of section 6 of article XIII D of the California Constitution (§ 6(b)(3)), which provides that fees charged by a local public entity for a property-related service cannot exceed the proportional cost of providing the service. Defendant charged tiered rates for SFRs, meaning that when a customer's water consumption increases beyond a certain threshold, the customer is charged a higher rate for water above that threshold. Defendant charged all customers other than SFRs a uniform rate, meaning that the rate charged per unit of water is the same for all levels of consumption. Plaintiffs challenged only the rates charged to SFRs.

Defendant provided a detailed calculation and allocation of the costs of providing its water service, using the best available methodology for performing such an accounting. Defendant properly applied that methodology to vast amounts of historical data concerning its own operations and customers and, where appropriate, data

1

concerning customers around the state and across the nation. Defendant's calculation and allocation of costs showed that the rates charged to SFRs (as well as the rates charged to all other customers) did not exceed proportional costs. But the trial court agreed with plaintiffs anyway and entered judgment against defendant for $79 million, increasing by $643,750 per month until defendant adopts lawful rates.

This case presents a legal question of broad importance: What standard of proof does a defendant in a section 6(b)(3) suit need to meet? What does the defendant need to do to prove that its rates do not exceed proportional costs? Until recently, the case law provided a clear answer: The defendant must provide a *reasonable* calculation and allocation of costs, according to which rates do not exceed proportional costs. (*Capistrano Taxpayers Assn., Inc. v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493, 1499, fn. 6 (*Capistrano*); *Griffith v. Pajaro Valley Water Management Agency* (2013) 220 Cal.App.4th 586, 601 (*Griffith*); *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368 (*Moore*); *KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1030 (*KCSFV*); *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914, 923.) That standard makes sense, because there is not just one correct way to calculate and allocate the costs of operating a water system. A defendant consequently cannot be required to prove that it calculated and allocated its costs in the one correct way, because there is no such thing as the one correct way. All that a defendant can be required to prove—all that it is in principle possible for a defendant to prove—is that its cost calculation and allocation were reasonable.

2

That sensible standard was rejected, however, in *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 800 (*Coziahr*), which held that in a section 6(b)(3) challenge to water rates "reasonableness is not the standard of proof." (Italics and capitalization omitted.) *Coziahr* thereby created a split of authority on the issue. Today's majority opinion deepens that split by following *Coziahr*. (Maj. opn., *ante*, at pp. 41-50.) In addition, both *Coziahr* and today's majority opinion fail to articulate any standard to replace the reasonableness standard that they reject. Both opinions consequently leave section 6(b)(3) defendants and trial courts in the dark about what standard a defendant must meet in order to defend its rates.

Beyond deepening that split and failing to articulate a new standard of proof, today's majority opinion has sweeping and severe consequences for all public water utilities in California. Published cases have long held that tiered water rates are not prohibited by section 6(b)(3). (See, e.g., *Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.) But this case upends that well-established rule. As defendant explained to the trial court, if defendant's "tiered water rates cannot be sustained on the record and expert evidence presented in this case, then no tiered water rates in California are lawful." Defendant is right.

Defendant used the only known methodology for setting tiered rates and properly applied it to all of the appropriate data. Plaintiffs have never suggested an alternative methodology. But defendant's rates were still found to violate section 6(b)(3), and the majority opinion affirms. The result is that, contrary to longstanding case law, today's

3

majority opinion now makes it impossible for a public water utility in California to set tiered rates without violating section 6(b)(3).

In part I of this dissent, I describe the legal background and some general features of cost calculation and allocation, and I explain why *Coziahr*'s and the majority opinion's rejection of the reasonableness standard is mistaken. In part II, I describe defendant's cost calculation and allocation and rate-setting methodology. In part III, I address the criticisms of defendant's methodology and explain that they are based on nothing but misrepresentations and red herrings.

On an accurate reading of the record and a proper understanding of the law, defendant has more than proved its case, and plaintiffs have proved nothing. There is no basis to impose any liability whatsoever. I therefore respectfully dissent.

I.      *Proposition 218, cost calculation and rate setting, and the standard of proof*

A.      *Legal framework*

California voters passed Proposition 218, the Right to Vote on Taxes Act, in 1996. (*City of Palmdale v. Palmdale Water Dist.* (2011) 198 Cal.App.4th 926, 931 (*Palmdale*).) Proposition 218 added article XIII D (among other provisions) to the California Constitution. (Subsequent references to articles are to the California Constitution.)

"Article XIII D sets forth procedures, requirements and voter approval mechanisms for local government assessments, fees and charges." (*Palmdale*, *supra*, 198 Cal.App.4th at p. 931.) Under *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 226, water rates charged by local public water utilities constitute such a property-related fee or charge.

4

Section 6(b)(3) provides that "[t]he amount of a fee or charge imposed [by a local government] upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel." (See art. XIII D, § 2, subds. (a), (e).) That is the provision that defendant is alleged to have violated: According to plaintiffs, defendant's water rates for SFRs exceed the proportional cost of providing water service to those customers' parcels.

Article XIII D also provides that "[i]n any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article." (Art. XIII D, § 6, subd. (b)(5).) And "both trial and reviewing courts are to apply an independent review standard" in determining whether the agency has carried its burden. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1507.)

In sum: Plaintiffs alleged that defendant's water rates for SFRs exceeded the proportional cost of providing water service to those customers' properties and therefore violated section 6(b)(3). Defendant bore the burden of proving that its rates comply with section 6(b)(3). The trial court was required to apply its independent judgment in determining whether defendant carried its burden, and we must exercise our independent judgment as well.

B.      *Cost calculation and rate setting*

Is there only one correct way to calculate and allocate the costs of providing water service? Is there only one correct answer to the question, "What is the proportional cost of providing water service to a parcel?" Case law has long recognized that the answer to both questions must be: No.

5

In a section 6(b)(3) challenge to water rates, the Court of Appeal has observed that cost "[a]pportionment is not a determination that lends itself to precise calculation." (*Griffith*, *supra*, 220 Cal.App.4th at p. 601.) And in a different rate-setting context (i.e., a Takings Clause challenge to regulation of car insurance rates), the Supreme Court has observed that "'[t]he economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result.'" (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 293 (*20th Century*).)

Brief reflection on the mechanics of water rate setting illustrates why that must be so. Because rates must be set before service is provided, the cost calculation and allocation that underly rate setting must involve forecasts and projections. For example, the 2015 cost of service study (COSS) that defendant used to set its rates was based on a forecast of defendant's costs for the next five years. As a result, it involved "annual projections of the number of customers, water use, revenues, and expenditures based on historical data and estimates for the next five years." There cannot be just one correct answer to any of those forecasting questions. Five years later, one can look back and see how many customers there actually were, how much water was actually delivered, and so on. But in advance, the best one can do is make projections based on historical data, and there will always be multiple ways of doing that. (See *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1052-1053 (*CBIA*) [recognizing "the imprecision inherent in predictions" and, in particular, "the imprecise nature of projecting future permit fee revenues and expenditures"].)

6

Some specific examples from the 2015 COSS further illustrate the point. On the basis of recent historical trends, the COSS "assumed a nominal water connection growth rate of approximately 0.65% annually over the five-year study period." Should it have been 0.6 percent? Or 0.7 percent? Or 0.55 or 0.75 percent? Also, because of state-mandated water use restrictions, the 2015 COSS assumed a drop in consumption in the next year followed by a gradual increase in subsequent years. Should the study have assumed a smaller drop, or a larger one, or none? The same COSS also had to utilize inflation rates for various cost components. For example, it assumed inflation rates of 1 percent for "Personnel Services," 3.5 percent for "Operating Supplies," and 9 percent for "Energy & Utilities," among others. Were all of those inflation projections exactly right, or were some a little high or a little low? The COSS also had to include projected future construction costs under defendant's "long-term Capital Improvement Program," which "is a constantly evolving program," so construction "projects may shift out in time or drop off" entirely, while other projects may also be added "as the need arises." Was there exactly one correct way to project defendant's construction costs for the next five years?

Similar examples could be multiplied at great length. They pervade all of defendant's COSSs. And all of them show that of course there is not only one right answer to the question, "What is the proportional cost of providing water service to a parcel?"

But there is an additional kind of indeterminacy that is also central to understanding the issues in this case. One approach to calculating and allocating costs would be to calculate a uniform (or flat) cost per unit of service. For example, a water

7

utility could (1) calculate the total projected cost of operating the entire water system for the next five years, (2) determine the total projected water consumption, in hundreds of cubic feet (HCF), by the system's customers for those years, and (3) divide the first number by the second to arrive at the cost per HCF. If the rate charged to all customers per HCF were set at that cost per HCF, then the rate would not violate section 6(b)(3), because it would not exceed the proportional cost of providing the service.

But another approach would be to try to calculate and allocate costs in a more fine-grained way, so as to attribute the "marginal cost of water to those consumers whose extra use of water forces water agencies to incur higher costs to supply that extra water." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1516.) Put another way, a tiered (as opposed to uniform) cost calculation would seek to allocate "the incrementally higher costs of expensive water to incrementally higher users." (*Id.* at p. 1511.) Such a cost calculation would seek to quantify the way in which the cost per unit of water is higher at higher levels of use, because higher levels of use create the need to build and operate larger facilities, to purchase more expensive sources of supply, and so forth.

Such a tiered cost calculation and allocation could then be used to set tiered rates without violating section 6(b)(3), as long as the tiered rates do not exceed the tiered costs. As a result, "[o]ur courts have made it clear they interpret the Constitution to allow tiered pricing." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.) It follows that uniform rates, based on uniform cost calculation and allocation, are not required by section 6(b)(3)— tiered rates based on tiered cost calculation and allocation are permissible.

But by the same token, tiered rates based on tiered cost calculation and allocation are not required by section 6(b)(3) either—uniform rates based on uniform cost calculation and allocation are permissible as well. *Capistrano* noted that the Association of California Water Agencies estimated that "over half its members now have some sort of tiered water rate system." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499, fn. 6.) And although the court described tiered rates as "a good idea" (*id.* at p. 1511), it never suggested that section 6(b)(3) *requires* any water agency to adopt tiered rates. I am not aware of any authority for the proposition that it does. Rather, all of those water agencies using tiered rates could instead have used uniform rates, based on uniform cost calculation and allocation, without violating section 6(b)(3).

Moreover, it is *always* possible to do a uniform allocation—just divide total projected cost by total projected consumption. It follows that whenever it is possible to do a tiered allocation it is possible to do both. That is, anytime the facts will support a tiered cost allocation, they will support *both* a tiered allocation and a uniform allocation. In such a situation, neither tiered nor uniform rates will be either required or prohibited by section 6(b)(3), which requires only that rates not exceed proportional costs.

A few more examples will further illustrate the variability in permissible methods of cost allocation and rate setting. First, recall the initial hypothetical of a uniform cost and uniform rate per unit of service. A utility could modify that approach as follows: Instead of including *all* projected system costs when calculating the cost (and consequent rate) per HCF, the utility could first separate out the cost components that do not vary significantly with levels of water consumption, such as billing and metering—every

9

customer needs a meter to be read regardless of how much water they use; every customer gets a bill regardless of how much water they use; and so on.  Call those "fixed costs," and call the remaining costs "variable costs" (because they vary with levels of consumption).  The utility could then divide the projected fixed costs by the projected number of customers to get a fixed cost per customer, and the utility could divide the projected variable costs by the projected total consumption to get a uniform cost per HCF.  If rates were set at those two different costs—so that each bill included both a fixed charge that did not vary with the amount of water consumed and a variable charge that did—then they would not violate section 6(b)(3), because again they would not exceed the proportional cost of providing the service.

Second, suppose that after calculating a uniform cost per HCF (with or without separating out fixed costs), the utility set the uniform rate per HCF at that cost, but with the following exception:  For SFRs only, the rate charged per HCF for the first 4 HCF consumed each month is 10 cents lower than the otherwise uniform rate.  That is, all customers other than SFRs are charged the same uniform rate for every HCF they consume, but SFRs are charged a two-tiered rate:  the same uniform rate as everyone else for any consumption above 4 HCF, but a 10-cent lower rate for consumption up to 4 HCF.  The utility might do this for any number of reasons, such as to reward SFRs for low levels of consumption or to give SFRs a break during difficult economic times.  But whatever the utility's reasons for implementing such a rate system, *it would not violate section 6(b)(3)*, because no customer would be charged more than the proportional cost of providing the service.  Section 6(b)(3) does not require the utility to provide a cost-based

justification for charging a tiered rate to SFRs while charging a uniform rate to everyone else. All that section 6(b)(3) requires is a cost calculation and allocation according to which no customer is being charged a rate that exceeds proportional cost.

Third, another variation will illustrate another important point about section 6(b)(3). Suppose that instead of setting the tier breakpoint (i.e., the level of consumption above which the rate per HCF changes) at 4 HCF, the utility set it at 3 HCF, or 5 HCF. Would that affect the section 6(b)(3) analysis? No. Regardless of where the utility sets the breakpoint, no customer is charged more than the proportional cost of providing the service, so section 6(b)(3) is not violated. What this shows is that section 6(b)(3) does not require a cost-based justification for *where* a tier breakpoint is set. Again, all that is required is a cost calculation showing that, wherever the breakpoints are set, each customer's rates do not exceed proportional costs.

Because the utility's rates in those last versions of the hypothetical are, in the aggregate, below cost, the hypotheticals might seem unrealistic and hence irrelevant. But the record in this case demonstrates the opposite: Before 2013, the cost of defendant's major source of supply increased, but defendant chose to "absorb[]" those increased costs and did not pass them on to customers. That is, in order to give its customers a break, defendant chose to charge rates that were, in the aggregate, below cost. In 2013, defendant raised its rates to begin to recoup those costs, but even then it "elected to only recover a portion of these past increases" in costs. As a result, even after the 2013 rate increases, defendant's rates were still, in the aggregate, below cost. And defendant's conduct in that regard is not unique. In *Morgan v. Imperial Irrigation Dist.* (2014) 223

11

Cal.App.4th 892, rates were set below cost and therefore did not violate section 6(b)(3). (*Id.* at p. 923 ["We find nothing in section 6 that prohibits an agency from charging less than the proportional cost of service. The fees simply cannot exceed the proportional cost"].)

Fourth, suppose that it were possible to do an extremely fine-grained tiered cost calculation and allocation, according to which costs increase incrementally at every HCF. If the utility chose to set tiered rates, would it be *required* to set the breakpoints at every HCF, charging the lowest rate for 1 HCF, a higher rate for the next HCF, and so on? Again, the answer is no. Just as the utility is allowed to use a uniform cost allocation and set a uniform rate even if the utility is capable of doing a tiered cost allocation, the utility is also allowed to use a relatively coarse-grained tiered cost allocation even if the utility is capable of doing a more fine-grained one. In a sense, a uniform allocation is just an ultra-coarse-grained tiered allocation in which all costs are aggregated into a single tier. And if that is permissible—as it must be—even when it is possible to do an allocation with multiple tiers, then it must be similarly permissible to aggregate costs into a relatively small number of tiers (e.g., two) even when it is possible to do a more fine-grained allocation that has more tiers (e.g., 6). Thus, to return to the hypothetical, even if it is possible to do a tiered cost allocation according to which costs increase at every HCF, the utility would not have to set breakpoints for tiered rates at every HCF. The utility could set a uniform rate, or set just one breakpoint (e.g., at 5 HCF), or two (e.g., at 4 and 8 HCF), or three (e.g., at 3, 6, and 9 HCF) without violating section 6(b)(3) as long as it could produce a cost calculation and allocation showing that the rate for each tier

12

does not exceed the costs for that tier.  The upshot is that *section 6(b)(3) does not require a cost-based justification for where the tier breakpoints are set*.  As long as rates do not exceed proportional costs, section 6(b)(3) is satisfied.

To summarize the results of the foregoing discussion:  There is not and cannot be only one correct answer to the question, "What is the proportional cost of providing water service to a parcel?"  All of the cost calculations that underly rate setting are based on forecasts, and *ex ante* there cannot be only one correct forecast of the myriad components that go into such a calculation.  Moreover, cost calculation and allocation can be very coarse grained (yielding a uniform cost per unit) or increasingly fine grained (by separating fixed from variable costs and/or by determining the increased cost per unit at higher levels of use).  But there is no single level of granularity that yields the single correct cost per unit of service, because there is no such thing as the single correct cost per unit of service.  (Again, *Capistrano* recognizes that tiered rates are common but not universal, and the opinion never suggests that one form of rate structure—uniform or tiered—is either required or prohibited, even though it is always *possible* to set a uniform rate.)  And if a water utility performs a tiered allocation in order to set tiered rates or to set them for some but not all classes of customers, section 6(b)(3) does not require cost-based justifications for where the tier breakpoints are set or which classes get uniform rates and which get tiered rates.  All that section 6(b)(3) requires is a cost calculation showing that each customer's rates do not exceed proportional costs.

C. *The standard of proof*

Again, in a suit alleging that the rates charged for water service violate section 6(b)(3), the defendant water utility bears the burden of proof, and the courts exercise independent review. But given that there is no such thing as the single correct cost per unit of service, the utility cannot be required to prove that it calculated that single correct cost and set its rates at that level or lower. There are numerous ways of calculating and allocating costs. So what exactly does the defendant utility have to prove?

Until recently, case law generally recognized that the standard of proof in this context is reasonableness. That is, the defendant utility must prove that, under a reasonable calculation and allocation of costs, rates do not exceed proportional costs. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499, fn. 6 [tiered rates are permissible if "those rates reasonably reflect the cost of service attributable to each parcel"]; *Griffith*, *supra*, 220 Cal.App.4th at p. 601 [the defendant prevailed because it used "a reasonable way to apportion the cost of service"]; *Moore*, *supra*, 237 Cal.App.4th at p. 371 [the plaintiff claimed that the defendants "did not use a reasonable methodology" "to estimate and allocate their costs"]; *KCSFV*, *supra*, 64 Cal.App.5th at p. 1030 [the plaintiff prevailed because the defendants "failed to show the rate increase reasonably represents the cost of providing service to the affected properties"]; *Howard Jarvis Taxpayers Assn. v. City of Fresno*, *supra*, 127 Cal.App.4th at p. 923 [a defendant must "reasonably determine" costs in order to prove compliance with section 6(b)(3)].)

14

Courts' longstanding application of a reasonableness standard does not constitute abdication of the duty to exercise independent judgment. Rather, it reflects judicial recognition of the indeterminacy inherent in the issue under review. There is no single correct method for calculating and allocating costs, so a defendant cannot be required to prove that it used the (nonexistent) single correct method. The defendant need only prove that, among the various possible methods, there is a reasonable method according to which rates do not exceed proportional costs.

Last year, however, *Coziahr*, *supra*, 103 Cal.App.5th at pp. 800-802, rejected the reasonableness standard. The majority opinion adopts *Coziahr*'s analysis. (Maj. opn., *ante*, at p. 43.) For several reasons, the analysis is unsound.

First, *Coziahr* never acknowledges that the predictive cost calculation and allocation involved in rate setting "'do not admit of a single correct result.'" (*20th Century*, *supra*, 8 Cal.4th at p. 293; see also *CBIA*, *supra*, 4 Cal.5th at p. 1053 [recognizing "the imprecision inherent in predictions"].) Consequently, *Coziahr* never explains how a defendant agency is supposed to carry its burden in a section 6(b)(3) suit. The agency must prove that its rates do not exceed proportional costs, but *what* proportional costs? According to what method of calculation and allocation? *Coziahr* never says. That is, *Coziahr* rejects the only standard articulated in the section 6(b)(3) case law but provides no alternative. That omission creates chaos in this area of the law. Not only is there now a split of authority on the standard of proof, but one side of the split—consisting of *Coziahr* and today's majority opinion—states no standard at all.

Under *Coziahr*, public water utilities faced with section 6(b)(3) suits do not know what standard they need to meet in order to carry their burden of proof.

Second, *Coziahr* claims that the Supreme Court rejected the reasonableness standard in *CBIA* (*Coziahr*, *supra*, 103 Cal.App.5th at pp. 800-801), but that is incorrect. *CBIA* was not a section 6(b)(3) case or even an article XIII D case. Rather, it concerned section 3 of article XIII A, which imposes restrictions on state taxes. (*CBIA*, *supra*, 4 Cal.5th at p. 1045.) *CBIA* concerned fees for certain permits, and the article XIII A restrictions on state *taxes* do not apply to such *fees* as long as the fees meet various requirements, including that they "must be allocated in a reasonable manner." (*CBIA*, at p. 1050; see *id.* at pp. 1047-1048.) The Supreme Court concluded that the fees in question "were reasonably allocated among fee payers" and met the other requirements, so the article XIII A restrictions on state taxes did not apply. (*CBIA*, at p. 1052; see *id.* at pp. 1049-1053.)

In the last two paragraphs of the opinion, the Supreme Court noted that "[i]n challenging the allocation of permit fees," the plaintiffs relied in some unspecified manner on *Capistrano*. (*CBIA*, *supra*, 4 Cal.5th at p. 1053.) But the court found *Capistrano* "distinguishable" because it involved article XIII D, not article XIII A. (*CBIA*, at p. 1053.) In particular, section 6(b)(3) of article XIII D "provides that the amount of a property-related fee 'shall not exceed the proportional cost of the service attributable to the parcel,'" but article XIII A contains no such requirement. (*CBIA*, at p. 1053.) Rather, "[u]nder article XIII A, all that is required is that the record demonstrate a reasonable basis for the manner in which the fee is allocated among those

16

who pay it." (*CBIA*, at p. 1053.)  Thus, a fee could be allocated in a reasonable manner (and hence meet the requirements of article XIII A) even if it exceeds proportional cost (and hence violates the requirements of article XIII D), because article XIII A does not require that fees not exceed proportional cost.  For example, a defendant in an article XIII A suit could concede that its fees exceed proportional cost but still argue that the fees are allocated in a reasonable manner—perhaps because they are allocated partially on the basis of ability to pay instead of wholly on the basis of cost—and hence meet the requirements of article XIII A.

*CBIA* says nothing about the standard of proof for a suit under section 6(b)(3) of article XIII D.  More precisely, it says nothing about what a public entity needs to do to carry its burden of proving that its rates do not exceed proportional costs under section 6(b)(3).  That issue was not presented, so the Supreme Court never discussed it.  *CBIA* never mentions that Court of Appeal cases have articulated and applied the reasonableness standard in section 6(b)(3) litigation.  The Supreme Court did not even mention that *Capistrano* itself articulates the reasonableness standard (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499, fn. 6 [tiered rates must "reasonably reflect the cost of service attributable to each parcel"]), because, again, the issue was not presented.  "'[I]t is axiomatic that cases are not authority for propositions not considered.'"  (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160.)  For all of these reasons, *Coziahr*'s claim (echoed by the majority opinion) that *CBIA* constitutes a *sub silentio* repudiation of the reasonableness standard for section 6(b)(3) litigation is both wholly unsupported and contrary to law.

17

Third, *Coziahr* dismisses the cases articulating and applying the reasonableness standard on the ground that they "were not using the term 'reasonable' in defining a standard of proof" but rather "were discussing the nexus between the rate and the cost of service, or describing the record while reviewing it for substantial evidence." (*Coziahr*, *supra*, 103 Cal.App.5th at p. 801.) All of that is incorrect. *Capistrano* states the reasonableness standard and does not apply substantial evidence review; the court mentioned substantial evidence review only to distinguish it from independent review. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499, fn. 6 [stating the reasonableness standard]; p. 1507 [distinguishing independent review].) The court had no occasion to apply the reasonableness standard, because the defendant expressly declined to try to defend its rates in terms of proportional costs. (*Id.* at p. 1505.) *Griffith* and *Moore* apply the reasonableness standard and do not even mention substantial evidence review. (*Griffith*, *supra*, 220 Cal.App.4th at p. 601; *Moore*, *supra*, 237 Cal.App.4th at pp. 371-375.) *Moore* actually frames the dispute *in the trial court* as focused on whether "the method used by [the defendants] to estimate and allocate their costs was unreasonable" (*Moore*, *supra*, 237 Cal.App.4th at p. 371); it was not a matter of substantial evidence review on appeal. And *KCSFV* applies the reasonableness standard and mentions substantial evidence review only in connection with administrative exhaustion. (*KCSFV*, *supra*, 64 Cal.App.5th at p. 1030 ["defendants have failed to show the rate increase reasonably represents the cost of providing service to the affected properties"]; p. 1034 [discussing administrative exhaustion].)

18

Like *Coziahr*, the majority opinion purports to distinguish *Griffith* and *Moore* on the ground that "the substantial evidence shoe is on the other foot" because the trial courts in those cases rejected the section 6(b)(3) challenges to the defendants' rates. (Maj. opn., *ante*, at pp. 49-50; see *id.* at p. 62; *Coziahr*, *supra*, 103 Cal.App.5th at p. 802.) But also like *Coziahr*, the majority opinion fails to acknowledge that neither *Griffith* nor *Moore* ever mentions substantial evidence review at all.

*Coziahr* also criticizes *Griffith* for citing a pre-Proposition 218 case for the claim that "[a]pportionment is not a determination that lends itself to precise calculation" (*Griffith*, *supra*, 220 Cal.App.4th at p. 601), and *Coziahr* notes that *Capistrano* expressed a similar criticism. (*Coziahr*, *supra*, 103 Cal.App.5th at p. 801; see *Capistrano*, *supra*, 235 Cal.App.4th at p. 1514.) But the criticism is empty, because the passage of Proposition 218 did not and could not change the fact that there is not just one way to calculate and allocate the predicted costs of operating a water system. It was true both before and after passage of Proposition 218 that the predictive cost calculation and allocation involved in rate setting "'do not admit of a single correct result.'" (*20th Century*, *supra*, 8 Cal.4th at p. 293.) And again, *Capistrano* itself articulates the reasonableness standard, acknowledges that tiered rates and uniform rates are common, and does not suggest that either form of rate structure is prohibited or required. (*Capistrano*, at p. 1499, fn. 6.)

For all of the foregoing reasons, I conclude that defendants are correct that the standard of proof in a section 6(b)(3) suit is reasonableness. That is, for the defendant to

19

carry its burden of proof, it must show that under a reasonable method of calculating and allocating costs, the defendant's rates do not exceed proportional costs.[1]

II.    *Defendant's calculation and allocation of costs*

The rates at issue in this case were set on the basis of COSSs prepared by an outside consultant in 2013 and 2015. The appellate record contains both studies. The studies are detailed and intricate, but much of that complexity is not necessary for analysis of the issues on this appeal. For simplicity, I will focus on the 2015 COSS, but the 2013 COSS is not materially different.

The 2015 COSS began by using historical data to project the total annual revenue required to operate defendant's water system for the next five years. The total cost included operations and maintenance, capital costs, debt service, and other components. It was a calculation of total system cost for all customers combined, not just for SFRs.

The study then focused on the upcoming year (fiscal year 2016) for purposes of allocating costs and setting rates. The study determined the total revenue to be recovered

---

[1]    The majority opinion asserts without explanation that "under the reasonableness standard of proof," a defendant in a section 6(b)(3) action must prove only that "(1) there is a reasonable basis for the fee, and (2) the fee is reasonably allocated among the fee payors or parcels." (Maj. opn., *ante*, at p. 41.) That is incorrect. Defendant has never advocated such an interpretation of the reasonableness standard, the cases articulating and applying the reasonableness standard have not interpreted it that way, and there is no reason to do so. Such an interpretation would erase the requirement that rates not exceed proportional costs. The reasonableness standard does not effect such an erasure. Rather, it merely acknowledges that there are different ways of calculating and allocating costs, some are reasonable, and some are not. Consequently, a defendant in a section 6(b)(3) suit must prove only that, based on a reasonable calculation and allocation of costs, rates do not exceed proportional costs.

*from rates* by starting with the total revenue requirement and deducting revenue generated by other sources.

The next part of the study's analysis used a cost-allocation methodology known as the "base-extra capacity" method. The methodology comes from the leading water industry manual on cost calculation and rate design, "Principles of Water Rates, Fees and Charges M1" (M1), which is published by the American Water Works Association (AWWA). The M1 explains the base-extra capacity method and identifies it as one of the two most commonly used methods of cost allocation; the other is the "commodity-demand method." Plaintiffs' expert, Rodney Smith, conceded that he has not seen a rate study that does not use the M1 methodology. Smith is not aware of any alternatives to the base-extra capacity method and the commodity-demand method, and he could not recall any California water utilities that use the commodity-demand method.

The rationale for the base-extra capacity method derives from the need to design and build a water system large enough to accommodate fluctuations in demand. For example, the projected total demand on defendant's system for 2016 was 64,545,546 HCF of water, which yields an average demand rate of 7,368 HCF per hour. If demand on the water system were uniform and constant at that average rate throughout the entire year, then a relatively small system would be capable of meeting total demand. That system size, which would be sufficient to meet total demand if demand were constant, is referred to as "base" capacity.

But demand is not constant. It fluctuates from month to month and day to day and hour to hour. In order to accommodate the resulting peaks in demand, one needs a bigger

system, even though the total amount of water delivered over the course of the year (in this instance 64,545,546 HCF) remains the same. The increased system size that is required to accommodate day-to-day fluctuations is referred to as "Max Day" extra capacity. Defendant's water system has been designed and built on the assumption that in order to meet day-to-day fluctuations in demand, the system must be 1.5 times the size of base capacity. So the max day "demand factor" used in the COSS is 1.5.

But hour-to-hour fluctuations are even bigger than day-to-day fluctuations. That is, hourly demand deviates even further from average demand than daily demand does. The increased system size that is required to accommodate those hourly fluctuations is "Max Hour" extra capacity. Defendant's water system was designed and built on the assumption that in order to meet hour-to-hour fluctuations in demand, the system must be 2.25 times the size of base capacity. So the max hour "demand factor" used in the COSS is 2.25. Together, the 1.5 max day and 2.25 max hour demand factors are referred to as "peaking factors," because they describe the increased system size that is required to meet peak demand (in contrast to average or below-average demand).[2]

The COSS did not arbitrarily invent the 1.5 max day and 2.25 max hour peaking factors or pull them out of the M1. On the contrary, the M1 itself states that the factors must "be determined on the basis of the actual operating history or design criteria for each system," and when the M1 gives examples of max day and max hour peaking

---

[2] The commodity-demand method also uses peak demand concepts like max day and max hour. The base-extra capacity method and the commodity-demand method generally yield similar results, but the commodity-demand method tends to allocate a greater share of costs to max day and max hour.

factors, they are not 1.5 and 2.25. The COSS got its peaking factors from defendant's "Water Facilities Master Plan," "historical data," and "discussions with [Public Utilities Department] staff." Defendant's engineers use the 1.5 max day factor "to plan and design infrastructure for" defendant's water system, and "[i]t is based on historic operating data records." Although defendant does not have access to similar data with respect to max hour demand, defendant's engineers use the 2.25 max hour factor "for planning purposes." Both factors are reflected in defendant's "Water Facilities Master Plan" and "are within the ranges typically experienced by other utilities across the nation."

Under the base-extra capacity method, the various components of system costs—such as water supply, pumping, and treatment—are apportioned among base, max day, max hour, "customer" costs, and "fire protection." Customer costs are those "that tend to vary in proportion to the number of customers," such as metering and billing. And fire protection includes things like fire hydrants and the need to design and build the system "to accommodate relatively large flows of water for short durations at suitable pressure" for fire suppression. Thus, the COSS would take a particular cost component, such as "Finance & Information Technology," and apportion it among base, max day, max hour, customer, and fire protection, depending on the extent to which the cost was attributable to the need to accommodate fluctuations in demand or the need to provide for fire protection or varied with the number of customers. The COSS based those cost allocations "on an analysis of employee timecard data, historical information and discussions [with] agency Staff."

Having apportioned costs among those categories, the COSS next looked at the various customer classes—SFR, multifamily residential, commercial/industrial, construction, and irrigation—to determine how much of each cost category (base, max day, etc.) to attribute to each class. Thus, the COSS had to determine how much each customer class contributed to max day and max hour demand. Those determinations were made by examining "historical data and usage patterns for the customer classes to estimate the [class-specific] Max Day and Max Hour Extra Capacity factors." Those factors were then checked against "typical" class-specific extra capacity factors provided in the M1, which are "determined from studies conducted throughout the nation, some of which reflect the outcomes of demand studies."[3]

The COSS then used those class-specific factors to allocate to each customer class (SFR, multifamily residential, etc.) its portion of each cost category (base, max day, etc.). The COSS then added up those portions for each class to arrive at the share of total system costs allocated to each class.

Finally, the COSS used the results of all of the foregoing calculations and allocations to design rates. It adopted a two-part rate structure for all customers: Each

---

[3]    The COSSs thus relied on two different types of "peaking factors." First, there are the 1.5 max day and 2.25 max hour factors, which describe the increased size of the system needed to meet peak demand; those factors came from the city's master plan. Second, there are the class-specific peaking factors, which describe different customer classes' peaking behaviors and consequent contributions to demand peaks; those factors came from historical data and usage patterns and were then checked against typical class-specific peaking factors in the M1, which are based on studies across the nation. The statement of decision conflates those two different types of factors, as discussed in part III.B, *post*.

customer would be charged both a fixed monthly charge based on meter size (the "service charge") and a variable monthly charge based on the number of HCF of water consumed (the "commodity charge").

For every customer class other than SFR, the commodity charge used a uniform rate. That is, within each non-SFR customer class, every HCF of water consumed was billed at the same rate, though that rate differed from one class to another (so, for example, construction customers paid a higher rate than irrigation customers). The reason for setting uniform rather than tiered rates for those classes was that "[c]ustomers other than SFR vary considerably in size which makes it impractical and inequitable" to use tiered rates. If tiered rates were used for those non-SFR classes, then "small customers (corner store, 10-unit apartment complex, 1 acre irrigated lot) would likely remain in the bottom block paying at the lowest rate, while large customers that use water because they are larger (Walmart, 200-unit apartment complex, an irrigated golf course) would pay for most of their water at the higher rates. This would be inequitable because the larger sized customers would always pay rates in the highest tiers even when they use water efficiently for their size." The M1 agrees that tiered rates are not appropriate for all customer classes and should be used only for "a small, highly homogeneous customer base," and the manual cautions that a tiered rate applied indiscriminately to all customers would actually be "more difficult to justify on a cost-of-service basis."

For SFRs, however, the commodity charge was a four-tiered rate. More precisely, each month every SFR customer paid the lowest rate for the first four HCF consumed, a higher rate for the next eight HCF (i.e., for the 5th through 12th HCF of total

25

consumption), a still higher rate for the next six HCF (13th through 18th HCF), and the highest rate for any consumption above 18 HCF.

The tier breakpoints for the SFR class were all based on variation above and below average use, and they were set on the basis of analysis of historical data. Defendant's historical billing records indicate that "about 50 percent of billed usage" by SFR customers was 12 HCF. The COSS consequently set the tier 2 breakpoint (i.e., the breakpoint between tiers 2 and 3) at 12 HCF. As a result, "approximately half of SFR customers will pay for usage only in Tiers 1 and 2"; "[t]hese customers have average or less than average usage."

The tier 1 breakpoint was set as follows: "[A] typical single-family residential size varies from 2 to 3 people per household." According to AWWA survey data, "the typical indoor residential water consumption is between 50 to 60 gallons per person per day," which works out to "3,000 gallons to over 5,000 gallons per month (or 4 HCF to 7 HCF per month)" for a household of two to three people. On that basis, the tier 1 breakpoint was set at 4 HCF, reflecting below-average use, i.e., use below what a two-person household would typically require for indoor use alone.

The tier 3 breakpoint (i.e., the dividing line between tiers 3 and 4) was set to distinguish between merely above-average use and high-level use. Defendant determined that 6 HCF would be "enough water for outdoor irrigation to maintain an average-sized green lawn." The COSS then set the tier 3 breakpoint at 18 HCF, i.e., 6 HCF above average. Thus, any use above that level would exceed average use *plus* enough water to maintain an average lawn. Projections based on historical billing data (and taking into

26

account factors such as conservation measures adopted to address statewide drought) indicated that only 6.31 percent of SFR use would be above the tier 3 breakpoint. In contrast, SFR use billed at tier 1 and tier 2 rates would account for over 80 percent of use.

Having set the tier breakpoints to create four tiers—below average, average, above average, and very high—the COSS again employed the base, max day, and max hour concepts to allocate SFR costs to each tier in order to set SFR rates. Thus, the base capacity costs that had been allocated to the SFR customer class as a whole were apportioned among the tiers on the basis of analysis of defendant's customers' historical usage data. The same process was then repeated to apportion SFR max day and max hour costs among the tiers. The aim of the process was to allocate to each level of use the costs for which that level of use was causally responsible. So, for example, max hour costs were allocated entirely to tiers 3 and 4, and that makes sense—hourly fluctuations above average would be caused by above-average use, so it makes sense to allocate the costs of sizing the system to accommodate such fluctuations to above-average use, i.e., tiers 3 and 4. The COSS states that base costs are "the majority of costs for the" SFR class, and tiers 1 and 2 "recover the majority" of those costs. That is an understatement. Putting aside meters and billing (which are not included in the per-HCF rate at all), SFR base costs were 79.9 percent of total SFR costs, and 90 percent of SFR base costs were allocated to tiers 1 and 2.

Next, "[a]s a check on the reasonableness of proposed pricing differentials for the tiers," the COSS compared the ratio of the tier 4 and tier 1 rates to the ratio of the cost of defendant's most and least expensive sources of supply. Defendant obtains water from

27

two primary sources:  local supply and purchased water from the San Diego County Water Authority (CWA).  The purchased water includes treated water, which goes straight into defendant's distribution system, and raw water, which goes to defendant's treatment plants.  Treated CWA water is defendant's most expensive source of supply and costs four to five times as much as local water, which is the cheapest source.  The tier 4 rate "is approximately 2.07 times" the tier 1 rate, well below the ratio of most to least expensive sources of supply.

Finally, it is worth emphasizing that although SFRs were the only customer class with a tiered commodity charge, SFRs were *not* the only class to which peaking costs (i.e., max day and max hour costs) were allocated.  Rather, such costs were allocated to *every* customer class before rates were set.  In fact, the proportion of peaking costs allocated to SFRs was *less* than SFRs' proportion of total consumption.

There are at least two ways to illustrate that point.  First, one can compare SFRs with irrigation.  Even though the total projected consumption of irrigation customers (about 9 million HCF) was *less* than half the total projected consumption of SFRs (about 24 million HCF), the max day and max hour costs allocated to irrigation were *more* than half the max day and max hour costs allocated to SFRs, because irrigation customers exhibit greater peaking behavior.  That is, irrigation customers were allocated a proportionally higher share of peaking costs than SFRs, precisely because irrigation customers were more responsible for peaks.  Irrigation customers paid their share of peaking costs via a uniform rate, and SFRs paid their share via a tiered rate.  But both classes paid their share of peaking costs.

28

Second, one can compare SFRs' share of peaking costs with SFRs' share of total consumption. SFRs' total projected consumption (24,100,457 HCF) was 37.3 percent of total projected consumption for all classes combined (64,545,546 HCF). But the max day and max hour costs allocated to SFRs ($24,582,900) were 35 percent of total max day and max hour costs for all classes combined ($70,032,200). Thus, the share of peaking costs paid by SFRs was actually smaller than SFRs' share of total consumption. Again, SFRs paid their share of peaking costs via a tiered rate, and other classes paid their shares of peaking costs via a uniform rate. But every class paid its share of peaking costs, and SFRs' share was (proportionally) smaller than others.

III.    *The trial court's erroneous critique*

Given the foregoing summary of defendant's cost allocation and rate setting, it might be difficult to imagine how they could be impermissible. *Capistrano* and prior cases acknowledge that section 6(b)(3) does not prohibit tiered cost allocation and consequent tiered rates. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.) *Capistrano* actually says it is "a good idea" to "pass[] on the incrementally higher costs of expensive water to incrementally higher users." (*Ibid.*) Defendant used the more conservative of the two known methodologies for doing exactly that, and plaintiffs' own expert is not aware of any alternatives to those two methodologies and is not aware of anyone in California who uses the one that defendant did not use. Defendant properly applied that canonical methodology to all of the appropriate data. What else was defendant supposed to do? If that is not a permissible way to set tiered rates, then how do you do it?

29

Plaintiffs have never answered that question, and the trial court's statement of decision, which plaintiffs drafted, is similarly silent. To make sure I had not missed something, I asked plaintiffs' counsel the question at oral argument: How is a water utility supposed to do a tiered cost allocation and set tiered rates without violating section 6(b)(3)? Counsel's only answer was to refer to amicus Mesa Water District, but counsel conceded that Mesa Water District charges uniform (not tiered) rates. In effect, counsel had no answer at all.

That should be sufficient confirmation of the claim I made at the outset: If the rates in this case are unlawful, then no tiered water rates in California are lawful.

In the following sections, I explain how plaintiffs' critique of defendant's rate setting—a critique that the trial court adopted in its entirety—is based on nothing but red herrings and misrepresentations of the facts and the law. But it is worth noting at the outset two examples of the kinds of misrepresentations that pervade the trial court's statement of decision, because they illustrate how baseless plaintiffs' claims are.

First, the statement of decision states the following: "It is [defendant's] position that it is not required to prove that its rates reflect the actual cost of delivering water to a parcel, including at a particular tiered level of usage. Indeed, in its briefing and at oral argument, [defendant] conceded that it cannot make this showing." Both of those sentences are false. That has never been defendant's position, and defendant has never made any such concession. Defendant has never denied that in order to prevail it must prove that its rates do not exceed proportional cost. And defendant has contended throughout this case that its COSSs show that its rates do not exceed proportional cost

30

and that they therefore comply with section 6(b)(3).  For example, defendant argued in its

trial brief that "[e]ach COSS employs detailed analyses of [defendant's] revenues,

expenses and usage data to calculate SFR tiered rates that are based on [defendant's]

costs to provide water service at the different consumption levels represented by the

tiers."  The trial brief went on to argue that "[i]f [defendant's] tiered water rates cannot be

sustained on the record and expert evidence presented in this case, then no tiered water

rates in California are lawful.  However, California courts have repeatedly held that tiered

water rates can be made consonant with Proposition 218.  [Citations.]  Here, the Court

has the opportunity to provide a concrete example of how tiered water rates may do so."

Defendant has never wavered from that position.[4]

Defendant objected to the baseless claims in plaintiffs' proposed statement of

decision about defendant's supposed concession, pointing out that defendant "makes no

such admission."  But the trial court adopted plaintiffs' claims without alteration.  That is

not a trivial misstatement or oversight.  The result is that the trial court's statement of

decision falsely asserts, on no basis whatsoever, that defendant conceded the central issue

in the case.

---

[4]     The majority opinion disagrees with defendant's claim that "California courts have
repeatedly held that tiered water rates can be made consonant with Proposition 218."
(Maj. opn., *ante*, at p. 77.)  That would appear to be a disagreement between the majority
opinion and *Capistrano*.  (See *Capistrano*, *supra*, 235 Cal.App.4th at pp. 1497-1498
[tiered rates "are perfectly consonant with" section 6(b)(3) as long as the rates do not
exceed proportional costs]; *id.* at p. 1511 ["courts have made it clear they interpret the
Constitution to allow tiered pricing"].)

31

Second, defendant's COSSs were prepared by a firm called Black & Veatch. Defendant's expert in this litigation, Ann Bui, is a managing director at Black & Veatch, and she was the project manager for the 2013 and 2015 COSSs. The trial court's statement of decision claims that the same methodology (the base-extra capacity method, or peaking factors) used by the same individual (Bui) at the same firm (Black & Veatch) for defendant's COSSs was rejected by the *Capistrano* court. The statement of decision says: "[T]he Court in *Capistrano* rejected the same peaking factor analysis from Black & Veatch and consultant Ann Bui that [defendant] relies on here. (See Pl. Class's Trial Presentation at 67-68.) Moreover, in both the 2013 and 2015 COSS, used a base/extra capacity method similar to the one used (and rejected by the Court) in *Capistrano* to allocate a disproportionate amount of [defendant's] costs to higher volume users." (Grammatical error in original.) Like the claims about defendant's putative concession, those claims about *Capistrano* make the case look easy—the same methodology used by the same individual at the same firm has already been found constitutionally inadequate by published case law. The statement of decision expressly recognized that the extensive parallels with *Capistrano* make the case easier: The court said that it did not have to "break new ground" in deciding this case, because "[t]he allocation methods at issue bear striking resemblance to those that the California Court of Appeal has already determined violate Proposition 218," and the court then cited *Capistrano* and *Palmdale*.

Plaintiffs' counsel has enthusiastically developed this theme throughout this litigation. Plaintiffs' opening briefs in the trial court and on appeal begin with the sentence, "This case is 'déjà vu all over again,'" with a citation to Yogi Berra. The briefs

32

proceed to describe how defendant's COSSs, prepared by Bui and Black & Veatch, used the same analysis that Bui and Black & Veatch had provided to the defendant in *Capistrano*—defendant "followed the *Capistrano* playbook to the letter." As a result, plaintiffs contend that "[t]his case is *Capistrano* all the way down."

The problem with all of this is that the *Capistrano* opinion never mentions Bui or Black & Veatch or the base-extra capacity method or peaking factors, and *Capistrano* did not reject *any* cost-based rate-setting methodology, because *the defendant in Capistrano did not attempt to defend its rates in terms of costs*. Instead, the defendant in *Capistrano* took the position that it did not have to show that its rates did not exceed proportional cost, so it declined to try. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1505 [the defendant claimed "local agencies do not have to—or should not have to—calculate the cost of water service at various incremental levels of usage"].) The *Capistrano* court disagreed, holding that a defendant in a section 6(b)(3) suit must prove that its rates do not exceed proportional cost. (*Capistrano*, at pp. 1504-1511.) There was no occasion to disapprove any cost-allocation or rate-setting methodology, because none was offered. The *Capistrano* court did not reject the base-extra capacity method or peaking factors or in any way disapprove the work of Bui or Black & Veatch. Again, the opinion never mentions any of them.

That is not a subtle or complex or reasonably debatable point—all you have to do is pull up the case and search for "Bui" or "Black" or "Veatch" or "base" or "extra" or "capacity" or "peak." But that did not stop plaintiffs' counsel from writing the following misrepresentation of the case law into the statement of decision, or stop the trial court

33

from signing it: "[T]he Court in *Capistrano* rejected the same peaking factor analysis from Black & Veatch and consultant Ann Bui that [defendant] relies on here."[5]

The entire statement of decision is like that. To anyone acquainted with the record and the relevant legal authorities, it reads like a work of fiction.

A.      *Tier 1 and local supply*

The statement of decision adopts plaintiffs' contention that defendant's COSSs claimed that water that was billed at the tier 1 rate came from local supply. Local supply is defendant's cheapest source of supply, and plaintiffs contended that was defendant's justification for the low tier 1 rate—defendant charged its lowest rate for water that came from the cheapest source of supply, and defendant charged higher rates (tiers 2 through 4) for water that came from more expensive sources. But the statement of decision explains that "over the course of this litigation" defendant has "abandoned this position," conceding that the water system "commingles all of its water and delivers it to customers using the same infrastructure." That is, contrary to the assertions in the COSSs (as interpreted by plaintiffs and the statement of decision), water billed at the tier 1 rate does not come exclusively from local supply, and water billed at higher rates does not come exclusively from other, more expensive sources. The majority opinion concludes that this point by itself is sufficient to affirm the trial court's liability determination. (Maj.

---

[5]      Tellingly, the statement of decision does not cite the *Capistrano* opinion as support for that sentence. Instead, it cites two slides from plaintiffs' PowerPoint presentation at trial: "(See Pl. Class's Trial Presentation at 67-68.)" Those slides are in the appellate record, and they too provide no page citations to the *Capistrano* opinion.

opn., *ante*, at p. 65 ["Affirmance of the liability portion of the judgment is proper on this ground alone"].)

That analysis is meritless. The first thing to note is that it is far from clear that defendant has ever claimed that water billed at tier 1 rates comes exclusively from local supply and water billed at higher rates comes from other sources. The relevant passage from the 2015 COSS reads as follows: "[T]he units of water included in Tier 1 are priced at the lowest rate since it represents the City's least expensive source of water—local supply. As water consumption increases beyond the base tier, water supplies to meet this demand lead to greater investments by the City in alternate sources of supply, yet at much higher costs per acre foot. The use of peaking factors reasonably represents the relationship between higher water consumption and increasing water supply costs."

There are at least two possible interpretations of that passage. One would be that because higher levels of water use require defendant to purchase water from more expensive sources of supply, the use of a tiered cost allocation and associated tiered rates (based on the base-extra capacity method or, equivalently, peaking factors) makes sense. Higher levels of use are causally responsible for the need to purchase water from more expensive sources—if everyone's consumption were limited to 4 HCF per month, defendant could meet demand with a cheaper mix of sources. So higher levels of use should be charged higher rates. That is exactly the approach that *Capistrano* encourages: The elevated costs of additional supply should be passed on "to those customers whose marginal or incremental extra usage requires" that additional supply, and "lower-than-average users" should not have to bear the costs of additional supply that "their levels of

35

consumption do not make necessary." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1503.) None of this requires that water billed at a lower rate actually comes from a cheaper source. The point, rather, is that higher levels of use create the need to purchase supply from more expensive sources, so higher levels of use should be billed at higher rates.

Another theoretically possible interpretation of the passage is the one adopted by the statement of decision: Water billed at tier 1 rates comes from local supply, and that is why the tier 1 rate was set where it was. It is worth pausing to recognize just how outlandish a claim that would be. Recall that for each SFR customer, the tier 1 rate applies to the first 4 HCF of water consumed each month, and higher rates apply to water consumed in excess of 4 HCF. Different customers use different amounts of water and at different paces, so one customer might be on their third HCF at the same time that their neighbor is on their fifth or sixth HCF. But both neighboring customers get their water from service lines connected to the same water main. Thus, the claim attributed to defendant by the statement of decision is that if both neighbors are running baths at the same time, somehow the neighbor who has used less than 4 HCF that month manages to draw only local supply water from the water main, but the neighbor who has used more than 4 HCF manages to draw only nonlocal supply water at the same time from the same water main. To my knowledge, no water system on Earth could do that.

It is unsurprising, then, that in one of Bui's reports for this litigation, she clarified that defendant was not making the patently absurd claim that water billed at tier 1 rates comes exclusively from local supply, water billed at higher rates comes from other sources, and the tiered rates are set on that basis. It "would be impossible" for defendant

36

to set its rates that way for several reasons, including (1) defendant would need to have different reservoirs, distribution pipes, and treatment plants for each different source of supply, and (2) the amount of local supply varies from year to year, making it impossible to set rates prospectively if they were tied to specific sources of supply.  Rather, Bui explained, the COSSs' statements about the tier 1 rate and local supply should be interpreted in the way I suggested above:  Defendant was doing just what *Capistrano* recommends, namely, creating a tiered cost allocation that passes on the elevated costs of additional supply "to those customers whose marginal or incremental extra usage requires" that additional supply, so that "lower-than-average users" do not have to bear the costs of additional supply that "their levels of consumption do not make necessary." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1503.)  Thus, as the COSS puts it, "[t]he use of peaking factors reasonably represents the relationship between higher water consumption and increasing water supply costs."  That is, higher levels of consumption are causally responsible for higher per-unit supply costs—if consumption were lower, then defendant would be able to purchase less supply, and defendant would presumably reduce its purchases of the most expensive sources first.  Tiered rates that are higher for higher levels of consumption are therefore a reasonable reflection of that causal relationship— higher levels of consumption cause higher per-unit costs—*even though the tiered rates themselves are calculated on the basis of peaking factors and not on the basis of the different costs of different sources of supply*.  In effect, the different costs of different sources of supply provide an additional justification for charging tiered rates, even

37

though the actual costs of different sources of supply are not used in the calculation of those rates.

According to the statement of decision, however, Bui's discussion was not a clarification of defendant's position but rather was an abandonment of the claim that water billed at the tier 1 rate comes from local supply. There are at least two problems here.

First, even if the statement of decision is correct, and Bui's description of the relationship between tier 1 and local supply is merely her fallback position after abandoning the claim that water billed at tier 1 rates comes from local supply, *the statement of decision never addresses that fallback position*. The statement of decision does not even acknowledge the *existence* of that position. Instead, the statement of decision just focuses on the (supposed) abandonment of the claim that water billed at the tier 1 rate comes from local supply and leaves it at that.[6]

Second, suppose that the statement of decision is right that the COSSs claimed that water billed at the tier 1 rate comes from local supply, and suppose the statement of

---

[6]    *Coziahr* suggests, and the majority opinion agrees, that "post-hoc rationalization" cannot be used to defend rates against a section 6(b)(3) challenge. (*Coziahr*, *supra*, 103 Cal.App.5th at p. 819; maj. opn., *ante*, at pp. 50, 78.) That is incorrect. Section 6(b)(3) requires only that rates not exceed proportional costs. If reasonable cost calculation and allocation developed after the fact show that rates do not exceed proportional costs, then the rates do not violate section 6(b)(3). It does not matter that the cost calculation and allocation are post hoc.

The majority opinion also asserts that defendant's "use of the base-extra capacity method, detailed in the 2013 and 2015 COSSs, was, as in *Coziahr*, an 'unsupported, post hoc rationalization' for the tiered rates." (Maj. opn., *ante*, at p. 50.) Nothing in the 2013 and 2015 COSSs could be a post-hoc rationalization—it is undisputed that both COSSs were produced before the rates were set and were used to set the rates.

decision is right that defendant (through Bui) subsequently abandoned that claim.  How does that show that defendant's rates exceed proportional cost?

The answer is straightforward:  It does not.  Defendant has provided an elaborate and detailed cost calculation and allocation according to which the tiered rates for SFRs do not exceed proportional costs.  *The alleged claim that tier 1 water comes from local supply plays no role in that cost calculation and allocation.*  The COSSs do not even contain separate cost projections for different sources of supply.  That is, neither COSS says specifically how much local supply costs, how much raw CWA water costs, or how much treated CWA water (the most expensive source) costs.  Instead, each COSS presents a single aggregate figure for total supply costs.  Thus, the alleged (and allegedly abandoned) claim that tier 1 water comes from local supply did not play any role in the calculation or allocation of any costs or the consequent setting of any rates.

Rather, as I explained in part II, *ante*, the relative cost of different sources of supply served only as a final "check on the reasonableness of proposed pricing differentials for the tiers."  Defendant's most expensive source of supply costs four to five times as much as its cheapest source, but the tier 4 rate "is approximately 2.07 times" the tier 1 rate, well below the ratio of most to least expensive sources of supply.  The statement of decision never mentions that point, even though it is the only use that the COSSs actually make of the different costs of different sources of supply, and even

39

though it occurs in the same paragraph of the COSSs on which the statement of decision relies to attribute to defendant the claim that tier water 1 comes from local supply.[7]

The course of the argument on this point could therefore be summarized as follows: Plaintiffs attributed a preposterous claim to defendant, namely, that water billed at the tier 1 rate comes exclusively from local supply. When defendant clarified that it was never making that claim, plaintiffs responded, "Gotcha. You're abandoning your claim. Therefore, your rates are unconstitutional." The trial court agreed. And the majority opinion concludes that "[a]ffirmance of the liability portion of the judgment is proper on this ground alone." (Maj. opn., *ante*, at p. 65.)

I disagree. This entire line of argument is, in my view, based on a misrepresentation of defendant's position—of course defendant never made the (obviously false) claim that it operated a byzantine water system (designed by Willy

_____

[7] The relevant paragraph from the 2015 COSS reads as follows: "For the study period, the units of water included in Tier 1 are priced at the lowest rate since it represents the City's least expensive source of water – local supply. As water consumption increases beyond the base tier, water supplies to meet this demand lead to greater investments by the City in alternate sources of supply, yet at much higher costs per acre foot. The use of peaking factors reasonably represents the relationship between higher water consumption and increasing water supply costs. As a check on the reasonableness of proposed pricing differentials for the tiers, Black & Veatch estimated the cost of local water and the cost of treated Tier I CWA water. These figures only reflect treatment costs and do not include such expenses as distribution and pumping. Roughly speaking, the cost of treated Tier I CWA water, which is the most expensive water that the City purchases is roughly 4 to 5 times the cost of local supply. Thus, Black & Veatch has limited the pricing differential between Tier 1 and Tier 4 to less than these figures." Again, assuming that tier 1 water does not come exclusively from local supply and assuming that defendant claimed it does, how does anything in that paragraph show that defendant's rates exceed proportional cost? The statement of decision provides no answer.

40

Wonka? Rube Goldberg?) with multiple pipes running to each SFR customer for every different source of supply, which were shut off or turned on individually for each customer whenever they reached a tier breakpoint. But even if the argument is not based on a misrepresentation, and defendant really did make that absurd claim, the entire line of argument is still a red herring. It has no tendency to prove that defendant's rates exceed proportional cost, which is the only issue in the case. Defendant has provided a detailed cost calculation and allocation according to which defendant's rates do not exceed proportional cost, and *defendant's cost calculation and allocation do not in any way depend upon the proposition that tier 1 water comes exclusively from local supply*. Plaintiffs and the statement of decision (and the majority opinion) do not articulate any argument to the contrary.

B. *Peaking factors and time-of-use data*

The statement of decision's next criticism concerns the COSSs' use of peaking factors and the base-extra capacity method. But before summarizing what the statement of decision says about that issue, it is important to acknowledge the actual meaning of plaintiffs' argument, which the trial court adopted and the majority opinion approves: It is a generalized rejection of the base-extra capacity method.

Plaintiffs never directly say that, and they attempt to conceal it in various ways, such as by claiming that the problem is just that defendant did not use actual data, or did not use the data that plaintiffs think defendant should have used. But the arguments that plaintiffs' counsel wrote into the trial court's statement of decision show that plaintiffs got the trial court to reject the base-extra capacity method itself. For example, the

41

statement of decision criticizes defendant's use of the "base-extra capacity peaking factor method" on the ground that it "relies on the assumption that water costs more to deliver at different times" (or "the supposition that it costs [defendant] more to deliver water at certain peak times"), but "[t]he record provides no evidence that it actually costs more to deliver water at peak times," and defendant actually "concedes that the cost of delivering water *does not* vary based on time of use." Putting those pieces together: The court determined (incorrectly) that the base-extra capacity method presupposes that it costs more to deliver water at certain peak times, but that presupposition is concededly false. It follows that *the base-extra capacity method itself is unsound*. The majority opinion endorses that analysis: It states that the trial court "properly found that" defendant "chose to base its tiered pricing 'on the supposition that it costs [defendant] more to deliver water at certain peak times.'" (Maj. opn., *ante*, at p. 69.)

The consequence of the trial court's reasoning and the majority opinion's affirmance of it is that it is impossible to set tiered water rates in California. The base-extra capacity method is the only known method for setting tiered rates,[8] and both the trial court and the majority opinion have found that the entire method is based on a false premise. The analysis is based on a clear error: The base-extra capacity method is not based on the assumption that it costs more to deliver water at certain peak times. But the trial court and the majority opinion have determined that it is based on that assumption,

---

[8]    More precisely, plaintiffs' own expert knows of no alternatives to the base-extra capacity method and the commodity-demand method and knows of no one who uses the commodity demand method, and both methods rely on the same peaking concepts like max day and max hour.

and that is a general result that is not limited to the record in this case. The method is set forth in the M1 and is what it is and assumes what it assumes. None of that will vary with the facts of any particular case.

The rest of the trial court's discussion of the issue can be summarized as follows: After describing the 1.5 max day and 2.25 max hour peaking factors used in the COSSs, the statement of decision asserts: "The problem with this theory is that the peaking factor ratios and the cost allocations are not based on actual data. In fact, as the City's expert conceded, at the time of the 2013 and 2015 rate studies, the City simply did not know when customers used water." The statement of decision goes on to explain that the max day and max hour "figures are not based on actual observed data from San Diego single-family residential customers," but rather were drawn from "'industry guidelines' '[i]n accordance with M1 standards' and . . . the City's 2011 'Water Facilities Master Plan' and the 'City Engineering Department.'" But "because the Master Plan does not break down the maximum day or hour data by customer class," defendant "simply did not know whether or how much single-family residential customers contributed to those peak usage levels." Consequently, defendant "did not know whether the demand levels it used to set the single-family residential rates even came from single-family residential customers and not from commercial customers or any other customer class." But "[d]espite lacking the necessary data," defendant "'adopted' the demand or peaking 'factors of 1.5 for the max-day demand and 2.25 for the max-hour demand that were 'set forth in the City's master plan.'" Defendant "then used these peaking factors to allocate nearly half of peak day costs, and all peak hour costs, to customers in Tiers 3 and 4." But defendant "does

not have data to support these allocations, because in addition to having no way of knowing the total maximum day or maximum hour use for single-family customers," defendant "had no time-of-use data" and "therefore did not know whether a particular customer was using water on a peak day or at a peak hour." As a result, defendant "allocated a disproportionate amount of the City's revenue requirements to Tier 3 and Tier 4 customers" on the ground that "Tier 3 and Tier 4 customers are using water during times of peak day and peak hour use, thus requiring the system to be sized larger to accommodate higher volumes of water." But Bui "conceded that Tier 1 and Tier 2 customers *also* use water during peak day and peak hour times, thus contributing to the need for the maximum system capacity," as do "other classes of customers—irrigation, construction, and multi-family residential—whom the City does *not* charge tiered rates." Bui even "conceded that customer classes other than single family residential customers contribute *more* to the need for maximum system capacity than do single-family residential customers." Defendant "simply failed to produce evidence indicating that single-family residential users in Tier 3 and 4 were any more responsible for peak use than any other single-family residential user—or that they were any more responsible than customers in any other customer class." In sum, "[t]he record provides no evidence that it actually costs more to deliver water at peak times, which the City candidly admits. But even if it did, the City does not know how much more it costs, or which customers are responsible for causing the system to peak, and thus which customers purportedly caused the City to expend costs to size the system to meet peak demand."

44

The analysis is meritless because it is just a tangle of confusion, misrepresentation of defendant's methodology, and omission of the data that defendant actually used. To begin at the end, in a sense it is true that there is "no evidence that it actually costs more to deliver water at peak times"—the record does not (to my knowledge) contain evidence that, *once the system has been designed and built to meet peak demand*, it costs more on a per-gallon basis to run the system at peak times than at off-peak times. But the claim is irrelevant, because defendant's cost allocation and rate setting do not assume any such cost disparity. Rather, defendant's methodology assumes that (1) in order to meet day-to-day fluctuations in demand, the system needs to be built 1.5 times larger than it would have to be if demand were constant, (2) in order to meet hour-to-hour fluctuations in demand, the system needs to be built 2.25 times larger than it would have to be if demand were constant, and (3) building a bigger system costs more than building a smaller one.

The statement of decision says that the 1.5 max day and 2.25 max hour factors "are not based on actual data" and "are not based on actual observed data from San Diego single-family residential customers," because they came from defendant's master plan instead of being derived somehow from time-of-use data that identifies how much water each customer is using on an hourly basis. But again, this is confusion. The master plan is exactly where those factors must come from, and the 1.5 max day and 2.25 max hour factors have nothing to do with how much water any individual customer is using in a particular day or hour. Rather, as explained in part II, *ante*, those factors are engineering and design principles used by defendant's engineers for planning, design, and construction—the engineers project how much total demand will be, from that they can

project average demand and the correspondingly necessary base capacity, and they use the 1.5 max day and 2.25 max hour factors to plan and build the system accordingly. There is no role for hourly time-of-use data to play. The statement of decision's argument that the 1.5 max day and 2.25 max hour factors "are not based on actual data" because they are not based on hourly time-of-use data is therefore meritless. The supposedly missing data is actually irrelevant data.

Another point of confusion that runs through the statement of decision's analysis is its conflation of the systemic 1.5 max day and 2.25 max hour factors—which reflect the increased system size needed to accommodate fluctuations in demand—with both the class-specific peaking factors—which reflect the extent to which different customer classes contribute to those fluctuations—and the analysis of customers' historical usage data that was used to apportion the SFR class's costs among the tiers. (See pp. 21, 24-25, *ante*.) The statement of decision never recognizes that those are three different things and play different roles in defendant's methodology. Again, the 1.5 max day and 2.25 max hour factors come from defendant's master plan and are used at an early stage of the cost allocation process, when different cost components (e.g., pumping, treatment, metering) are allocated to base, max day, customer, and so forth. The class-specific factors, which are used at a later step in the cost allocation process, are based on "historical data and usage patterns for the customer classes" and are then checked against "typical" class-specific extra capacity factors provided in the M1, which in turn were "determined from studies conducted throughout the nation," including "demand studies." The statement of decision never mentions that. Those class-specific factors are used to

46

apportion the base, max day, max hour, and other costs among the classes, so that each class bears its share of each of those cost categories. And finally, to set rates for the SFR class, defendant allocated the SFR class's costs to the different tiers by analyzing customers' historical usage data (including proxy data from other customer classes). The statement of decision never mentions that either.

Thus, the statement of decision's claim that defendant used the 1.5 max day and 2.25 max hour "peaking factors to allocate nearly half of peak day costs, and all peak hour costs, to customers in Tiers 3 and 4" actually manages to conflate three different steps in defendant's methodology. In reality, the 1.5 max day and 2.25 max hour peaking factors were neither used to allocate max day and max hour peaking costs to the SFR customer class nor used to allocate the SFR customer class's peaking costs among the tiers. And the statement of decision's sweeping conclusion that defendant's cost allocations were not based on data is completely unsupported—the statement of decision simply fails to mention the data that defendant actually used.

In a similar vein, the statement of decision conflates *paying for peaking costs* with *paying tiered rates*. For example, the statement of decision disparages defendant's methodology on the grounds that customer classes other than SFRs use water at peak times but are "*not* charge[d] tiered rates," that non-SFR classes pay uniform rates but "contribute *more* to the need for maximum system capacity than do single-family residential customers," and that there is no evidence that tier 3 and tier 4 use by SFR customers is "any more responsible for peak use" than use by "customers in any other customer class." All of those criticisms manifest confusion about how defendant's cost

47

allocation actually works.  As explained in part II, *ante*, *defendant allocated peaking costs to every customer class*, and *the share of peaking costs allocated to SFRs was smaller than SFRs' share of total consumption*.  As a result, every customer class paid its share of peaking costs, and SFRs' share was *smaller* than SFRs' share of total consumption.  The non-SFR classes paid their peaking costs via uniform rates, but they still paid them.  Thus, when the statement of decision criticizes defendant's rates on the ground that other classes "contribute *more*" to peaks than SFRs, it confirms yet again that the statement of decision has lost the plot.  In reality, defendant's rates reflect that other classes contribute more to peaks.  As a result, what the statement of decision takes to be a criticism is actually a confirmation that defendant's rates are appropriately cost based.

The statement of decision also claims that defendant "allocated a disproportionate amount of the City's revenue requirements to Tier 3 and Tier 4 customers" because defendant allocated "nearly half of peak day costs, and all peak hour costs, to customers in Tiers 3 and 4."  But the statement of decision fails to acknowledge that the SFR customer class's *base* costs ($97.5 million) were about four times larger than the SFR customer class's max day and max hour costs *combined* ($24.5 million), and *90 percent of SFR base costs were allocated to tiers 1 and 2*, with *none* allocated to tier 4.  The statement of decision's conclusion that "a disproportionate amount of the City's revenue requirements" was allocated to tiers 3 and 4 is consequently unsupported by the statement of decision's own analysis, because the statement of decision never accounts for the fact

that SFR base costs dwarf SFR peak costs and were overwhelmingly allocated to tiers 1 and 2.[9]

The statement of decision's persistent use of ill-defined terms further confuses the issues. The statement of decision repeatedly refers to "Tier 3 and Tier 4 customers," contrasting them with "Tier 1 and Tier 2 customers," but never explains what those terms mean. In reality, the tiers refer not to customers but to levels of water consumption: For every SFR customer, the first 4 HCF are billed at the tier 1 rate, the next 8 HCF are billed at the tier 2 rate, the next 6 HCF are billed at the tier 3 rate, and anything above that is billed at the tier 4 rate. What, then, is a "Tier 4 customer," as opposed to a "Tier 1 customer"? Literally every customer who pays the tier 4 rate for any water in any billing cycle also pays the tier 1 rate, the tier 2 rate, and the tier 3 rate in the same billing cycle.

The statement of decision's references to "Tier 3 and Tier 4 customers" contribute to its misleading treatment of the issues. The statement of decision's argument is that there is a certain group of individuals—"Tier 3 and Tier 4 customers"—who are being charged high water rates that defendant cannot justify, because defendant lacks hourly time-of-use data and consequently does not know how much water those individuals are using at specific times. But once we recognize that tiers 3 and 4 do not refer to particular *individuals* but rather to particular levels of *use*, and specifically to *above-average* use,

---

[9]     What made the tier 4 rate high was not that an inordinate amount of costs were allocated to tier 4 but that there is so little *consumption* at the tier 4 level. Only about 6 percent of SFR use was projected to be in tier 4. And that confirms the reasonableness of defendant's rate setting—tier 4 really is an outlier, representing exceptionally high-level use.

49

the argument collapses. Above-average use contributes more to above-average demand than average or below-average use does, so it is allocated a greater share of the costs of sizing the system to accommodate above-average demand. Defendant may not know what any particular individual (a "Tier 4 customer"?) is doing at any particular time, but defendant does know that tier 4 use is far above average use and hence contributes more to above-average demand than average or below-average use does. The statement of decision never addresses that point.

Once the confusion and misrepresentation and omission of defendant's actual methodology and data are eliminated, all that is left of the statement of decision's criticism is that defendant does not possess and consequently did not base its rates on hourly time-of-use data. But section 6(b)(3) does not require defendant to possess or base its rates on hourly time-of-use data. It requires only that rates not exceed proportional costs. Defendant has provided a reasonable calculation and allocation of costs according to which defendant's rates do not exceed proportional costs. The fact that defendant's cost calculation and allocation are based on data other than hourly time-of-use data does not render them unreasonable.

Moreover, if it were true that section 6(b)(3) requires hourly time-of-use data in order to set tiered rates, then it would be impossible for defendant (and most water utilities in California) to use tiered rates. Given the current physical infrastructure of defendant's water system, it is impossible for defendant to acquire hourly time-of-use data, because it would require sending someone out to read every meter of every customer every hour of every day. Deployment of new technology ("smart meters") may

50

solve that problem in the future. But in the meantime, requiring hourly time-of-use data

means prohibiting tiered rates across the board. And that cannot be correct, because

*Capistrano* recognizes that tiered rates not only have long been constitutional but are

actually "a good idea." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.)

C. *Other issues*

1. *Price discrimination*

The statement of decision concludes that defendant "discriminates" against SFRs

in violation of section 6(b)(3) by charging tiered rates for SFRs but uniform rates for all

other customer classes. (Boldface omitted.) The majority opinion agrees. (Maj. opn.,

*ante*, at pp. 73-75.) The conclusion is erroneous because section 6(b)(3) does not contain

a nondiscrimination provision or otherwise prohibit treating different customer classes

differently. Rather, it requires only that rates not exceed proportional costs. As long as

defendant can provide a reasonable cost calculation and allocation according to which

rates do not exceed proportional costs, defendant's rates do not violate section 6(b)(3).

Defendant has done that, so it does not matter that SFRs are charged tiered rates while

other customer classes are charged uniform rates. Every customer is charged rates that

do not exceed proportional costs, so section 6(b)(3) is satisfied.

The statement of decision argues that defendant's use of the different rate

structures is unlawful because defendant fails to provide "an adequate cost-based

justification" for imposing tiered rates on SFRs while charging uniform rates to everyone

else. The argument fails because section 6(b)(3) does not require a cost-based

justification for the different treatment. As explained in part I, *ante*, there is not just one

right way to calculate and allocate costs. It is always possible to do a uniform cost allocation by dividing total projected costs by total projected consumption. Thus, whenever it is possible to do a tiered cost allocation, it is possible to do both. As long as both allocations are reasonable, section 6(b)(3) allows a water utility to choose either of them, and section 6(b)(3) does not require a cost-based justification for the utility's choice.

The statement of decision relies on *Palmdale* for its discrimination analysis, but that reliance is misplaced. In *Palmdale*, all customers were charged tiered rates, but the rates were different for different customer classes, and the defendant water utility "admittedly target[ed]" certain users "to pay dramatically higher and disproportionate water rates." (*Palmdale*, *supra*, 198 Cal.App.4th at p. 934.) As a result, "[t]he record show[ed] that [the utility] intentionally seeks to recoup most of its costs from a relatively few . . . users . . . , so as to keep costs to the vast majority of . . . customers proportionately low." (*Ibid.*) The facts of *Palmdale* thus showed a straightforward violation of section 6(b)(3): Some customers were being charged rates that dramatically exceeded proportional costs.

Defendant has done nothing comparable in this case. Defendant has produced reasonable cost calculations and allocations showing that no customer's rates exceed proportional costs. Costs are not being disproportionately loaded onto one customer class in order to keep rates low for other customers. In particular, every customer class is bearing its share of peaking costs. SFRs are paying those costs via a tiered rate, and other customer classes are paying them via a flat rate, but all customer classes are paying them.

52

To whatever extent *Palmdale* could be interpreted as implying that section 6(b)(3) prohibits discriminating between customer classes by subjecting them to different rate structures without a cost-based justification for the different treatment, such an interpretation must be rejected, because section 6(b)(3) on its face does no such thing.[10] It requires only that rates not exceed proportional costs.

### 2. *Setting the breakpoints*

The statement of decision makes a similar error by criticizing defendant for setting "breakpoints between the tiers" that "are not based on cost." Just as section 6(b)(3) does not require a cost-based justification for choosing between uniform and tiered rates, it does not require a cost-based justification for the location of the tier breakpoints. Section 6(b)(3) requires only that wherever the breakpoints are set, rates do not exceed proportional costs. As explained in part I.B, *ante*, a water utility is never *required* to set tiered rates, even if the utility is capable of doing a reasonable tiered cost allocation. The utility can always use a (reasonable) uniform cost allocation instead. Similarly, even if a utility is capable of doing an extremely fine-grained tiered cost allocation—perhaps calculating and allocating tiered costs to the hundredth of a penny for each additional gallon of water consumed—the utility is never *required* to set such fine-grained rates. The utility can always use a (reasonable) more coarse-grained structure instead, just as it

---

10      *Coziahr* adopts such an erroneous interpretation of *Palmdale*. (*Coziahr*, *supra*, 103 Cal.App.5th at p. 814 ["*Palmdale* stands for the proposition that rate differentials between groups, whether customer classes or tiers, support an inference of disproportionality—and, to be constitutional, must be supported by evidence of costs justifying the differences"].)

could use the (reasonable) ultra-coarse-grained structure of a uniform rate.  In each instance, all that section 6(b)(3) requires is a reasonable cost calculation and allocation according to which rates do not exceed proportional costs.

It should be noted that even the statement of decision's description of the basis for defendant's tier breakpoints is inaccurate.  As explained in part II, *ante*, the breakpoints were set to reflect average, below average, above average, and exceptionally high-level use.  That is reasonable because the base-extra capacity method allocates costs based on deviations from average use.  The tier 2 breakpoint was set at 12 HCF because analysis of defendant's billing records showed that about half of SFR monthly consumption was 12 HCF, so higher levels of use would be above average.  The tier 1 breakpoint was set at 4 HCF because national survey data show that is less than what a two-person household would typically need for indoor use alone, so use below that level would be below average.  The tier 3 breakpoint was set at 18 HCF because 6 HCF is enough water to maintain an average-sized green lawn, so use above 18 HCF would be above average-plus-a-lawn, that is, very high-level use.  Further analysis confirmed that use above the tier 3 breakpoint (i.e., use billed at the tier 4 rate) is indeed an outlier:  Projections indicated it would be only 6.31 percent of total SFR use.

Considered against that background, the statement of decision's account of the setting of the breakpoints is a barely recognizable caricature.  According to the statement of decision, the tier 1 breakpoint was "based on . . . assumptions about what the water would be used for," because it was based on data concerning "'typical indoor residential water consumption' for a house of two persons."  The tier 2 breakpoint was then set by

54

"adding an allocation for (assumed) outdoor water use."[11]  And the tier 3 breakpoint was then set by including "an additional 'outdoor irrigation or landscape allowance.'"  In sum, each breakpoint was set on the basis of "the assumed use of the water":  defendant "assumed that [tier 3 and tier 4] use was for landscaping" and that tier 1 consumption would be for indoor use.  The majority opinion endorses the statement of decision's descriptions of the tier breakpoints.  (See, e.g., maj. opn., *ante*, at p. 72 ["In setting the pricing for Tiers 3 and 4, City *assumed* that usage in Tiers 3 and 4 was for landscaping"].)

Thus, according to the statement of decision and the majority opinion, defendant assumed that when a household reached 12 HCF of consumption in a given month, the members of the household would stop flushing their toilets, bathing, washing dishes, doing laundry, and cooking with or even drinking tap water, and they would instead devote all of their water use for the remainder of the month to landscaping.  But at the start of the next month, they would not use any water for landscaping until they had used 4 HCF for indoor consumption alone.  The record, of course, reflects that defendant did not make any of those ridiculous assumptions.

In keeping with the statement of decision's false narrative that "the Court in *Capistrano* rejected the same peaking factor analysis from Black & Veatch and consultant Ann Bui that [defendant] relies on here," the statement of decision asserts that

---

[11]    As far as I can tell, this is a pure fabrication.  Defendant has never explained the setting of the tier 2 breakpoint in terms of an allocation for outdoor use.  Defendant has always explained the tier 2 breakpoint in terms of average use, determined by analysis of defendant's customers' billing records.

defendant's explanations of its breakpoints "echo the justifications" given by the defendant in *Capistrano*. But again, all of defendant's breakpoints were explained in terms of average use—which was determined by analyzing defendant's own customers' billing records—and deviations from it, and that is reasonable because the base-extra capacity method allocates costs based on deviations from average use. The breakpoints in *Capistrano*, even as described by the statement of decision itself, were not based on average use and deviations from it. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1499.)

### 3. *Promoting conservation*

The statement of decision repeatedly refers to the fact that in setting the tiered rates for SFRs, one of the goals that defendant intended to promote was water conservation, as though defendant's intention to promote conservation had some tendency to show that defendant's rates violate section 6(b)(3). That is yet another red herring.

Section 6(b)(3) has no intent element. It requires only that rates not exceed proportional costs. If a water utility has produced a reasonable tiered cost allocation according to which the utility's tiered rates do not exceed proportional costs, then the utility has not violated section 6(b)(3), regardless of whether the utility intended to promote conservation by adopting those rates.

### 4. *Factual disputes and substantial evidence*

Like *Coziahr*, the majority opinion purports to limit its own consequences by claiming that "the liability issues are primarily factual." (Maj. opn., *ante*, at p. 54.) That is incorrect. The issues in the case are (1) what defendant did and (2) whether it

56

complied with section 6(b)(3). The first issue is factual but undisputed—we have defendant's COSSs, with additional background and detail provided by Bui's reports. There are no material factual disputes about what defendant did. And the second issue is legal. As a result, there are no material factual disputes in the entire case.

The majority opinion argues that whether defendant's SFR rates exceed proportional costs is a mixed question of law and fact and that substantial evidence supports the trial court's determination that the rates do exceed proportional costs. (Maj. opn., *ante*, at pp. 56-57, fn. 7, 75-78.) The majority opinion accordingly suggests that water utilities should not set tiered rates if "substantial evidence shows the tiered rates" exceed proportional costs "despite the agency's purportedly 'reasonable' cost projections, allocation methods, and data," because as long as such evidence exists, the utility "risks violating section 6(b)(3)." (*Id.* at p. 77.)

That analysis confirms that under the majority opinion it is impossible for California public water utilities to set tiered rates. In this case, the only purported substantial evidence that defendant's rates exceed proportional costs is the opinion of plaintiffs' expert Smith, who rejects the base-extra capacity method because it is based on "a narrative that isn't factually correct," and who claims that tiered water rates based on peaking factors "would require [s]mart meters." That same evidence will be available in any section 6(b)(3) suit against any utility that uses the base-extra capacity method or

does not have smart meters (or both)—counsel in those suits can just retain Smith or a like-minded expert.[12]

The result is that, short of universally deploying smart meters *and thereby imposing the costs of that deployment on customers*, there is nothing that California public water utilities can do to insulate themselves from section 6(b)(3) liability if they set tiered rates. That cannot be correct. The California Constitution does not require public water utilities with tiered rates to increase the cost of water for all of their customers in order to make plaintiffs' expert happy.[13]

IV.     *Conclusion*

Defendant used the only known methodology for constructing a tiered cost calculation and allocation and setting tiered rates, and it applied that methodology to all

---

[12]     Smith has already been retained as an "economic consultant" in a challenge to tiered water rates in Los Angeles, California. Unsurprisingly, he has concluded that the tiered rates are "not defensible." He also has never evaluated a tiered water rate system in California in which he determined that the tier breakpoints were not arbitrary.

[13]     Much more could be said about Smith's various opinions. For example, Smith testified that the 1.5 max day and 2.25 max hour factors used in defendant's COSSs "were just out of the manual" (i.e., taken from the M1) and "did not reflect all the facts of" defendant's actual water system. But the record reflects that the 1.5 max day and 2.25 max hour factors came from defendant's master plan and discussions with defendant's staff, and when the M1 gives examples of max day and max hour factors they are *not* 1.5 and 2.25. Smith's opinion does not constitute substantial evidence that the factors came from the M1, because he provides no support for it and we can see for ourselves that the manual does not contain those factors. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 [substantial evidence must be "'reasonable in nature, credible, and of solid value'"]; *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567 ["expert testimony does not constitute substantial evidence when based on conclusions or assumptions not supported by evidence in the record"].)

of the appropriate data and the only data that defendant had, which is the only data that anyone has (with the possible exception of any utilities that use smart meters). Holding defendant liable for that is like holding an accountant liable for using generally accepted accounting principles.

The trial court's statement of decision is riddled with inaccuracies and fallacious reasoning, but two central errors—expressly adopted by the majority opinion—are particularly harmful. First, the statement of decision and the majority opinion reject the reasonableness standard articulated in pre-*Coziahr* case law. Moreover, having created that split of authority, *Coziahr* and the majority opinion do not say what the new standard is. The result is that public water utilities trying to defend section 6(b)(3) suits do not know what they need to prove in order to prevail. According to *Coziahr* and the majority opinion, it is not enough to provide a reasonable cost calculation and allocation according to which rates do not exceed proportional costs. What is enough? No one knows.

Second, the statement of decision and the majority opinion reject the base-extra capacity method. They say that the method assumes that it costs more to deliver water at certain peak times, and the method is unsound because there is no evidence (particularly no hourly time-of-use data) to support that assumption. That analysis creates a hurdle that no public water utility defending a section 6(b)(3) suit will be able to clear—the base-extra capacity method actually does not rest on that assumption, so no water utility is going to have evidence supporting an assumption it never actually used (and few utilities will have hourly time-of-use data until smart meters are widely deployed). But litigants challenging tiered water rates will argue, as plaintiffs did in this case, that the

method does rely on that assumption, and they will cite the majority opinion as providing definitive support. And without the base-extra capacity method, no California public water utility using tiered rates will be able to defend them. Again, it will be like asking accountants to defend their books without relying on generally accepted accounting principles.

Worse still, I fear that *Coziahr*'s and the majority opinion's errors will actually make it impossible for California public water utilities to defend even *uniform* rates. In setting its tiered rates, defendant was trying to do exactly what *Capistrano* describes as a "good idea": "pass[] on the incrementally higher costs of expensive water to incrementally higher users." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.) If, in the wake of this case and *Coziahr*, water utilities abandon that effort and adopt uniform rates across the board, they will be vulnerable to an argument that they are violating *Capistrano*. Why should customers whose use is far below average pay for having a water system that is far larger than their use makes necessary? (See *Capistrano*, at p. 1503 ["Proposition 218 protects lower-than-average users from having to pay rates that are *higher than the cost of service for them* because those rates cover capital investments their levels of consumption do not make necessary"].) Without the shield of the reasonableness standard, water utilities will have no answer, and their uniform rates will be indefensible.

The Legislature evidently is aware of the crisis created by the litigation in this case and *Coziahr*. One way in which the Legislature has tried to limit the damage is by

enacting a statute that appears to approve both the reasonableness standard and cost allocation based on peaking. Subdivision (b)(1) of Government Code section 53750.6 now provides that "incrementally higher costs of water service associated with higher water usage demands, the maximum potential water use, or projected peak water usage may be allocated using any method that reasonably assesses the water service provider's cost of serving those parcels that are increasing potential water usage demand, maximum potential water use, or projected peak water usage."

The majority opinion concludes that the statute has no impact on this case (see maj. opn., *ante*, at pp. 78-80), and I am inclined to agree that it is of limited utility. Courts must decide for themselves, case by case, whether particular water utilities' rates comply with section 6(b)(3), and courts are constitutionally required to exercise their independent judgment in doing so. (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1507.) A legislative attempt to tell courts how to decide such cases would therefore appear to raise separation of powers concerns. But in my view, Government Code section 53750.6 has at least the following significance: If litigation against accounting firms were producing results that motivated the Legislature to enact a statute clarifying that accountants are *allowed* to use generally accepted accounting principles, then perhaps that should lead courts to consider whether we may have gotten something terribly wrong.

This appeal presented the opportunity to clarify the law in this area and thereby make it easier for trial courts to dispose of wholly meritless lawsuits like this one. Unfortunately, the majority opinion has not only missed that opportunity but also has achieved the opposite result, making it impossible for California public water utilities to

defend tiered rates, and arguably impossible to defend any rates at all.  For all of the

foregoing reasons, I respectfully dissent.

MENETREZ           

J.
